# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**,

v.

**RAYMOND ZARECK.**

Defendant.

Criminal No.   09-168

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge

Pending before the court is a motion to suppress evidence (the "Motion") (ECF No. 37) filed by defendant Raymond Zareck ("defendant" or "Zareck").  On April 13, 2009, the United States government ("government") filed a criminal complaint charging defendant with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g).  (ECF No. 1.) On May 13, 2009, a federal grand jury in the Western District of Pennsylvania returned a one-count indictment charging defendant with that offense.  (ECF No. 5.)  On November 25, 2009, defendant filed the Motion in which he makes three arguments for suppression of evidence in this matter: 1) the search of his vehicle was conducted without a warrant, probable cause, or exigent circumstance, thereby violating his constitutional rights under the Fourth Amendment of the Constitution of the United States; 2) he made statements while in police custody relating to the purchase or assembly of firework or improvised explosive devices without first being read his <u>Miranda</u> warnings, which violated his constitutional rights under the Fifth Amendment of the Constitution of the United States; and 3) the search of his residence was premised on a fatally flawed affidavit of probable cause, thereby violating his constitutional rights under the Fourth Amendment of the Constitution of the United States.

On December 15, 2009, the government filed a response to the Motion. (ECF No. 52.) On May 27, 2010, the court held an evidentiary hearing on the Motion during which witnesses testified and exhibits were entered into evidence. On June 29, 2010, the court continued the evidentiary hearing. On July 21, 2010, the court held a hearing to determine if defendant was entitled to a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), to challenge the truthfulness of factual statements made in the affidavit of probable cause supporting the warrant issued to search his residence. The court ordered the parties to submit proposed findings of fact and conclusions of law addressing three issues: 1) whether the search of the vehicle was appropriate, 2) whether defendant's statements should be suppressed, and 3) whether the search warrant was supported by probable cause. The government did so on October 27, 2010; defendant did so on November 3, 2010; and the matter is ripe for the court to make the following findings of fact and conclusions of law.

## I. Findings of Fact

### Defendant's Arrest, Search of Vehicle and Questioning of Defendant

1.      Defendant is charged in a federal indictment with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

2.      A confidential informant ("CI") informed officers of the Homestead Police Department ("HPD") that defendant would be purchasing illegal narcotics on the evening of April 3, 2009. (Hr'g Tr. 12, May 27, 2010.)

3.      An officer conducted a surveillance of defendant's vehicle during the alleged illegal purchase. (Id. at 43.)

4.      Officer Fusco ("Fusco") followed defendant's vehicle back from the location of the

illegal purchase to the Waterfront shopping center where defendant was stopped by Officer Wintruba ("Wintruba"), who was aware that defendant had purchased stamps bags of heroin and two rocks of crack cocaine.  (Id. at 43-44.)

5.      Wintruba observed the license plate of defendant's vehicle at the time defendant pulled into the Waterfront parking lot and just before the officers initiated the arrest.  (Id. at 38.)  The sticker on the license plate was expired as of December 2008.  (Id.)  Having an expired registration is an offense for which Homestead Police may tow and conduct an inventory search of a vehicle.  (Id.)

6.      Wintruba testified that in effectuating the arrest of the passenger in Zareck's vehicle, he looked inside the vehicle:

> At that time I had a clear, unobstructed view.  What I look for, I
> look at the passenger seat, I look at the arm rest, I look at the floor,
> I look everywhere where the person inside the vehicle could have
> an arm's reach, what we call wingspan.

(Id. at 47.)

7.      Wintruba testified that while looking into defendant's vehicle, he observed an eight-to-ten-inch long green rope-like cord sticking out from the vehicle's center console.  (Id.  at 47-48.) Wintruba did not ask defendant what was at the end of the cord because defendant was "fighting to stay inside the running vehicle, left hand on the steering wheel, right hand reaching for the center console, trying to pull away from the officers effectuating the arrest."  (Id. at 48.)

8.      Wintruba did not observe any weapons, drugs or drug paraphernalia, only a "green rope-like device hanging out of the console."  (Id. at 47.)

9.      Wintruba did not know what was on the other end of the green wick prior to opening the center console.  "I had no idea what was at the end."  (Id. at 52.)  "I went in there to go ahead and

alleviate my concerns." (Id. at 53.)  Wintruba described the wick as "very similar to what is used on heavier professional [firework] types." (Id. at 51.)

10.     After handcuffing and securing the passenger, Wintruba "opened up the armrest . . . removed [the device] from the vehicle" and then placed the item on the vehicle's trunk and photographed it.  (Id. at 16.)  Wintruba "was concerned with the wick.  I've never seen a wick sticking out of a center console before like this, a fuse-type device.  Whenever I lifted up the lid, I became alarmed at what I saw." (Id. at 50.)  "The wick appeared to be some type of flammable type of device. . . ." (Id. at 50-51.)  Wintruba stated:

> Once I picked that device up from the center console – actually, I
> became extremely concerned and I backed out of the vehicle very
> cautiously, alerting all the officers around we got a problem.  Look
> what's inside his car.  Everyone be careful.

(Id. at 29.)

In describing the device, Wintruba testified:

> If I can recall, it didn't feel very light like it was hollow. It was
> very heavy. I also recall that the ends of the device, of the tube
> were sealed kind of crudely with some type of sealant, some type
> of jagged edge type of gray dark matter. It was wrapped in red,
> kind of like a tether, not real professional or real new. It looked
> like it was kind of crude.
> . . .
> [The device] seemed to be crudely made versus something that was
> professionally made.

(Id. at 30.)

11.     Wintruba did not serve in the military or have any ordinance or explosive training, and his department did not have a bomb squad.  (Id. at 51).

12.     Officer Ronald DePellegrin ("DePellegrin"), of the HPD, described the device as a "cylindrical tube" or "round cylinder object," which did not appear to be metal in composition.

(Hr'g Tr. 42-43, June 29, 2010.)

13.     The officers removed the tube from the vehicle and turned it over to the Allegheny County Bomb Squad ("ACBS"), which later detonated it.   (Hr'g Tr. 15, May 27, 2010; Govt. Ex. 2.)

14.     After defendant was removed from the vehicle and placed under arrest, a search of defendant's person incident to arrest produced a clear knotted baggie containing seven stamp bags of heroin and two rocks of crack cocaine.  (Id. at 44-45.)  Wintruba observed the arrest and the search of defendant.  (Hr'g Tr. 17, June 29, 2010.)

15.     Fusco gave defendant his Miranda warnings verbally immediately upon arrest.  (Id. at 24.)

16.     After defendant and the passenger in his vehicle were arrested, officers seized the vehicle. (Hr'g Tr. 54, May 27, 2010.)

17.     Wintruba testified the HPD's policy concerning conducting an inventory and towing a defendant's vehicle is that once a defendant is in custody, officers do a vehicle inventory, which requires looking inside the center console.  "Once the occupants are removed from the vehicle, the vehicle then becomes the responsibility of the Homestead Borough Police Department, at which time an inventory is done and the vehicle is secured to a tow yard."  (Id.)  The police department has a "form that we document the removal of items or the identification of items inside the vehicle."  (Id. at 19.)[1]

18.     The search and seizure of the device preceded the inventory search.   (Id. at 54.)

19.     Defendant was handcuffed behind his back and placed in a police vehicle driven by

---

[1] Defendant did not contest the existence of the HPD's policy concerning the inventory and towing of a defendant's vehicle once a defendant is arrested.

Wintruba. (Id. at 19. )

20. Wintruba initially headed towards the West Homestead Police Station ("WHPS"), approximately one mile from the Waterfront shopping center, and with whom Homestead Police has a contract in order to utilize West Homestead's holding cells and processing area. (Id. at 20.) Just before arriving at the WHPS, Wintruba received a radio transmission that he should take defendant to the Homestead Police Station ("HPS") instead. (Id.). Wintruba turned the police vehicle around and headed toward the HPS, which is approximately one mile from the WHPS. (Id. at 20-21.)

21. Wintruba had his radio on scan mode to monitor the local fire departments and ambulance services and recognized the voice of the Homestead Fire Department chief over the radio. (Id. at 21.)

22. Wintruba testified that the chief broadcast something to the effect that "this is a dangerous device. This is an explosive device. Notify the Allegheny County Bomb Squad." (Id.)

23. Upon hearing this broadcast, defendant became "very agitated, ranting, making statements that it isn't an explosive device. This isn't a big deal. They're wrong. He continued on, this is nothing more than a Bumble Bee fireworks that you buy at the Target Store that I disassemble. This is nothing more than this." (Id. at 22.)

24. Wintruba tried to calm defendant down, stating "we'll talk about this once we get back to the station. Don't get yourself all upset. We'll deal with this at the station." (Id.)

25. Once Wintruba and defendant arrived at the station, Wintruba went over "general booking information" with defendant. (Id. at 23.)

26. Wintruba read defendant his Miranda warnings from a warning form. (Id. at 24; Govt.

Ex. 1.)

27.     Defendant's handcuffs were repositioned from the back of his body to the front to facilitate the completion of forms.  He initialed each line after statements appearing on the Miranda form were read to him and signed the bottom of the form.  (Id. 25.)  Wintruba's signature also appears at the bottom of the Miranda form, along with the date and the time.  (Id.)  Wintruba testified that defendant agreed to speak to the officers after waiving his Miranda rights. (Id. at 25-26; Govt. Ex. 1.)

28.     Thereafter, defendant was questioned by Wintruba.  (Id. at 26.)  Initially the questioning "focused in on the drugs he possessed that he just purchased."  (Id.)

29.     Wintruba testified that defendant became agitated while in the police station upon hearing radio communications regarding the device  (Id. at 28), and uttered, "they are Bumble Bee explosives, these are things you can buy at any Target store.  He takes these items apart. He does this on his own. He's not that dangerous."  (Id. at 29.)

30.     In light of the information that was coming over the radio channel, the focus of the questioning of defendant changed to address the device that was found in defendant's car.  (Id.)

31.     Wintruba took notes of his interview of defendant "on a long scrap piece of paper . . . and placed into the body of the incident report."  (Id. at 73).

32.     With respect to the incident report, Wintruba testified:

> [S]tarting with Item 33, Line Item 33 clearly states what I found out after the fact from the Allegheny County Bomb Squad with some of the information that came from the briefing.
>
> As I continue to go down to Line Item 40, that's when I go ahead and I get into more of the information about some of the items that were coming up during our questioning, some of the items which were given after he was Mirandized and we were having our conversation.

(Id. at 69.)

33.    Wintruba acknowledged that the affidavit of probable cause did not contain any

statements made by defendant relating to purchasing, possessing, assembling, disassembling, or

utilizing fireworks, explosives or IEDs at his residence.  (Id. at 73-74.)

        The Search Warrant

34.    At approximately 2:00 a.m. on April 4, 2009, Wintruba made application for and

received a search warrant from the magisterial district justice, who was on duty at the City of

Pittsburgh, Pennsylvania magistrate court, for the residence of defendant at 3379 Parkview

Avenue, Pittsburgh, Pennsylvania 15213.  Defendant's residence is located in Oakland section of

Pittsburgh.  (Id. at 12, 31-34; Govt. Ex. 2.)   The Borough of Homestead[2] is not within the city

limits of Pittsburgh.

35.    The scope of the search warrant, i.e. identity of the items to be searched for and seized,

was described as:

            improvised explosive devices, which are a danger to the public and
            surrounding homes, explosives and bomb-making material, to
            include explosive powders, components, fuses and instructional
            material used to manufacture explosive devices.

(Hr'g Tr. June 29, 2010 at 16-17 (Govt Ex. 2)).

36.    Wintruba "recall[ed] sitting down [at the HPS] as we were encouraged to go ahead and

initiate a search warrant by the experts. We were going over all of our different experiences that

---

[2]        The court takes judicial notice of this fact.  United States v. Grape, 549 F.3d 591, 604 (3d Cir. 2008) (citing
United States v. Remoi, 404 F.3d 789, 793 n.1 (3d Cir.2005); Werner v. Werner, 267 F.3d 288, 295 (3d Cir. 2001)
("A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute ... [and such
a] fact must either be generally known within the jurisdiction of the trial court, or be capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be questioned." (citing FED. R. EVID. 201)).

evening." (Hr'g Tr. 79, May 27, 2010.)

37.     The search warrant was drafted after Wintruba's briefing by members of the ACBS, who were on the scene and had detonated the device seized from defendant's vehicle. Concerning the narrative of the search warrant, Wintruba stated:

> There was [sic] some things which were pulled out which I believe were put into the narrative of the search warrant. The Allegheny County Bomb Squad was responsible for the go ahead and initiating their own reports and their officers were taking the notes.

(Id. at 65.) Wintruba did not recall seeing the notes or reports drafted by members of the ACBS prior to or after drafting the search warrant affidavit. (Id. at 66, 87). The narrative of the affidavit of probable cause provides:

> The Homestead Police Department was conducting a narcotic buy bust with in [sic] the borough of Homestead. Officers arrested Raymond J. Zareck with in [sic] his 2007 Chevrolet Malibu SDN at the Waterfront McDonalds. Officers observed a green fuse sticking out of the center console. Officers are familier [sic] with this type of fuse which is consistent with an improvised explosive device. Officers opened the center console & observed a pipe type object which was approximately 8" long. The object was wrapped with tape & had glue on each end. A 12" green fuse was sticking out of one end. The device appeared to be a homemade pipe bomb. Officers secured the area & contacted the Allegheny County Bomb Squad. Raymond Zareck was transported to WHPD then to HPB for processing. Zareck was mirandized and questioned regarding the improvised explosive device. Zareck stated to Ofc. Wintruba & Fusco that he purchases "Bumble Bee" commercial fireworks at Target Department Stores. Zareck then takes the fireworks to his residence at 3379 Parkview Ave. Pittsburgh, PA 15213 disassembles them and creates improvised explosive devices. Zareck stated that he takes the flash powder out of several commercial fireworks and condenses the flash powder into one cardboard tube. He them applies a fuse and glue to each end. Finally he tapes the tube up with cloth tape. Zareck is unsure how much additional flash powder is with in [sic] his residence, but did state that it is not in any type of fire retardent [sic] cabinet nor does he have any type of automatic fire supression [sic] devices. Zareck's residence is a row house with multiple family

residences on each side.

Homestead Police and Fire Departments evacuated the Waterfront McDonalds & Get Go gas station prior to the bomb squads [sic] arrival. Allegheny County Bomb Squad arrived on scene & took possession of the device. The device was transported to a vacant area on the Waterfront & detonated. Bomb Technicians Robert Synan & Mark Divelbiss advised officers that the device was infact [sic] an improvised explosive device. They went on to state that the flash powder Zareck is using in these types of devices is extremely volitile [sic] & dangerous. In addition, depending on how much flash powder is located with in [sic] Zareck's residence this could prove to be a dangerous and hazardous condition for the surrounding neighbors & the public. The technicians Synan & Divelbiss stated that they have had prior experience with bomb makers of this type. They stated that these bomb makers do not make just one improvised explosive device, but infact [sic] make several at a [sic] one time.

During officers [sic] interactions with Zareck he appeared to be unstable in his demeaner [sic] and possesses a violent criminal history, with multiple weapon and drug charges. While being interviewed at HPD Zareck assaulted officers, attempted to escape & attempted to destroy evidence. Officers managed to subdue Zareck, but not before he destroyed one piece of evidence.

Based on the above information and the advice of the Allegheny County Bomb Squad Technicians we respectfully request the issuance of a search warrant for the residence & curtilage located at 3379 Parkview Ave. Pittsburgh, PA 15213 for the safety of the public as a whole.

Aff. of Probable Cause (Govt. Ex. 2.)

38.     Wintruba was briefed by technicians from the ACBS about "what happened down at the

Waterfront while [he] was at [the] station." (Id. at 34-35.) In describing the briefing of the

ACBS, Wintruba testified that the technicians described the device seized from the defendant's

vehicle as follows:

very hot, very unstable.
    They were concerned of how the ends were sealed . . . about the
crudeness, how it was made. This was not a person that would

have made one or two of these.
    They were stating in their experience, they highly encouraged us to go forward with the search warrant, that the individual that made this would have made more and does make more.

(Id. at 35.)

39.     During defense counsel's cross-examination of Wintruba he asked  whether defendant

made the statements, averments or inferences contained with the search warrant affidavit:

DEFENDANT'S COUNSEL:   Are those my client's words or are those your words?

WINTRUBA:   Actually, a lot of the terminology was cleaned up. For example, improvised explosive device. I was told by the bomb experts from the Allegheny County more specific terms versus a device as you described earlier in the testimony.
    I was – they were educating me on what was there and what happened.

DEFENDANT'S COUNSEL:   I understand that, but you're alleging interviewing my client, Officer, in reference to what he does at his residence.
    Did he tell you that he disassembled commercial fireworks and then created IED's?

WINTRUBA:   I don't believe Mr. Zareck spoke in such professional terminology as that. I believe he used more layman's terms.

DEFENDANT'S COUNSEL:   It then says Zareck stated that he takes the flash powder out of several commercial fireworks and condenses the flash powder into one cardboard tube.
    Did he tell you that or are those you're words?

WINTRUBA:   They're my words after we had our interview that he told me of his process that he uses to go ahead and to manufacture these devices.

DEFENDANT'S COUNSEL:   Okay. So your testimony here today is that my client told you that he takes flash powder out of the commercial fireworks he purchases at Target, is that what your testimony is?

WINTRUBA:   I don't recall Mr. Zareck saying flash powder. I do recall Mr. Zareck saying he disassembles them.  I do recall Mr. Zareck saying where he purchases them, how he does it, how he combines it. We talked about his house, where he does that, we talked about the general facility of his residency.

(Hr'g Tr. at 88-89, May 27, 2010.)

40.     Wintruba acknowledged that the term "flash powder" was terminology he learned from the bomb squad.  (Id. at 89.)

41.     Wintruba ran defendant's criminal history two or three times prior to the application for the search warrant, and included a summary of the criminal history when drafting the affidavit of probable cause.  (Hr'g Tr. 22, June 29, 2010.)

42.     The search warrant was executed on April 4, 2009, at defendant's residence by Wintruba and other officers of the HPD, who located and seized a Remington 12-gauge shotgun in the upstairs front bedroom of the residence.  (Hr'g Tr. 36, May 27, 2010.)  DePellegrin testified that he did not see the shot gun immediately when he entered the bedroom, but that when he "entered deep into the bedroom" he saw the shot gun "barrel up"  "either on the wall or against the clothes hutch."  (Hr'g Tr. 35-36, June 29. 2010.)  DePellegrin testified that he did not have to move anything out of the way to discover the gun.  (Id.)  The 12-gauge Remington Shotgun seized had serial number 163784V, and forms the basis of the instant indictment.  Wintruba testified that Homestead Police officers executed the warrant in conjunction with officers from the City of Pittsburgh Police Department.  (Hr'g Tr. 33, 34, May 27, 2010; Govt. Ex. 4.)

43.     DePellegrin was familiar with Zareck's criminal history prior to execution of the search warrant and was aware he was a convicted felon.  (Hr'g Tr. 37 June 29, 2010.)

44.     DePellegrin testified that the shotgun was seized for evidence reasons because "[a] shotgun would be a firearm not to be possessed by a former felon."  (Id. at 38.)  DePellegrin

testified that Wintruba or Fusco told others and him in the pre-raid briefing that, "[w]e were doing a search warrant for that kind of items [IEDs and bomb-making materials], but any other elements of a crime that's found while in the, conducting a search warrant is, you know, subject to seizure by police." (Id.)

45.     DePellegrin did not review the search warrant prior to its execution at defendant's residence.  (Hr'g Tr. 38, May 27, 2010.)  DePellegrin was briefed with respect to the information contained in the search warrant prior to the search of defendant's residence and the seizure of the shotgun (Hr'g Tr. 39, June 29, 2010), including information on defendant's criminal history. (Hr'g Tr. 36-37, May 27, 2010.)

Franks Hearing

46.     Defendant filed a motion for a Franks hearing alleging that the narrative of the search warrant affidavit of probable cause contained knowing or reckless false or misleading information, which was necessary to the probable cause determination.  Franks v. Delaware, 438 U.S. 154 (1978).

47.     On July 22, 2010, the court held a hearing to determine whether defendant was entitled to a Franks hearing.  The court informed the parties that under Franks the inquiry was two-fold: a) "The first question is whether or not there's been a preliminary showing of a knowing or reckless inclusion of false information that was necessary to the probable cause determination"; and b) "[t]he second inquiry is if that material is excised from the warrant, would the warrant still support the probable cause necessary for the issuance of the warrant."  (Hr'g Tr. 2, July 22, 2010) (citing Franks, 438 U.S. at 171-72).

48.     With respect to the first inquiry of the test for a Franks hearing, the court concluded that it was a close question whether any words should be stricken from the search warrant affidavit.

The court made a preliminary ruling that the search warrant affidavit contained some untruths.

Id. at 3.)  The language in issue was:

Paragraph One:

"Officers are familier [sic] with this type of fuse, which is consistent with an improvised explosive device."

"The device appeared to be a homemade pipe bomb."

"regarding the improvised explosive device."

"and creates improvised explosive device."

"flash"

(Id. at 14-17.)

Paragraph Two:

"flash"

"flash"

(Id. at 21, 23.)

Paragraph Three:

"possesses a violent criminal history, with multiple weapon and drug charges."

(Id. at 24.)

49.    With respect to the second inquiry of the test for a Franks hearing, the court provided the

benefit of any doubt to defendant and performed a line-by-line review of the search warrant

affidavit, excising the language in issue from the search warrant affidavit.

50.    With respect to the court's findings related to the requisite two-pronged inquiry to

determine if a Frank's hearing was warranted, the court stated, "I'm not making a final resolution

[about the first inquiry of the Franks test].  I'm just saying let's assume all of this is excised what

14

we have gone through here, is there still enough on the face of the affidavit to support probable

cause?"  (Id. at 30.)  In resolving that issue, the court quoted United States v. Laville, 480 F.3d

187, 194 (3d Cir. 2007):  "Probable cause exists whenever reasonably trustworthy information or

circumstances within an arresting officer's knowledge are sufficient to warrant a person of

reasonable caution to conclude that an offense has been or is being committed by the person

being arrested".   (Id. at 32-33.)

     The court explained:

> THE COURT:  So, what the Court is saying there is that, as I
> indicated here, if there's a showing to warrant the hearing,
> then you have the hearing and if there's a preponderance of
> the evidence of the matters that are in contention that are
> shown to be recklessly or intentionally untruthful, then the
> Court has to consider whether the remaining content is
> sufficient to establish probable cause.
>
>     So here the Court would say to look at the
> affidavit as it would remain after the showing. It all comes
> down, and this is where I would disagree with [defendant's
> counsel] the thrust of the affidavit is not so much what Mr. Zareck
> said.
>
>     Mr. Zareck was saying he had some commercial
> firework material in his home, that he takes powder out of
> those fireworks and he then puts them together into one
> cardboard tube and he didn't know how much additional powder he
> had at his residence; but then you have the bomb squad
> being called, detonating the device, saying that it was an
> improvised explosive device, saying that the powder is
> extremely volatile and dangerous and that that could prove to
> be dangerous to the surrounding neighbors and public and they
> have had experiences with bomb makers in the past and the bomb
> makers do not just make one explosive device at a time, it
> makes several together.
>
>     So, when you read the testimony and you recall the
> one decision that I read from which said that you can look at
> hearsay and say if there's a credibility to it and here you
> have individuals who are part of the Allegheny County bomb
> squad making these statements, that adds the sufficient
> information that a reasonable magistrate in issuing the
> warrant could consider and would support probable cause to

believe that this type of contraband or dangerous devices
could be located at the residence.

(Id. at 34-35.)

51.    The court determined, after excising the challenged language, that the description of  the

actions and statements of the bomb squad in paragraph two of the search warrant affidavit

provides sufficient probable cause for the issuance of the search warrant and denied the motion

for a Franks hearing.[3]  The court stated:

> THE COURT: I have already gone through I think in
> some detail the case law and the review of the Court of the
> affidavit.
> So the Court's view would be to assume for purposes of this
> hearing that the sentences and phrases and words that we've
> reviewed were actually excised, that there, the warrant
> would still provide sufficient -- the remaining portions of
> the warrant would still provide sufficient probable cause to
> support the issuance of -- the affidavit would still provide
> sufficient probable cause to support the issuance of the
> search warrant. The Franks hearing will not be held.

(Id. at 39.)


## II.    Conclusions of Law

### A.    Search of Defendant's Vehicle

1.    As a general rule, the burden of proof is on the defendant who seeks to suppress

evidence.  United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).  Once the defendant

establishes a basis for his motion, "the burden shifts to the government to show that the search or

seizure was reasonable."  Id.

---

[3]    While the court found a close question existed with respect to the first inquiry of the Franks test, the second
inquiry was not close; the remaining portions of the affidavit provided probable cause to support the issuance of the
search warrant.  (Hr'g Tr. 25, July 22, 2010.)

2.	The Fourth Amendment to the United States Constitution provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. CONST. amend. IV.

3.	The Fourth Amendment generally requires police to secure a warrant before conducting a search.  Maryland v. Dyson, 527 U.S. 465, 466 (1999) (citing California v. Carney, 471 U.S. 386, 390-91 (1985)).

4.	"'The touchstone of the Fourth Amendment is reasonableness.'" United States v. Mundy, 621 F.3d 283, 287 (3d Cir. 2010) (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)). In determining whether reasonableness exists in the context of a warrantless search, the Court of Appeals for the Third Circuit in Mundy instructed:

> Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies.  *California v. Acevedo,* 500 U.S. 565 . . . (1991) ("It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." (quotation marks omitted)); *see also Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). "Such exceptions are based on the Supreme Court's determination that a particular search is reasonable, that is, that the government's legitimate interests in the search outweigh the individual's legitimate expectation of privacy in the object of the search." *United States v. Salmon,* 944 F.2d 1106, 1120 (3d Cir.1991).

Mundy, 621 F.3d at 287.

5.	An exception to the warrant requirement for a search is the inevitable discovery doctrine. The government has the burden of proving that the subject evidence would have been inevitably discovered.  Nix v. Williams, 467 U.S. 431, 449 (1984); United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998) (determining that the government's burden can be met by

establishing that the police, following routine procedures, would inevitably have uncovered the evidence). The government argues that, even if Wintruba lacked probable cause to perform a warrantless search of defendant's vehicle, the inevitable discovery doctrine remedies any constitutional violation. The government asserts that the HPD would have inevitably discovered the device upon conducting an inventory search of defendant's vehicle once the officers took the vehicle into custody.

"If the prosecution can establish by a preponderance of the evidence that [the item seized] ultimately or inevitably would have been discovered by lawful means . . . [then] the evidence should be received." <u>Nix</u>, 467 U.S. at 432; <u>see e.g.</u>, <u>United States v. Ethingor</u>, No. 09-13342, 2010 WL 2836755, at *3 (11th Cir. July 21, 2010) (concluding that although the vehicle could not have been lawfully searched incident to arrest, the firearm was admissible under the inevitable discovery exception to the exclusionary rule because it would have been found by police during the inventory search of the vehicle); <u>United States v. Mendez</u>, 315 F.3d 132, 137-38 (2d Cir. 2002) (handgun found in glove compartment admissible under inevitable discovery doctrine though original search illegal).

In <u>United States v. Mundy</u>, 621 F.3d 283 (3d Cir. 2010), the Court of Appeals for the Third Circuit recently considered the inevitable discovery doctrine in the context of a Fourth Amendment violation. In <u>Mundy</u> the defendant was stopped by two patrol officers for an apparent violation of the motor vehicle code for making a right turn without using a turn signal and for excessively dark window tinting. <u>Mundy</u>, 621 F.3d at 285. After the defendant was unable to locate documentation for the vehicle, the officers checked the vehicle registration and license plate number. The officers determined there was no registration information of record for the vehicle and directed the defendant to exit the vehicle. The defendant was placed in a

patrol car and the officers radioed for a tow truck.  Id. at 285-86.  While the defendant was in the patrol car, one of the officers searched the interior of the vehicle and the trunk.  In the trunk was, among other things, a closed shoebox, which the officer opened.  The shoebox contained a substantial amount of a substance that appeared to be cocaine.  The officer replaced the items, closed the trunk of the vehicle, and placed the defendant under arrest.  The officers did not complete a towing report listing the items found during the search.  Id. at 286.   A search warrant was issued for the vehicle and after execution of the warrant, suspected cocaine was seized from the trunk.  Id.

The defendant was charged, among other things, with possession with intent to distribute illegal narcotics.  The defendant moved to suppress the evidence found during the search, arguing that the stop and the search violated his rights under the Fourth Amendment.  Id.   At the hearing on the motion to suppress, the officer, who first opened the trunk and looked inside the shoebox, testified that he found the drugs during a routine inventory search of the defendant's car.  The local police policy provided that, in order to protect the police from claims of missing property and damage, the contents of a vehicle must be inventoried.  The defendant argued that the officer did not have probable cause to search the vehicle.  The district court concluded that the search was conducted pursuant to a valid inventory search in accordance with the police department's policy and denied the motion to suppress.  On appeal after a jury convicted the defendant, the defendant argued that the district court erred in admitting into evidence the drugs seized during the warrantless inventory search of the vehicle.  Id. at 287-88.

In affirming the district court's decision to deny the suppression of the evidence, the court of appeals discussed the inevitable discovery exception to the Fourth Amendment's prohibition against warrantless searches:

The Supreme Court has determined that one exception to the warrant requirement is for inventory searches of lawfully seized automobiles. *Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 138, 93 L.Ed.2d 739 (1987); *Illinois v. Lafayette,* 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L..Ed.2d 65 (1983) ("[T]he inventory search constitutes a well-defined exception to the warrant requirement."); *South Dakota v. Opperman,* 428 U.S. 364, 372, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) ("[I]nventories pursuant to standard police procedures are reasonable."). Inventory procedures serve three "strong governmental interests": "[1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen, or vandalized property, and [3] to guard the police from danger." *Bertine,* 479 U.S. at 372, 107 S.Ct. 738.

Lawful inventory searches must be "conducted according to standardized criteria" or established routine, consistent with the purpose of a non-investigative search. *Id.* at 374 n. 6, 107 S.Ct. 738. This requirement "tend[s] to ensure that the intrusion w[ill] be limited in scope to the extent necessary to carry out the caretaking function." *Opperman,* 428 U.S. at 375, 96 S.Ct. 3092. The criteria or routine must limit an officer's discretion in two ways: first, as to *whether* to search the vehicle, and second, as to the *scope* of an inventory search. *Salmon,* 944 F.2d at 1120-21 (citing *Florida v. Wells,* 495 U.S. 1, 4-5, 110 S.Ct. 1632, 109 L.Ed. 2d 1 (1990); *Bertine,* 479 U.S. at 374 & n. 6, 375-76. 375-76, 107 S.Ct 738). These limitations ensure that officers performing these caretaking functions are " 'not [ ] allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime.' " *Id.* at 1120 (quoting *Wells,* 495 U.S. at 4, 110 S.Ct. 1632 (quotation marks omitted)); *see also Wells,* 495 U.S. at 4, 110 S. Ct. 1632 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").

Mundy, 621 F.3d at 287-88.

The defendant in Mundy argued that the police policy for the inventory searches in issue did not permit the officers to open closed containers. The court of appeals declined to create a formulaic "rule of constitutional dimension that requires an inventory search protocol to predict every conceivable scenario an officer may happen upon while conducting an inventory search."

Id. at 290.  The court of appeals instructed:

> Such a requirement would not only prove unworkable, but would run contrary to the letter and spirit of *Bertine* and *Wells. See United States v. Andrews,* 22 F.3d 1328, 1336 (5th Cir. 1994) (upholding inventory search involving an officer's reading of incriminating evidence inside a notebook recovered pursuant to an inventory search, reasoning that neither *Bertine* nor *Wells* "requires a law enforcement agency's inventory policy to address specifically the steps that an officer should take upon encountering a closed container").

> Instead, "reasonable police regulations relating to inventory procedures," *Bertine,* 479 U.S. at 374, 107 S.Ct. 738, mean that "[t]he policy or practice" is "designed to produce an inventory," *Wells,* 495 U.S. at 4, 110 S.Ct. 1632, and that the criteria do not allow officers "so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of a crime.' " *Id.* (quoting *Bertine,* 479 U.S. at 376, 107 S.Ct. 738 (Blackmun, J., concurring)). Those principles are satisfied here.

Mundy, 621 F.3d at 290-91 (footnote omitted);  see United States v. Morris, 179 F. App'x 825, 828 (3d Cir. 2006) (affirming the district court's order denying a defendant's motion to suppress evidence of drugs discovered during a warrantless search of the defendant's truck following the defendant's arrest for drunk driving under the doctrine of inevitable discovery based upon the district court's finding that the officers inventoried the defendant truck vehicle in accordance with standardized method and policies); United States v. Humphries, No. Crim. 04-CR-535, 2004 WL 2743432, at * 7 (E.D. Pa. Nov. 29, 2004) (denying a defendant's motion to suppress upon finding that all evidence regarding the discovery of the defendant's  gun was admissible at trial pursuant to the inevitable discovery exception to the warrant requirement under the Fourth Amendment where the officers conducted a valid inventory search of the defendant's vehicle under Philadelphia's "live stop" procedure).

6.	In <u>United States v. Sinkler</u>, 267 F. App'x 171 (3d Cir. 2008), the defendant was pursued by the police in a high speed car chase, which ended in a collision. The officers involved in the chase searched a backpack located fifteen feet away from the defendant's vehicle at the scene of the incident and found over fifty grams of crack cocaine and drug paraphernalia. The examination search of the backpack at the scene of the arrest was not conducted pursuant to an inventory search. <u>Id.</u> at 175. It was noted, however, "that even if the backpack was not examined at the scene of the arrest its contents would have been discovered in an inventory search conducted at police headquarters[.]" <u>Id.</u> An inventory search was conducted at police headquarters. <u>Id.</u> The defendant moved the district court to suppress the drug evidence. The district court denied defendant's motion and the defendant appealed. The court of appeals remanded the case back to the district court on the basis that the record was insufficiently developed to support a finding that the backpack had been searched incident to a lawful arrest or that it had been abandoned or subjected to an inventory search. On remand, the district court after an evidentiary hearing held:

> [N]otwithstanding the fact that a search is invalid because it was not conducted incident to an arrest or because it was not conducted as an inventory search, items seized during a warrantless search will not be suppressed if the police would have discovered such items in the normal course of business.... Because the Court finds that the backpack would inevitably have been inventoried along with the other items confiscated at the arrest scene pursuant to established inventory policy and practice, the narcotics and paraphernalia seized from the backpack will not be suppressed.

<u>Id.</u> at 173.

Thereafter, the defendant appealed on the basis that the district court lacked the authority to consider the doctrine of inevitable discovery because the government did not expressly invoke the doctrine at the hearing on the defendant's motion to suppress, thus violating his due process

22

rights to respond to the issue. Id. at 174. The court of appeals upheld the district court's ruling, noting that the "[i]nevitable discovery as a possible justification for the search did not first appear in the trial judge's decision, but . . . was specifically listed by [the court of appeals] as an issue to be determined on remand." Id. at 174.

7.      In United States v. Felder, Crim A. No. 07-540, 2008 WL 2051967 (E.D. Pa. May 13, 2008), the district court denied a motion to suppress evidence found pursuant to a potentially unlawful search of a vehicle violating Philadelphia's live stop policy. Id. at 2008 WL 2051967, at ** 9-10. Officers were patrolling a neighborhood where a drug war was occurring and noticed the defendant driving a vehicle that lacked a valid registration. The officers approached the defendant after he pulled into a gas station. Id. at *1. Because the vehicle lacked a valid registration, the officers implemented the city's live stop policy that provided standard impounding procedures to follow, including instructions governing the initiation and scope of inventory searches. Id.   While inventorying the vehicle, the officers opened the vehicle's trunk and found drugs in the trunk. Id. at *2. The defendant was charged with a drug violation and filed a motion to suppress the evidence on the basis that it was recovered by a warrantless investigatory search without probable cause in violation of his Fourth Amendment rights. Id. at *3. The district court denied the motion.

      The district court commented that even if the actual search conducted violated the live stop policy and was unlawful, the cocaine would not be suppressed under the inevitable discovery doctrine. Id. at **9-10.

> It is beyond dispute that Defendant's automobile lacked proper registration, and that the impoundment of the vehicle was required. Under the circumstances, an inventory search of the vehicle was going to be conducted and, eventually, the crack cocaine in the trunk was inevitably going to be discovered.   If evidence

> unlawfully obtained would have been inevitably discovered by
> lawful means, exclusion of the evidenced is not required.  See Nix
> v. Williams, 467 U.S. 431, 443-44 . . .  (1984); see also United
> States v. Vasquez De Reyes, 149 F.3d 192, 194-95 (3d Cir. 1998).

Id.  The district court relied, in part, upon a decision from the Court of Appeals for

the Tenth Circuit:

> In the case of *United States v. Haro-Salcedo,* 107 F.3d 769 (10th
> Cir.1997), the Tenth Circuit Court of Appeals dealt with a case
> similar in some respects to this case. In *Haro-Salcedo,* defendant's
> vehicle was stopped by local police. *Id.* at 770. Since defendant
> could not show proper ownership and registration the vehicle was
> impounded. *Id.* A DEA agent who had been investigating
> Defendant for involvement in drug trafficking conducted a
> warrantless search of defendant's vehicle and discovered cocaine in
> the trunk. *Id.* The search was admittedly an investigatory search
> and not an inventory search. *Id.* The Tenth Circuit concluded that
> defendant's motion to suppress was properly denied based upon the
> inevitable discovery rule. *Id.* at 773-74. The Court found that even
> though the search by the DEA agent was unlawful, defendant's
> vehicle had been impounded by the local police and police
> department procedures mandated an inventory search of
> impounded vehicles. *Id.* The Court concluded that since a proper
> inventory search of the vehicle would have uncovered the cocaine
> and since an inventory search would have been conducted, the
> cocaine in the trunk of the vehicle would have been inevitably
> discovered. *Id.*

Felder, 2008 W.L 2051967, at **9-10.

8.      The government established that the HPD had a policy in place to tow vehicles of persons

placed under arrest, and a policy to tow a vehicle which had an expired registration.  HPD had a

policy to conduct an inventory search of a vehicle after it is towed and impounded.   Because

defendant was arrested and the registration of the vehicle had expired, the HDP would have

towed and impounded his vehicle.  Under those circumstances an inventory search of the vehicle

would have been conducted and the device in the console would have been found.

        Defendant does not challenge the inventory policy in issue.  Instead, defendant argues

that the officers did not have probable cause to search his vehicle. That argument is without moment because even if the officers did not have probable cause to search defendant's vehicle incident to his arrest, the record supports the finding that the device in the console would have been discovered by police during an inventory search of the vehicle. Zareck's vehicle would have been inventoried after being towed for two reasons: first, because his registration was expired; and second, because he was placed under arrest.

The court finds that the government met its burden under the inevitable discovery doctrine by showing that the device would have been discovered because defendant's vehicle would have been inventoried pursuant to the HPD's established policies with respect to vehicles of arrested individuals and vehicles whose registrations have expired. The inevitable discovery doctrine is applicable here and any constitutional deficiencies of a warrantless search of defendant's vehicle cannot support suppression of the device. Defendant's request to suppress evidence of the device will be denied and the other issues raised with respect to the search of the vehicle need not be addressed.

**B.    Statements of Defendant**

9.      A person "questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966) (the "Miranda warnings")).

10.     The government bears the burden of proving by a preponderance of the evidence that defendant's statements were voluntarily given. Lego v. Twomey, 404 U.S. 477, 489 (1972).

11.     Defendant was given his <u>Miranda</u> warnings twice:  once verbally at the time of his arrest and second in writing while he was in custody at the HPD.  (<u>See</u> Govt. Ex 1.)  Defendant's argument that the <u>Miranda</u> warnings pertained only to the drug transaction and did not extend to the device seized from his vehicle lacks merit.  There is no evidence that defendant was told that there was a limitation on the kind of questions he would be asked or was told that his rights against self-incrimination and to an attorney would be limited.

Wintruba's questioning of defendant initially focused on the drugs defendant purchased, but upon defendant's concern over the radio communications about the device, the focus of the questioning turned to the device.  The record reflects that this focus turned on defendant's statements offered after he was given his <u>Miranda</u> warnings.  Those statements concerned the Bumble Bee fireworks purchased at Target that he took apart and reassembled.  Under these circumstances, the court finds that the record supports the finding that defendant's statements related to the device were voluntary.

12.     Unlike the right to counsel under the Sixth Amendment, which attaches automatically upon initiation of formal, adversarial proceedings, the Fifth Amendment right to counsel attaches only when a suspect invokes the right by making a clear and unequivocal request for counsel. <u>See</u> U.S. Cont. Art. VI; <u>see</u> <u>also</u> <u>Brewer v. Williams</u>, 430 U.S. 387, 404 (1977); <u>Davis v. United States</u>, 512 U.S. 452, 458-59 (1994).  Here, the record reflects that defendant's statements about the device found in his vehicle and the Bumble Bee fireworks he disassembled and reassembled at his residence were made voluntarily, after he was given <u>Miranda</u> warnings, and he did not request counsel.  Therefore, defendant's statements related to the device found in the center console of his vehicle are admissible and defendant's motion to suppress with respect to the statements will be denied.

**C.  Search Warrant for Defendant's Residence**

13.  "The Fourth Amendment states that 'no warrants shall issue but upon probable cause, supported by oath or affirmation . . .' U.S. CONST. amend IV.  "[T]he probable-cause standard is a "'practical, nontechnical conception' " that deals with " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Maryland v. Pringle, 540 U.S. 366, 370-71 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983) (internal citations omitted). "'[P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules."' Id. (quoting Gates, 462 U.S. at 232).  "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances". Id. (citing Gates, 462 U.S. at 232.) "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." Id. (quoting Gates, 462 U.S. at 232).  "[T]he belief of guilt must be particularized with respect to the person to be searched or seized." Id.

14.  "The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).

15.  The issue here is whether, if the words, lines and phrases in the affidavit of probable cause attached to the search warrant that could potentially be stricken or redacted by the court were excised from the affidavit (see page 14 supra), there is a lack of probable cause to support the search warrant.

16.  "[A] criminal defendant has the right to challenge the truthfulness of factual statements

made in the affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant." United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006) (citing Franks v. Delaware, 438 U.S. 154 (1978)). In Franks, "the Court created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid." Id. The court of appeals acknowledged the following test set forth in Franks:

> First, the defendant must make a "substantial preliminary showing" that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause. *Id. [Franks*, 438 U.S.] at 171, 98 S.Ct. 2674. At the hearing, the defendant must ultimately prove by a preponderance of the evidence that: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997) (citing *Franks,* 438 U.S. at 171-72, 98 S. Ct. 2674).

>   The Supreme Court in "*Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that 'negligence or innocent mistake [is] insufficient.' " *Wilson v. Russo,* 212 F.3d 781, 787 (3d Cir.2000) (quoting *United States v. Davis,* 617 F.2d 677, 694 (D.C.Cir.1979)). In *Wilson,* we set forth standards to identify what constitutes "reckless disregard for the truth" regarding both misstatements and omissions:

>> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

>> . . .

>   In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the

original probable cause finding. *Id.*

> **. . .**
>
> If the defendant is able to ultimately meet this burden, "the Fourth Amendment requires that ... the fruits of the search [must be] excluded to the same extent as if probable case was lacking on the face of the affidavit." *United States v. Frost,* 999 F.2d 737, 743 (3d Cir. 1993) (quoting *Franks,* 438 U.S. at 156, 98 S.Ct. 2674).

Id. at 383-84 (footnote omitted).

17.    The threshold preliminary showing defendant must make to warrant a Franks hearing is that the search affidavit was either deliberately or recklessly false.  United States v. Brown, 3 F.3d 673, 676, 679 (3d Cir. 1993).  Even if the defendant proves at a Franks hearing that there are statements in a search affidavit which are deliberately or recklessly false, the warrant would still be valid if the remaining portions of the affidavit are sufficient to support a finding of probable cause.  See Franks, 438 U.S. at 156, 171-72.  Here, the court conducted the requisite analysis at the hearing on July 22, 2010 to determine whether defendant was entitled to a Franks hearing.  At that hearing the court determined that under the circumstances presented to the court, it would give defendant the benefit of the doubt, excise the challenged language and determine whether the remaining portions of the affidavit support a finding of probable cause. The court determined that probable cause existed to support the search warrant after all potential information that could be stricken was excised from the affidavit.  See page 16 supra.  In particular, the actions and statements of the bomb squad technicians described in the affidavit support a finding of probable cause.  At this time, there is nothing in the record to alter the court's decision with respect to that issue.  Therefore, defendant's motion to suppress evidence gathered at his residence, including the shot gun, will be denied.

18.    While the shot gun was not within the scope of the search warrant, it is noteworthy that

the evidence adduced supports the applicability of the plain view doctrine. "Under the plain view exception, evidence that is inadvertently discovered by police officers may, under certain circumstances, be seized without a warrant." United States v. Humphries, No. Crim. 04-CR-535, 2004 WL 2743432, at **4 -5 (E.D. Pa. Nov. 29, 2004) (citing Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)). Evidence discovered in plain view need not be suppressed provided that: "(1) the officers did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the incriminating character of the evidence is immediately apparent, and (3) the officers have a lawful right to access the object seized." Id. (citing Horton v. California, 496 U.S. 128, 136-37 (1971)). Here, the officers arrived lawfully at defendant's residence pursuant to a valid search warrant and observed the shot gun in plain view. The incriminating character of the shot gun was immediately apparent because the officer was aware that defendant was a convicted felon who was prohibited from possessing a firearm.

19. Another issue raised challenges Wintruba's jurisdictional authority to apply for and receive a search warrant for a location or residence outside of his jurisdictional limits. The Statewide Municipal Police Jurisdiction Act of Pennsylvania, 42 Pa. Cons. Stat. Ann. §. 8953, provides:

> Section 8953 Statewide municipal police jurisdiction
> (a) General rule.– Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:
>
> > (1) Where the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated, or where the officer is otherwise acting pursuant to

> the requirements of the Pennsylvania Rules of Criminal
> Procedure, except that the service of an arrest or search
> warrant shall require the consent of the chief law
> enforcement officer, or a person authorized by him to give
> consent, of the organized law enforcement agency which
> regularly provides primary police services in the
> municipality wherein the warrant is to be served.

42 PA. CONS. STAT. ANN. § 8953 (a)(1).

20.     Pennsylvania Rule of Criminal Procedure 200 sets forth who may issue a search warrant.

Rule 200 provides in relevant part:

> A search warrant may be issued by any issuing authority within the
> judicial district wherein is located either the person or place to be
> searched.

PA. R. CRIM. P. 200.

21.     Pennsylvania Rule of Criminal Procedure 204 sets forth who may serve a search warrant.

Rule 204 provides in relevant part, "[a] search warrant shall be served by a law enforcement

officer."  PA. R. CRIM. P. 204.  The Comment to Rule 204 states:

> Comment: No specific person need be designated in the warrant.
> However, only a law enforcement officer can properly serve a
> search warrant.
>
> For the requirements when a law enforcement
> officer executes a search warrant beyond the territorial limits of the
> officer's primary jurisdiction, see Sec. 8953 of the Judicial Code ,
> 42 Pa.C.S.A. Sec. 8953. *See also Commonwealth v. Mason*,
> 490 A.2d 421 (Pa. 1985).

PA. R. CRIM. P. 204, cmt.

22.     In Commonwealth v. Mason, 490 A.2d 421 (Pa. 1985), the Supreme Court of

Pennsylvania held that even if officers violate the rule requiring that a search warrant be served

by a law enforcement officer from the jurisdiction where the search is to occur, the remedy is not

suppression of the evidence.  Id. at 426.  The court stated:

> [W]e reemphasize that exclusion/suppression of evidence is not an
> appropriate remedy for every violation of the Pennsylvania Rules of
> Criminal Procedure concerning searches and seizures. It is only
> where the violation also implicates fundamental, constitutional
> concerns, is conducted in bad-faith or has substantially prejudiced
> the defendant that exclusion <u>may</u> be an appropriate remedy.

<u>Id.</u>  (emphasis in original).

There was no evidence adduced to implicate that the alleged violation here warrants suppression.

23.     Even if the officers here failed to comply with Rule 204 as read in conjunction with the section 8953, the remedy would not be suppression.

24.     If Pennsylvania law was violated in the process of securing and executing a search warrant in this instance, a federal district court is not required to find a federal constitutional violation.  "We have never held that an arrest that is unlawful under state or local law is unreasonable *per se* under the Fourth Amendment."  <u>United States v. Laville</u>, 480 F.3d 187, 192 (3d Cir. 2007).

25.     Probable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested.  <u>Laville,</u> 480 F.3d at 193.

26.     The Court of Appeals for the Third Circuit's approach in <u>Laville</u> is consistent with the Supreme Court's decision and analysis of a Fourth Amendment challenge to an arrest made in <u>Virginia v. Moore</u>, 553 U.S. 164 (2008).  In <u>Moore</u>, the Supreme Court instructed that the inquiry whether there was a Fourth Amendment violation does not end with a determination that a violation of state law had taken place during an arrest.  In rejecting the argument that the

Fourth Amendment's reasonableness requirement incorporated a state regulation of a police officer's arrest authority prohibiting an arrest for a traffic violation, and required the issuance of a summons instead, the Court instructed:

> A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional.
> . . .
>    [W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state regulations do not alter the Fourth Amendment's protections.

Moore, 553 U.S. at 174-76.

27.     Here, probable cause was found by a neutral and detached magistrate with respect to the search of the defendant's residence and this court determined that probable cause existed even if the questioned language in the affidavit was excised.  The Supreme Court held "[w]ith rare exceptions," the reasonableness of a search or seizure under the Fourth Amendment "is not in doubt where [it] is based upon probable cause."  Whren v. United States, 517 U.S. 806, 817 (1996).

28.     The court finds that the record supports the finding that the search warrant was based upon probable cause and there is no basis to suppress the evidence of the gun, which was found in plain view during the search of the residence.


**III.     Conclusion**

For the above reasons, defendant's motion to suppress is denied.

**IV.    Order**

AND NOW, this 3rd day of December 2010, upon consideration of defendant's motion to suppress evidence (ECF No. 37), the government's response thereto, the evidence and arguments presented to this court at the hearings on May 27, 2010, June 29, 2010 and July 22, 2010, and the findings of fact and conclusions of law filed by both parties, IT IS HEREBY ORDERED that, in accordance with this court's Findings of Fact and Conclusions of Law filed herewith, defendant's motion to suppress is DENIED.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge