**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**,

v.

**RAYMOND ZARECK.**

Defendant.

Criminal No.    09-168

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge

Pending before this Court are supplemental motions to suppress arrest and to identify the confidential informant (ECF No. 111) filed by defendant Raymond Zareck ("defendant" or "Zareck"). On April 13, 2009, the United States ("government") filed a criminal complaint charging defendant with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). (ECF No. 1.) On May 13, 2009, a federal grand jury in the Western District of Pennsylvania returned a one-count indictment charging defendant with that offense. (ECF No. 5.) On November 25, 2009, defendant filed a motion to suppress evidence in which he made three arguments: 1) the search of his vehicle was conducted without a warrant, probable cause, or exigent circumstance, thereby violating his constitutional rights under the Fourth Amendment of the Constitution of the United States; 2) he made statements while in police custody relating to the purchase or assembly of firework or improvised explosive devices without first being read his Miranda warnings, which violated his constitutional rights under the Fifth Amendment of the Constitution of the United States; and 3) the search of his residence was premised on a fatally flawed affidavit of probable cause, thereby violating his constitutional rights under the Fourth Amendment of the Constitution of the United States.

On December 15, 2009, the government filed a response to the Motion. (ECF No. 52.) On May 27, 2010, the court held an evidentiary hearing on the Motion during which witnesses testified and exhibits were entered into evidence. On June 29, 2010, the court continued the evidentiary hearing. On July 21, 2010, the court held a hearing to determine if defendant was entitled to a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), to challenge the truthfulness of factual statements made in the affidavit of probable cause supporting the warrant issued to search his residence. The court ordered the parties to submit proposed findings of fact and conclusions of law addressing three issues: 1) whether the search of the vehicle was appropriate, 2) whether defendant's statements should be suppressed, and 3) whether the search warrant was supported by probable cause. The government did so on October 27, 2010; defendant did so on November 3, 2010. On December 3, 2010, this court issued a Memorandum Opinion and Order denying the motion to suppress evidence.

On December 9, 2010, Zareck requested leave to file supplemental pretrial motions (ECF No. 109), which this court granted on December 14, 2010 (ECF No. 110). In his supplemental motion, filed on December 22, 2010 (ECF No. 111), Zareck makes the following four arguments: (1) his arrest was illegal because the police officers did not have probable cause to arrest him on a misdemeanor; (2) the arrest was illegal because it was based upon information provided by an informant who was not a credible or reliable source of information; (3) the stop of Zareck's vehicle was pretextual and therefore without reasonable suspicion or probable cause; and (4) the government should be compelled to reveal the informant's identity.

On January 25, 2011, the government filed its response to defendant's supplemental motion (ECF No. 116). This court held a hearing on the supplemental motion on February 25, 2011, March 7, 2011 and May 2, 2011. Both the defendant and the government complied with

2

this court's order to file proposed findings of facts and conclusions of law (respectively, ECF No. 133 and ECF No. 135). The matter is now ripe for the court to make the following findings of fact and conclusions of law.

## I.    Findings of Fact

1.    Officer Matthew Fusco ("Officer Fusco") of the Homestead Borough Police Department had been working on narcotics cases for approximately nine years at the time of the events giving rise to this matter. (Hr'g Tr. Feb. 25, 2011 ("Hr'g Tr. I") at 9.)

2.    Officer Fusco received specialized training in narcotics from the Allegheny County District Attorney's Narcotics Task Force and the Pennsylvania Attorney General's Narcotics Task Force. (Id.)

3.    Officer Fusco worked with the Drug Enforcement Administration and the Federal Bureau of Investigation on interstate narcotics trafficking matters. (Id.)

4.    Officer Fusco was the lead coordinator for all narcotics investigations through the Homestead Police Department at the time of the events in this case. (Id. at 10.)

5.    Officer Fusco supervised the investigation conducted by Officer James Wintruba ("Officer Wintruba") into the facts of this case. (Id. at 10, 68.)

6.    Officer Wintruba had been a police officer for one and one-half years at the time of the events. (Id. at 99.) Officer Wintruba testified that during that period of time he participated in other drug investigations and worked with other informants. (Id. at 111-13.)

7.    On April 1, 2009, Officer Wintruba was on patrol in a fully marked police vehicle when he observed a white Toyota MR2 in Homestead, Pennsylvania, circling a block around a Citgo gas station, at the corner of West Street and 16th Avenue. (Id. at 86-88.)

8.    The driver appeared nervous at the sight of Officer Wintruba. (Id. at 86.)

9. The Citgo gas station is a place known for drug activity, as well as for violent activity. (Id. at 87.)

10. Officer Wintruba observed the white Toyota MR2 pulling into the Citgo gas station. (Id. at 88.) He saw two black males approach the driver from the driver's open window and converse with the driver. (Id.)

11. As Officer Wintruba's car passed around the white Toyota MR2, the two black males looked up at his vehicle, turned around and walked away from the white vehicle. (Id.) Officer Wintruba did not observe any kind of hand-to-hand exchange between the two black men and the driver. (Id.)

12. The officer saw the driver frantically look back and forth into his car's mirrors and leave the gas station to head toward the Homestead High Level Bridge. (Id. at 86, 89.)

13. Officer Wintruba decided to intercept the white Toyota. (Id. at 89.) He was able locate it while it was travelling on the Homestead High Level Bridge at a high rate of speed. (Id.)

14. Officer Wintruba initiated a traffic stop of the white Toyota on the bridge. (Id.)

15. Officer Wintruba approached the driver. (Id. at 90.) The driver was extremely nervous, sweating, shaking, upset and his pupils were very small, which is one indicator of possible intoxication from alcohol or controlled substances. (Id.)

16. Officer Wintruba asked the driver to provide his driver license and registration. (Id.) The driver was extremely nervous, shaking, talking in a rambling manner and fumbling his papers. (Id. at 91). The driver was able to provide his license, but not the registration. (Id. at 91.)

17. Officer Wintruba requested back up officers. (Id.) Officer Fusco and Officer Miller arrived as back up. (Id. at 96.)

18. Officer Witntruba asked the driver to get out of the vehicle so that he could perform a

series of field sobriety tests. (Id. at 91.) While the driver did well on these tests, he was very nervous, upset and shaking. (Id.) Officer Wintruba believed the driver was under the influence of some sort of medication. (Id. at 91.) Officer Fusco believed the driver was under the influence of narcotics. (Id. at 52.)

19.     As the driver exited the vehicle, Officer Wintruba saw, inside the driver's door armrest, a pocket, a razor blade and a short, cut-off drinking straw with some powder residue. (Id. at 92.)

20.     In Officer Wintruba's experience, the razor blade was of significance because it posed issues of safety for the officer. (Id. at 92-93.) The razor blade and the straw were also of significance because they are generally used by an individual who inhales powder narcotics. (Id. at 93.)

21.     Officer Wintruba made the driver aware that he may be charged with possessing drug paraphernalia. The driver told the officer he wanted to know what he could to help himself. Although Officer Wintruba was interested in learning what help the driver could offer, the officer did not make a final decision at that time about using the driver as an informant. (Id. at 94.)

22.     While Officer Wintruba acknowledged that it is not uncommon to come across such kind of offers, he stated that only a small number (ten percent) of would-be informants end up being informants. (Id. at 95.)

23.     The driver was taken into custody for disorderly conduct, possessing paraphernalia (id. at 39), and further sobriety testing. (Id. at 96.) His vehicle was towed. (Id. at 11.) The report prepared by Officer Wintruba for the stop did not reference the driver's arrest, the reasons for his arrest, the field sobriety tests, the paraphernalia, or how long the driver was in police custody. (Hr'g Tr. Mar. 7, 2011 ("Hr'g Tr. II") at 27-28, 32-33; Hr'g Tr. I at 40.)

24.     At the station Officer Fusco assisted Officer Wintruba in the investigation of the matter. (Hr'g Tr. I at 97.)

25.     While at the station, the driver began to relax and willingly answered the officers' questions. (Id. at 98.) He expressed an interest in cooperating with them. (Id. at 11-12, 94.)

26.     The driver told the officers an individual named Ray Zareck asked him to go to Homestead to make a drug purchase. (Id. at 99.) The driver stated that Zareck offered him a single stamp bag payment if he would drive to Homestead. (Id.) The driver reported that Zareck gave him a phone number to contact a drug supplier in Homestead. The name of the drug supplier was "Al", (id.), a black male. (Id. at 47.)

27.     The driver indicated that he routinely accompanied Zareck when Zareck went to Homestead to make narcotics' purchases. (Id. at 18.) The driver usually made a phone call to arrange the location of the transaction when they came across the High Level Bridge. (Id. at 101.) They would meet at the agreed upon location, exchange money for drugs and leave Homestead. (Id.)

28.   The driver described Zareck as a white male who was older than fifty years, wore glasses, had grayish hair, resided in Oakland and drove a newer style, black, large, 4-door sedan. (Id. at 99-101.)

29.     Officer Wintruba verified some of the information about Zareck provided by the driver. (Id. 18, 115.) Officer Wintruba was independently able to determine Zareck's age and obtain a photograph of him through the JNET database. (Id. at 18, 115-16.) The description provided by the driver was consistent with the photograph obtained through that database. (Id. at 18, 116.)

30.     Officers Wintruba and Fusco were interested in the information provided by the driver because it was factually accurate and was of a nature that would be available only to a person

who went to Homestead to purchase heroin or crack cocaine. (Id. at 101.)

31.     For example, Officer Fusco was aware from previous investigations that an individual, "Al", was known to the police as a drug dealer operating in the area of Pearl's Café in Homestead, (id. at 14), a high violent crime area (id. at 15); Officer Wintruba testified that Officer Fusco recognized the phone number the informant was given to make contact with Al (id. at 101-02); and Officer Wintruba recognized that the procedure followed by Zareck and the informant was similar to the modus operandi of other individuals in the area. (Id. at 102.)

32.     In light of the information provided, Officers Wintruba and Fusco believed that the driver was providing reliable information and that he would work well as an informant. (Id. at 17, 103.)

33.     Officers Wintruba and Fusco asked the driver to contact the officers the next time Zareck wanted the driver to come to Homestead to make a narcotics purchase. (Id. at 21, 103.)

34.     After the driver left, Officer Wintruba ran additional background checks on him. (Id. at 104.) In addition to the information gathered at the time of the stop on the bridge (id. at 97-98), Officer Wintruba checked the JNET database and other records to substantiate some of the information the driver had provided. As a result of the check, Officer Wintruba learned the driver had some minor contacts with the law, but nothing serious (id. at 16, 45, 104), and there were no outstanding warrants for him. (Id. at 41; Hr'g Tr. II at 45-46.)

35.     Among other information related by the driver, he disclosed he was a mechanical engineer working daylight shifts for a company located approximately a half-hour away from Pittsburgh, Pennsylvania, he had family in the South Hills area, a girl friend and had recently started consuming heroin. (Hr.'g Tr. I at 16-17, 43-44, 46, 105.) The driver told the officers he was purchasing heroin every couple of days through Zareck, who, in turn, would purchase the drugs from Al. (Id. at 46-47.)

36.     The day after this first encounter, on April 2, 2009, the driver, acting as an informant, told Officer Wintruba that Zareck had contacted him about the next purchase of heroin from Al which was to take place that night in Homestead. (Id. at 21, 105.)

37.     Officer Wintruba discussed this information with Officer Fusco. The officers decided they would try to observe the vehicle when it came into Homestead in order to determine where the purchase would be made.  (Id.)  As part of the plan, the officers asked the informant to drive his Toyota MR2 because it was much easier to identify. (Id. at 106.)  The officers asked the informant to stay in touch with them via phone or by text messages while he was with Zareck (Id. at 103, 106.)

38.     The officers planned to make these observations that night.  Contrary to the plan, the informant was not able to convince Zareck to ride with him in his Toyota MR2. The informant notified the officers that Zareck and he would be in Zareck's larger, newer, black, four-door sedan.  (Id. at 106-07.)  While the informant was not able to provide the registration plate of Zareck's vehicle, he was able to give the officers information about their whereabouts.  (Id. at 107-08.)

39.     Based on the text messages sent by the informant to Officer Wintruba, the officers learned that Zareck's vehicle entered Homestead, traveled to West Homestead, picked up Al (the drug dealer), Al's three or four-year old child, left the Lowe's movie theater, traveled through Homestead, and went to Al's house. (Id. at 107-08.)  At that point, the messaging became sporadic until the informant notified the officers that Zareck and he had obtained some drugs. (Id.)

40.     The officers were unable to intercept the vehicle when it left Homestead (id. at 21, 108), and did not see Zareck or any drug transaction.  (Hr'g Tr. II at 51.)

41.	The officers at that point thought the informant had changed his mind about cooperating with the police. (Hr'g Tr. I at 109.)  Officer Wintruba sent a message to the informant asking him to contact the officer as soon as possible to find out what happened. (Id.)

42.	Once the informant was in his vehicle, he called Officer Wintruba. As a result of the conversation, the informant went to the Homestead Police station. (Id.)

43.	Officers Wintruba and Fusco, who were both present at the station, made it clear to the informant they were not happy with what happened.  (Id. at 57, 109.)  The informant told the officers he became very nervous and could not go through with the plan to provide additional information about Zareck's movements because he was concerned for his safety. (Id. at 23.) Based on the officers' experience, it is not uncommon for informants to become nervous under the circumstances.  (Id. at 23-24, 109-13.)

44.	The informant did not appear under the influence of narcotics at the time of his interaction with the officers. (Id. at 22-23, 68, 113-14.)

45.	The informant told the officers that Al was unable to supply all the narcotics (heroin and crack) Zareck requested but only a smaller amount, and Zareck was to go back to Homestead the following day (Friday, April 3, 2009) to purchase the additional drugs from Al. (Id. at 113-14.)

46.	The informant told the officers that Zareck gave him one stamp bag of heroin as a payment for riding with him on April 2, 2009. (Id. at 113.)  The informant put the bag of heroin on the table in front of the officers. (Id. at 22.)

47.	Upon learning that Zareck would go back to make an additional purchase the next day, the officers asked the informant to notify them about the time the next transaction was take place. (Id. at 114.)

48.	In the meantime, Officer Wintruba obtained a photograph of Zareck through the JNET

database and learned Zareck's age and that Zareck had a prior contact with the West Mifflin Police Department. (Id. at 18, 115-17.) Officer Wintruba requested Zareck's certified driving record from the Allegheny County Police dispatch. (Id. at 20, 118.) Officer Wintruba mentioned had two reasons for obtaining Zareck's driving record: first, to compare the address Zareck reported at the time of his encounter with the West Mifflin Police Department; and second, to ascertain whether Zareck had a valid license. (Id. at 19, 119.)

49.     The address reported in driving record was different from the address reported to the West Mifflin Police Department, but matched the information provided by the informant. (Id. at 19, 119-20.)

50.     Officer Wintruba requested Zareck's criminal history and ran a check for warrants through the Allegheny County Police dispatch. (Id. at 120.)

51.     Zareck's criminal record showed that he had been arrested numerous times for drugs and that he had drug convictions in the past. (Id. at 122.)

52.     As a result of the check for warrants, Officer Wintruba learned there was a magisterial warrant for Zareck's failure to pay a fine and costs for a retail theft. (Id. at 120.)

53.     Officer Wintruba testified that he talked to someone within the Allegheny County Police dispatch center and this individual told him there was magisterial warrant for Zareck and then faxed him a copy of the "warrant." (Id. at 120-21.)

54.     The next day, April 3, 2009, sometime around 5 p.m., the informant called Officer Wintruba to tell him about the next drug transaction. (Hr'g Tr. II at 3.) Specifically, the informant told the officer that he received a call from Zareck while he was on his way back from work and that Zareck asked the informant to meet him at the Waterfront complex (by Lowe's movie theater) (Hr'g Tr. I at 125) in Homestead, for the purpose of making a drug purchase.

(Hr'g Tr. II at 3-4.)

55.     Officer Wintruba asked the informant to provide him with as many details as possible about the transaction and suggested he drive the Toyota MR2 because it was easily recognizable. (Id. at 122-23.)

56.     Officer Wintruba notified Officer Fusco about the new development. (Hr'g Tr. II at 4.) Others officers were involved in the surveillance plan set up by Officers Wintruba and Fusco. (Hr'g Tr. I at 123.)

57.     Officer Wintruba's role in the plan devised by the officers was to maintain contact with the informant, as well as to set an observation point at the Waterfront shopping mall. (Hr'g Tr. II at 4.) He positioned his marked patrol vehicle by that mall.  While Officer Wintruba was at that location he exchanged phone calls and text messages with the informant about Zareck and his moves. (Hr'g Tr. I at 124; see also Hr'g Tr. II at 5.)

58.     The informant told Officer Wintruba the original meeting spot (Lowe's movie theater) had changed because Zareck wanted to eat at the McDonald's Restaurant first. (Hr'g Tr. I at 125.)  Both the theater and the restaurant are located within the Waterfront mall complex. (Id.)

59.     As a result of the change of the meeting spot, Officer Wintruba notified all other officers to clear the area around the McDonald's Restaurant of marked vehicles and to locate a point of observation where they could see a black, four-door sedan, arriving at the restaurant. (Id. at 125-26.)

60.     One officer positioned by the restaurant saw a male pulling into parking lot on the east side of the McDonald's Restaurant.  (Id. at 126.)  The officer confirmed that the driver matched the description of Zareck. Later, other officers notified Officer Wintruba that the male entered the restaurant. (Id.)

61.     Officer Wintruba made a drive-by past the vehicle in which the male fitting the description of Zareck was seen. Officer Wintruba was able to observe the registration plate, as well the validation sticker of the vehicle. With that information, Officer Wintruba called the Allegheny County dispatch center to obtain information regarding the ownership of the vehicle. (Id. at 126-27.)

62.     Officer Wintruba was told by an individual in the dispatch center that Zareck was the owner of the vehicle. Officer Wintruba ascertained that the validation sticker was invalid and that the vehicle matched the description provided by the informant. (Id. at 69, 127.)

63.     In the meantime, the informant traveled toward the McDonald's Restaurant to meet with Zareck. (Id. at 128.)

64.     At some point, Officer Wintruba, who went back to his observation spot, saw the informant's vehicle crossing the railroad tracks, travelling on Amity Street and turning onto Waterfront Drive toward the McDonald's Restaurant. (Id. at 128.) Similarly, Officer Fusco saw the vehicle driven by Zareck arriving at the Waterfront mall complex. (Id. at 28.)

65.     Zareck was already in his vehicle when the informant arrived at the designated location. The informant got into the passenger side of Zareck's vehicle and they left. (Id. at 28, 128.)

66.     After Zareck and the informant left the parking lot, Officer Wintruba moved to a different location to check on the movements of Zareck's vehicle. (Id. at 129.) Officer Fusco followed Zareck's vehicle in an unmarked SUV. (Id. at 29, 60, 129.) The informant was texting Officer Wintruba providing detailed information about Zareck's movements and locations. (Id. at 129, 131; Hr'g Tr. II at 14.) In turn, Officer Wintruba relayed this information to the other officers, including Officer Fusco. (Hr'g Tr. I at 30, 129, 131.)

67.     At one point, Officer Fusco lost visual sight of Zareck's vehicle when it turned onto

Margaret Street (id. at 30, 130-32) in Munhall (id. at 61), an area of extremely high narcotics distribution, which is in the vicinity of Pearl's Café. (Id. at 32.) Officer Fusco decided not to follow Zareck's vehicle on Margaret Street because he was aware of the presence of look-outs who could have notified the drug dealers about the police presence in the area. (Id. at 31.) A couple of minutes later, however, he was able to pick up surveillance of Zareck's vehicle. (Id. at 31, 133.)

68. The informant was not aware that Officer Fusco followed Zareck's vehicle. (Id. at 133-34.) Because Officer Fusco was able to see Zareck's vehicle, he could confirm that the information about Zareck's movements relayed by the informant was accurate. (Id. at 34-35, 133-34.)

69. At some point, the informant told Officer Wintruba that Zareck and he were meeting with Al to purchase drugs (id. at 33-34), and that they went to a large apartment building with two large pine trees. (Id. at 131-32.) The informant notified Officer Wintruba that Zareck purchased seven stamp bags of heroin and two rocks of crack cocaine. (Id. at 33-34; Hr'g Tr. II at 64.)

70. A text message, sent at approximately the time of the drug transaction, stated: "Deal done. Seven bags and crack. On our way back. I know what house the dude went in." (Hr'g Tr. II at 15.) Officer Wintruba interpreted this message as confirming that a drug transaction for heroin and crack cocaine had just been completed. (Id.)

71. Officer Fusco did not see anyone approaching Zareck's vehicle on Margaret Street (Hr'g Tr. I at 62), the drug transaction or the people involved in it. (Id. at 63.) Similarly, Officer Wintruba did not personally witness the drug transaction. (Hr'g Tr. II at 67.)

72. Officer Fusco, who was still in the area looking for Zareck's vehicle, located it again on East 13th Avenue. (Hr'g Tr. I at 31, 34, 62.) He followed it until Zareck arrived at the

McDonald's Restaurant's parking lot (id. at 36), never losing sight of it. (Id. at 62.)

73.     Once Zareck's vehicle pulled into the McDonald's Restaurant's parking lot and stopped, the marked patrol vehicles and Officer Fusco pulled up behind and to the sides of Zareck's vehicle. (Id. at 36.)  Officer Fusco approached the vehicle from the driver's side and asked the driver, Zareck, to step out of the vehicle. (Id. at 36-37.) Zareck attempted to get out of the vehicle, but then tried to re-enter it. (Id. at 37.)  Officer Fusco thought that Zareck was reaching for the gear shift of the vehicle, which was still running. (Id.)  Officer Fusco and another officer physically removed Zareck from the vehicle because he would not comply with Officer Fusco's order to get out of the vehicle. (Id. at 37-38.)   Eventually, the officers got Zareck out of the vehicle, placed him on the ground and handcuffed him.  (Id. at 38.)  In the meantime, Officer Wintruba had approached the passenger's side of the vehicle with the intent of taking the informant into custody. (Hr'g Tr. II at 20.)

74.     Officer Fusco searched Zareck after the arrest and found heroin and crack cocaine on Zareck.  (Hr'g Tr. I at 38.) Specifically, seven stamp bags of heroin and a small knotted baggy of rock crack cocaine were found.  (Hr'g Tr. II at 20.)

75.     Officer Fusco testified that the arrest of Zareck was based upon the information provided by the informant, a magisterial warrant for his arrest, and Zareck's failure to comply with the officers' order to get out of the vehicle. (Hr'g Tr. I at 64, 66-67.)

76.     Regarding the magisterial warrant, Officer Fusco relied upon a docket sheet, which did not specifically state it was a warrant; a docket sheet nonetheless was the kind of document officers typically received from the dispatch center to show the existence outstanding warrants for magisterial cases.  (Id. at 65-66, 70-71.)

77.     Regarding the text messages exchanged between Officer Wintruba and the informant,

14

Officer Fusco stated there were approximately 100 text messages (id. at 72), but that the majority of them were lost. (Id. at 73.)

78.     Mary Ann Terrick ("Terrick") is a secretary at the Magisterial District Court 05-124 located in West Mifflin and provided the following evidence with respect to the events relating to the magisterial warrant in issue. (Hr'g Tr. 5/2/11 ("Hr'g Tr. III") at 4.)

79.     On October 25, 1994, a non-traffic summary case was filed in the Magisterial District Court 05-124 at docket number 1526-94 captioned "Commonwealth of Pennsylvania versus Raymond Zareck." (Id. at 6-8.) Zareck was found guilty by trial and a fine and costs were assessed. (Id. at 8.)

80.     There was a partial payment made on January 3, 1995. Because there was still a balance due, the district court office, as it normally does in similar cases, sent a pre-warrant notification to Zareck warning him that if he did not pay the balance, a warrant for his arrest would be issued. (Id. at 8-9.) Zareck did not pay the balance due and a warrant for his arrest was issued on September 25, 2000. (Id. 9.)

81.     On or before April 8, 2011, Terrick was asked to locate the warrant for Zareck's arrest. (Id. at 13-14.) She was unable to find the relevant file. (Id. at 12-14.)

82.     On April 8, 2011, because the file pertaining to warrant could not be located, a case balance adjustment was made, which resulted in a zero balance (id. at 11), and the warrant was cancelled.

83.     The warrant, although issued, had not been served. (Id. at 12.)

84.     The document faxed to the officers in this case was a docket sheet. (Id. at 18.)

85.     John Legin ("Officer Legin"), a police officer and an Allegheny County 911 dispatcher, was a dispatcher with the Allegheny County 911 Center at the time of the events of this matter

(April 2009). (Id. at 28-29.)

86.     Officer Legin provided evidence regarding the procedures generally followed when a dispatcher receives an inquiry from an officer. A search is run through the driver's license number, and, if available, the driver's name, date of birth and social security number. The system accessed is CAD (Computer-Aided Dispatch), which is linked to CLEAN (Commonwealth Law Enforcement Assistance Network) and NCIC (National Crimes Information Center). (Id. at 31.) This search is to ascertain whether there are warrants on a national basis. (Id.) The subsequent step is running a search through the JNET database, which is a Pennsylvania database that includes warrants issued by magisterial districts. (Id. at 30-32.)

87.     When an inquiry by an officer is made over the radio, the information about the existence of a warrant is first verbally relayed to the officer. (Id. at 32.) A copy of what the dispatcher finds will later be faxed to the officer. (Id.) Officer Legin clarified that the JNET database does not maintain a copy of the actual warrant, but can only confirm the existence of an outstanding warrant. (Id. at 33.)

88.     The docket sheet relating to the magisterial warrant in issue was faxed by Officer Legin's office, the East Zone, which is a subdivision within the Allegheny County 911 Center. (Id. at 30.) The docket sheet was obtained through the JNET database. (Id. at 31.)

89.     A docket sheet, which does not contain the word "warrant" but shows specifics relating to an outstanding warrant, is what a dispatcher would fax to the officer if there is an outstanding magisterial warrant. (Id. at 32-33, 41.)

90.     When there is an outstanding warrant, the JNET database shows two screens: the first screen, which shows the docket sheet, and a second screen, which shows the word "warrant." (Id. at 46-47.) The docket sheet in this case showed a warrant existed because it showed a

16

balance due of $121. The officer knows a warrant exists for the outstanding balance because that information was "previously run." (Id. at 41.) The information previously run would show the kind of warrant and a number attached to the warrant. (Id. at 47.) Once the number is obtained, the docket sheet will be pulled up. (Id. at 48.) Dispatchers provide a copy of the first screen, but not of the second, to the officer because the first screen provides all relevant information, i.e., the magistrate's office contact and offense. (Id. at 34-36, 39.)

91.     While the docket sheet relating to the magisterial warrant at issue in this case does not state that it is a warrant, it is the docket sheet for an outstanding warrant to arrest Zareck that existed on the relevant date. (Id. at 20, 40.)

**II.     Conclusions of Law**

Zareck raised the following issues for this court's review: (1) the officers did not have probable cause to arrest him because the offense involved a misdemeanor and it was not committed in their presence; (2) the officers did not have probable cause because the informant was not reliable; (3) the vehicular stop was pretextual; and (4) the government should disclose the identity of informant.   They will be discussed ad seriatim.

**A.     Probable cause to arrest -- Misdemeanor offense not committed in presence of police**

1.     Defendant first argues the officers did not have probable cause to arrest him because they did not see him committing a felony.   Specifically, defendant argues he was arrested at the McDonald's Restaurant's parking lot for possession of a controlled substance, an ungraded Pennsylvania misdemeanor.   Zareck argues that the arrest, because it lacked probable cause, violated his Fourth Amendment rights. Zareck also asserts that, as consequence, the evidence obtained from a violation of his Fourth Amendment rights should be suppressed.   This court

17

disagrees.

2.    As threshold matter, the issue whether the drug offense involved was misdemeanor or a felony under state law is not dispositive.   In <u>United States v. Laville</u>, 480 F.3d 187 (3d Cir. 2007), the Court of Appeals for the Third Circuit addressed a similar situation.   In that case, the district court granted a suppression motion.   It concluded the defendant's warrantless arrest was unlawful because the offense was a misdemeanor not committed in the officer's presence, and under the Virgin Islands' statutory law "a misdemeanor must be committed in the presence of the officer in order to justify a warrantless arrest." <u>Id.</u> at 191.   The court of appeals reversed.   The court of appeals commented:

> [T]he validity of an arrest under state law must never be confused or conflated with the Fourth Amendment concept of reasonableness, and . . . the validity of an arrest under state law is at most a factor that a court may consider in assessing the broader question of probable cause . . . . We . . . have never held that an arrest that is unlawful under state or local law is unreasonable *per se* under the Fourth Amendment.

<u>Id.</u> at 192.

3.    In <u>Laville</u>, the court of appeals noted:

> As the Supreme Court emphasized in *Draper v. United States*, there is a "'difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search.'" 358 U.S. 307, 311–12, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (quoting *Brinegar v. United States*, 338 U.S. 160, 173, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). And, as Judge Learned Hand recognized more than sixty years ago, the "'reasonable cause' necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties." *United States v. Heitner*, 149 F.2d 105, 106 (2d Cir.1945) (quoted in *Draper*, 358 U.S. at 312 n. 4, 79 S.Ct. 329); *see also Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (stating that in determining whether use of force violates the Fourth Amendment, "'reasonableness' . . . must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

> And it is reasonableness that is the central inquiry under the Fourth Amendment.

> *United States v. Williams*, 417 F.3d 373, 376 (3d Cir.2005). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California*, 401 U.S. 797, 804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971); *see also Locke v. United States*, 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364 (1813) (recognizing that probable cause "means less than evidence which would justify condemnation"). <u>Probable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested.</u> *Draper*, 358 U.S. at 313, 79 S.Ct. 329; [<u>United States v. Myers</u>, 308 F.3d 251, 255 (3d Cir. 2002].

<u>Id</u>. at 193-94 (emphasis added).

Additionally, "[t]he arresting officer need not have contemplated the specific offense for which the defendant ultimately will be charged. The appropriate inquiry, rather, is whether the facts and circumstances within the officer's knowledge at the time of an investigative stop or arrest objectively justify that action." <u>Id.</u> at 194.

In <u>Laville</u>, even though a warrantless arrest for a misdemeanor not committed in the officer's presence occurred, the court of appeals found probable cause for the arrest existed and reversed the decision of the district court. <u>Id.</u> at 195.

4.      Here, the issue is not whether the warrantless arrest was for a misdemeanor not committed in an officer's presence, but whether the officer had "reasonably trustworthy information or circumstances . . . sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested." <u>Id.</u> at 194.

5.      The government argues Zareck was arrested for two reasons: his involvement in two drug transactions and because of an outstanding magisterial warrant.

6.      It is undisputed defendant was arrested at the McDonald's Restaurant's parking lot. At that point in time, the officers, based on information related by the informant, were aware that Zareck, who has a history of drug convictions, had been involved in an attempted drug

transaction and two completed drug transactions with a known drug dealer, Al, within a short period of time. The drug transactions involved heroin and crack cocaine. While there is no information about the amount of drugs attempted to be purchased or purchased on the first two occurrences (April 1, 2009 and April 2, 2009), the officers were told by the informant that on the latest occurrence, April 3, 2009, seven stamp bags of heroin and two rocks of crack cocaine were purchased. The informant was texting updates constantly during the surveillance related to the April 3, 2009 drug transaction. Based on this information and the other factors set forth above, from the perspective of experienced officers, they reasonably believed that Zareck was involved at least in two drug transactions (April 2 and April 3, 2009). Once the officers approached Zareck, Zareck had to be physically removed from the vehicle by two officers because he would not comply with the officers' order to get out of the vehicle and even attempted to reach the gear shift of the vehicle while the engine was still running.

7. While it is a factor that the arrest was for misdemeanor under Pennsylvania law which was not committed in the officer's presence, the totality of circumstances compels this court to conclude there was probable cause for Zareck's arrest. The officers had reasonably trustworthy information sufficient to warrant a reasonable person or officer to conclude that an offense had been committed.

8. The officers also were aware of an outstanding magisterial warrant for Zareck's arrest. Zareck argues the document the officers replied upon was only a docket sheet that did not contain the word "warrant". As such, Zareck argues, there was no warrant for his arrest and the officers' reliance on that document was, in essence, reckless because they never attempted to verify it.

9. Even if the document faxed was not the warrant, this court concludes that the officers had

probable cause to arrest Zareck by reason of the existence of an outstanding warrant for his arrest, whether Pennsylvania or federal law applies.

The Superior Court of Pennsylvania recently held:

> This Court has, however, held that NCIC entries alone are of sufficient reliability to provide officers with probable cause to arrest without the addition of the warrant upon which the NCIC entry was based. *See Commonwealth v. Feflie,* 398 Pa. Super. 622, 581 A.2d 636, 643 (1990) (affirming denial of motion to suppress evidence obtained during search incident to arrest executed after police entry into third party's home without arrest warrant; NCIC report of outstanding arrest warrant provides probable cause to arrest). Accordingly, we reject Appellant's contention that an NCIC bulletin on an outstanding arrest warrant may not provide probable cause to arrest unless police first verify the validity of the underlying warrant.

Commonwealth v. McRae, 5 A.3d 425, 430 (Pa. Super. Ct. 2010).

Here, the officers did not learn about the outstanding arrest warrant through a NCIC report, but through JNET database. As explained by Officer Legin, the difference concerns only the geographical scope of the search. JNET focuses on warrants issued at the local level. NCIC focuses on warrants issued at the state or national level. "JNET, the Commonwealth's system of providing immediate justice information to law enforcement agencies, is designed to insure accuracy of information and facilitate the dissemination of this information in a timely and electronic manner. The Legislature has recognized the advantages of Internet access to assist law enforcement." Commonwealth v. Carr, 887 A.2d 782, 783 (Pa. Super. Ct. 2005). The difference, therefore, between the two databases, for purposes of the instant matter, is not relevant.

The Court of Appeals for the Third Circuit previously has held:

> It is argued by appellant that the arresting agents did not have the warrant in their possession, that they did not know what the D.C. warrant was for, and that they had never seen a copy of the warrant prior to the arrest of appellant. None of these items would be sufficient to invalidate the arrest.

> Under Fed. Rule of Cr. P. 4(c)(3) an officer need not have the warrant in his possession at the time of arrest. The instance in this case is governed by Rule 9 which has provisions for execution of a warrant the same as Rule 4(c)(3). In a similar situation, <u>Bartlett v. United States</u>, 232 F.2d 135 (5 Cir. 1956) the court in effect ruled it unnecessary for agents to have the warrant in their actual possession in order to justify the arrest, so long as they had reliable information of an outstanding warrant.

<u>United States v. Smith</u>, 468 F.2d 381, 382-83 (3d Cir. 1972).

Here, there was an outstanding warrant for Zareck's arrest at the time the officers arrested Zareck as evidenced in JNET database and this information was relayed to the officers by the Allegheny County Dispatch Center and later confirmed by a fax of the docket sheet pertaining to the case. "Even if the court assumes the factual statements advanced by [the defendant] are true, and there was no paper warrant for his arrest, the law is quite clear that if a warrant has been issued, the arresting officer need not have it in his possession at the time of arrest." <u>United States v. Penson</u>, Nos. 03-197, 05-720, 2008 WL 2446794, at *3 (W.D. Pa. June 16, 2008). Here it is not disputed that a warrant had been issued and that at some point in time the file containing the warrant was lost. The information furnished to the officer about the warrant for Zareck's arrest was from a reliable source and the officer was justified in relying upon it. Under those circumstances, there was probable cause for Zareck's arrest.

10.     At any rate, this court finds that "good faith" exception would apply to this matter and, consequently, the evidence obtained as result of the arrest must not be excluded even if there was no warrant. Although the document faxed by the Allegheny County Dispatch Center did not state anywhere that it was a warrant, based on their experience, the officers reasonably believed that there was a valid warrant. Officer Legin confirmed that the 911 dispatch center routinely provides similar documents to officers as evidence of the existence of warrants and that the

dispatch center does not have copies of the actual warrant. Officer Legin relied on the

information provided by the dispatch center and the fax of the relevant docket sheet.

The Court of Appeals for the Third Circuit has recently held:

> In *United States v. Leon,* the Supreme Court recognized that the purpose of the exclusionary rule — to deter police misconduct — would not be furthered by suppressing evidence obtained during a search "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." 468 U.S. 897, 919–20 (1984). The Court explained that "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 921 . . . ; *see also Massachusetts v. Sheppard,* 468 U.S. 981, 988–90 . . . (1984) (holding that the good faith exception applied in a case where the warrant lacked particularity because the officers reasonably believed the warrant was valid). Thus "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Herring v. United States,* 555 U.S. [135, 143 (2009)] (*quoting Illinois v. Krull,* 480 U.S. 340, 348–49 . . . (1987)).
>
> Accordingly, a determination that the Fourth Amendment has been violated does not necessarily require application of the exclusionary rule. *Id.* at [140]; *see also Leon,* 468 U.S. at 919–20 . . . . It applies when it serves "to safeguard Fourth Amendment rights ... through its deterrent effect." *United States v. Calandra,* 414 U.S. 338, 348 . . . (1974). To determine whether to apply the rule in a particular case, we weigh the benefits of the rule's deterrent effects against the costs of exclusion, which include "letting guilty and possibly dangerous defendants go free." *Herring,* [555 U.S. at 141]. Because of the high social costs of excluding evidence in a criminal case, the Supreme Court has instructed that the exclusionary rule should only be applied when "police conduct [is] ... sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at [144]. Accordingly, we apply the rule when police conduct is "deliberate, reckless, or grossly negligent," or when it will deter "recurring or systemic negligence." *Id.* Put another way, isolated

> negligent acts on the part of the police do not warrant application
> of the exclusionary rule. *See id.*

United States v. Tracey, 597 F.3d 140, 150-51 (3d Cir. 2010).

11.     Here, there is nothing that can remotely show the officers' conduct was deliberate, reckless, or grossly negligent or that the application of the exclusionary rule will deter recurring or systematic negligence. As such, the application of the good faith exception is warranted. At most, Zareck showed that the officers could have obtained the additional page showing the word "warrant" sometime before the execution of the arrest. As noted, however, isolated negligent acts on the part of the police do not warrant application of the exclusionary rule. Id.

12.     In conclusion, the officers had probable cause to arrest Zareck, based upon the totality of the circumstances, or by reason of the outstanding magisterial warrant. In the alternative, Zareck's arrest did not violate the Fourth Amendment. The good faith exception applies and the evidence obtained as a result of the arrest would not be excluded.

### 2)     Reliability of informant

13.     Zareck argues the officers lacked probable cause to arrest him because his arrest was based on information related by a not credible or reliable informant. Zareck argues the informant is not credible or reliable because the officers had never used him as an informant before and because there was no independent corroboration of Zareck's drug purchases on April 3, 2009. This court disagrees.

14.     In United States v. Torres, 534 F.3d 207 (3d Cir. 2008), the Court of Appeals for the Third Circuit reiterated the factors a court is to assess in determining whether a tip is reliable as follows:

> (1) The tip information was relayed from the informant to the
> officer in a face-to-face interaction such that the officer had an

opportunity to appraise the witness's credibility through observation.

(2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.

(3) The content of the tip is not information that would be available to any observer . . .

(4) The person providing the information has recently witnessed the alleged criminal activity.

(5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility[.]

*See Brown,* 448 F.3d [239, 249–50 (3d Cir. 2006)] (citations and internal quotation marks omitted). Other factors can bolster what would otherwise be an insufficient tip, such as "[the p]resence of a suspect in a high crime area," "[a] suspect's presence on a street at a late hour," "[a] suspect's nervous, evasive behavior, or flight from police," and a suspect's behavior "that conforms to police officers' specialized knowledge of criminal activity."

Id. at 211.

15.     Here, all the factors listed in Torres are met.  Specifically:

(1)     The officers had a face-to-face interaction with the informant on April 1, 2009 at

the police station in connection with the interview.  At that time, after interacting

with him and considering the information provided, the officers believed that he

was credible and that he could provide useful information.

(2)     The officers knew the informant's identity, phone number, address, and vehicle.

The officers checked his criminal background and driving record.  Accordingly,

the officers could hold him responsible.

(3)     The informant provided information about the April 3, 2009 purchase not

otherwise available. He told the officers that the transaction would be for heroin

in stamp bags and crack cocaine. The informant provided the officers with Al's phone number, which was not readily available. The informant's description of Zareck's modus operandi of conducting his drug transactions, although similar to others involved in this business, was not known to others.

(4) The informant provided real-time updates to the officers about the movements of Zareck's vehicle, as well as the transaction that took place on April 3, 2009.

(5) The tips provided gave the officers advance notice of the events that were about to occur.

16. The drug transaction took place in a high crime area and Zareck resisted the officers when they were trying to get him out of the vehicle.

17. In light of the foregoing, considering the totality of the circumstances, this court finds the information provided by the informant was reliable and credible. Accordingly, the officers had probable cause to arrest Zareck.

**B.     Pretextual stop of Zareck's vehicle**

18. Zareck argues the stop was illegal because it was based on a pretext. Defendant's argument is flawed. Even if the officers' motivation to stop Zareck's vehicle had to do with the suspected drug transaction, the stop was valid because the officers had reasonable suspicion of a violation of the Pennsylvania Vehicle Code.   See 75 PA. CONS. STAT. § 6308(b); Ark. v. Sullivan, 532 U.S. 769, 771 (2001); Whren v. United States, 517 U.S. 806, 811-13 (1996); United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006); Commonwealth v. Holmes, 14 A.3d 89, 94 n.12 (Pa. 2011); Commonwealth v. Chase, 960 A.2d 108, 120 (Pa. 2008).   Officer Wintruba observed that Zarek vehicle had an expired registration sticker, which constitutes a violation of the Pennsylvania Vehicle Code.  The argument is, therefore, without merit.

### C. Identity of the confidential informant

19.     The Court of Appeals for the Third Circuit has noted:

> The Supreme Court in *Roviaro v. United States,* 353 U.S. 53 . . . (1957), explained the standard for determining whether an informant's identity should be revealed. "[P]rotecting an informant's identity serves important law enforcement objectives, most significantly, the public interest in encouraging persons to supply the government with information concerning crimes." [United States v. Brown, 3 F.3d 673, 679 (3d Cir. 1993)] (citing *Roviaro,* 353 U.S. at 59). The Government's privilege to withhold disclosure is not limitless, however. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *United States v. Jiles,* 658 F.2d 194, 196 (3d Cir.1981) (quoting *Roviaro,* 353 U.S. at 60–61).
>
> Thus we are to apply a balancing test to weigh these competing considerations. "[O]nce a defendant sets forth a specific need for disclosure the court should balance 'the public interest in protecting the flow of information against the individual's right to prepare his defense.' " *Id.* (quoting *Roviaro,* 353 U.S. at 62). The inquiry is case specific, "taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* (quoting *Roviaro,* 353 U.S. at 62).

United States v. Thomas, 58 F. App'x 915, 918-19 (3d Cir. 2003).

20.     Applying these factors to the instant matter, the court concludes Zareck did not show a specific need for disclosure that outweighs the public interest in allowing an informant to remain silent.   Zareck essentially argues that: (1) he does not know who the informant is, (2) the informant participated in the criminal activity, and (3) because the informant had not been used as an informant on other occasions, the information he provided to the officers equated to an anonymous tip, which is particularly troublesome when used by an experienced officer.

21.     For the following reasons, the court finds the balance weighs in favor of not disclosing

the name of the informant on the record at this time.

(1)     Zareck is fully aware of the identity of the confidential informant.   In his Supplemental Motion, Zareck stated: "The CI, who was a passenger of the Defendant's vehicle, allegedly texted Officer Wintruba of the Defendant's location during his travel time before and after he allegedly purchased drugs."  (ECF No. 111 at 2.)

(2)     Officer Fusco, a police officer with nine years of experience in drug investigations, was the lead coordinator of the instant matter and actively participated in it. The officers had a reasonable basis to conclude the informant was credible and reliable.   The officers were fully aware of the informant's identity. The details provided by the informant related to a man named "AL", which was the name of a drug dealer. The informant described Zareck's car and the background check on Zareck revealed he had prior drug convictions.

22.     Because Zareck failed to establish a specific need for disclosure of the informant's identity.  Defendant's motion to identify the confidential informant is denied.

## IV.     Order

AND NOW, this 26th day of October 2011, upon consideration of defendant's supplemental motions (ECF No. 111), the government's response thereto, the evidence and arguments presented to this court at the hearings on February 25, 2011, March 7, 2011, and May 2, 2011, the findings of fact and conclusions of law filed by both parties, and the parties' supplemental filings, IT IS HEREBY ORDERED that, in accordance with this court's Findings of Fact and Conclusions of Law filed herewith, defendant's supplemental motions are DENIED.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge