# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 09-168 |
| RAYMOND ZARECK, | ) | |
| | ) | |
| Defendant | ) | |

## OPINION

CONTI, Senior District Judge

## I.    Introduction

Currently pending before the court are three motions filed by petitioner and defendant Raymond Zareck ("Zareck," "defendant" or "petitioner"). The motions all concern Zareck's motion to vacate his conviction and sentence filed under 28 U.S.C. § 2255 (the "§ 2255 motion"). (ECF No. 348.) Zareck asserts there are thirty-seven[1] grounds upon which this court should vacate his conviction and sentence. The government opposes each motion, including each of Zareck's grounds for relief. As set forth fully in this opinion, Zareck's motion for expansion of the record and for enlargement of page limit for his reply will be granted. Zareck's § 2255 motion will be denied because he did not show entitlement to habeas relief, i.e., that his trial or appellate counsel provided him ineffective assistance of counsel in violation of his rights guaranteed by the Sixth Amendment to the United States Constitution or that the assistant United States attorneys that prosecuted his case engaged in prosecutorial misconduct in violation of his rights guaranteed by the Fifth Amendment to the United States Constitution. Zareck's motion to supplement his § 2255 motion will denied because the decision upon which he relies, Rehaif v.

---

[1]    There are thirty-six grounds stated in his § 2255 motion and one ground stated in his motion to supplement.

<u>United States</u>, 139 S.Ct. 2191 (2019), is not applied retroactively to collateral attacks under §

2255.

II.    **<u>Background</u>**

On May 13, 2009, a federal grand jury returned a one-count indictment against Zareck

charging him with possession of a firearm by a convicted felon on or about April 4, 2009, in

violation of 18 U.S.C. § 922(g)(1). On November 25, 2009, Zareck filed, among other motions, a

motion to suppress evidence ("first suppression motion"). (ECF No. 37.) In the first suppression

motion, Zareck raised three arguments: (1) the search of his vehicle was conducted without a

warrant, probable cause, or exigent circumstance, thereby violating his constitutional rights

under the Fourth Amendment to the Constitution of the United States; (2) he made statements

while in police custody relating to the purchase or assembly of firework or improvised explosive

devices without first being read his <u>Miranda</u> warnings, which violated his constitutional rights

under the Fifth Amendment to the Constitution of the United States; and (3) the search of his

residence was premised on a fatally flawed affidavit of probable cause, thereby violating his

constitutional rights under the Fourth Amendment to the Constitution of the United States. (ECF

No. 143 at 1.) On May 27, 2010, and June 29, 2010, the court held a suppression hearing. On

July 2, 2010, Zareck filed a "Motion for <u>Franks</u> hearing" ("<u>Franks</u> motion"). (ECF No. 84.)

On July 21, 2010, the court held a continued suppression hearing and a hearing on the

<u>Franks</u> motion. The court on the record denied the <u>Franks</u> motion. On December 3, 2010, after

the parties filed proposed findings of fact and conclusions of law, the court issued a

memorandum opinion and order denying the motion to suppress. (ECF No. 108.) The court

found, among other things, that the search warrant issued by a magistrate judge for Zareck's

home, pursuant to which law enforcement found a firearm and ammunition, was supported by

probable cause and there was no basis to suppress the evidence of the gun, which was found in plain view during the search of Zareck's home. (ECF No. 108 at 33.)

On December 22, 2010, Zareck filed a "supplemental" motion to suppress in which he raised the following four arguments: (1) his arrest was illegal because the police officers did not have probable cause to arrest him on a misdemeanor; (2) the arrest was illegal because it was based upon information provided by an informant who was not a credible or reliable source of information; (3) the stop of Zareck's vehicle was pretextual and therefore without reasonable suspicion or probable cause; and (4) the government should be compelled to reveal the informant's identity. (ECF No. 111.) On February 25, 2011, and May 2, 2011, the court held an evidentiary hearing on the supplemental motion to suppress. On October 26, 2011, after the parties filed proposed findings of fact and conclusions of law, the court in an opinion and order denied the supplemental motion to suppress. (ECF No. 143.)

After additional motions practice and various continuances, this case was set for a jury trial to commence on August 6, 2012. On August 1, 2012, however, a federal grand jury returned a two-count superseding indictment against Zareck, charging him with: (1) possession of a firearm and/or ammunition by a convicted felon, in and around 2004 through April 4, 2009, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e); and (2) possession of a firearm and/or ammunition by an unlawful user of a controlled substance, in and around 2004 through April 4, 2009, in violation of 18 U.S.C. § 922(g)(3). (ECF No. 195.) On August 28, 2012, Zareck filed various pretrial motions, including motions to dismiss the superseding indictment and motions for reconsideration of the court's decisions to deny the suppression motion and Franks motion. (ECF Nos. 206-210, 220-221.)

On November 9, 2012, the court held a pretrial motions conference during which it

denied Zareck's pretrial motions. On November 13, 2012, a jury trial commenced against Zareck. On November 20, 2012, the jury returned guilty verdicts on each of counts one and two of the superseding indictment. (ECF No. 243.) On May 21, 2013, the court sentenced Zareck to a term of imprisonment of 188 months[2] at each of counts one and two of the superseding indictment, to concurrently run, for a total term of imprisonment of 188 months, and a term of supervised release of five years at each of counts one and two of the superseding indictment, to concurrently run, for a total term of supervised release of five years. (ECF No. 275.)

On May 23, 2013, Zareck appealed his convictions and sentences to the Third Circuit Court of Appeals. (ECF Nos. 277, 278.) On July 24, 2015, the court of appeals affirmed petitioner's convictions, but vacated the judgment of sentence because this court erred when it imposed a sentence at each of counts one and two. (ECF No. 310 at 2.) In accordance with the court of appeals' decision, count two was merged into count one. (ECF No. 328.) On January 25, 2016, the court resentenced petitioner to, among other things, a term of imprisonment of 188 months at count one and a term of supervised release of five years at count one. (ECF No. 329.)

On January 29, 2016, petitioner appealed his new sentence. (ECF No. 331.) On September 29, 2016, the court of appeals affirmed the judgment of sentence entered by this court. (ECF Nos. 335, 336.) On November 3, 2016, the Third Circuit Court of Appeals denied petitioner's request for rehearing. (Court of Appeals for the Third Circuit, Docket No. 16-1215, Order dated November 3, 2016.) On November 11, 2016, petitioner submitted a "notice of

---

[2]     The applicable sentencing guideline range for a term of imprisonment was 188 months to 235 months.  (Amended Judgment dated 1/25/2016 at 7; Judgment dated 5/17/2013 at 7.) Zareck was subject to a mandatory term of imprisonment of 15 years, pursuant to 18 U.S.C. §§ 922(g)(1) and 924(e).

appeal" of his sentence. (ECF No. 337.) The court of appeals did not act on that notice.[3] (ECF No. 338 at 2.)

On February 1, 2017, Zareck filed in the Supreme Court of the United States a petition for writ of certiorari. (Court of Appeals for the Third Circuit, Docket No. 16-1215, Notice dated February 8, 2017.) On March 6, 2017, the Supreme Court of the United States denied Zareck's petition for writ of certiorari. (Court of Appeals for the Third Circuit, Docket No. 16- 1215, Notice dated March 6, 2017.) On February 23, 2018, the Third Circuit Court of Appeals denied Zareck's "Recall Mandate and Amend Judgment of Appeal with Appointment of New Counsel for Failure of CJA Counsel to File Petition Upon Petitioner's Request and Timely Withdraw Pursuant to 18 U.S.C.S Section 3006A and Third Circuit CJA Plan[.]" (Court of Appeals for the Third Circuit, Docket No. 16-1215, Order dated February 23, 2018.)

On March 6, 2018, petitioner filed in this court a motion to vacate under 28 U.S.C. § 2255. (ECF No. 340.) On March 9, 2018, petitioner filed a motion to supplement his § 2255 motion. (ECF No. 342.) On April 20, 2018, the government filed a motion requesting the court to issue a notice to petitioner pursuant to United States v. Miller, 197 F.3d 644, 649 (3d Cir. 1999). (ECF No. 344.) On May 2, 2018, the court issued a Miller notice in the form provided by the

---

[3]     The Clerk of the Court of Appeals for the Third Circuit explained:

No action will be taken on the foregoing document which was transmitted to this Court by the United States District Court for the Western District of Pennsylvania as a new notice of appeal. Appellant seeks review from final judgment of Appellant's sentence decided November 3, 2016. The November 3, 2016 order was entered by this Court in the above-docketed case and denied Appellant's petition for en banc rehearing and panel rehearing. As previously advised by the Clerk in a letter dated November 18, 2016, any further review of this Court's decision must be sought in the United States Supreme Court.

(ECF No. 338 at 2.)

government in which one sentence referred to petitioner by an incorrect name. (ECF No. 345.) On May 11, 2018, petitioner filed a motion for clarification and extension of time. (ECF No. 346.) On June 8, 2018, petitioner filed a second motion for clarification. (ECF No. 347.) On June 20, 2018, petitioner—in an effort to comport with the court's order dated May 2, 2018—filed a second amended § 2255 motion (the "second amended § 2255 motion"), which, according to petitioner, only reasserts the claims he raised in the initial § 2255 motion and the motion to supplement. (ECF No. 348 at 12.)

On July 12, 2018, this court issued an opinion and order granting in part and denying in part the motion for clarification and enlargement of time and denying as moot the second motion for clarification. (ECF No. 349.) The court provided clarification with respect to the <u>Miller</u> notice and explained that unless the government raised an objection to the timelines of Zareck's filings, the first § 2255 motion and the supplement thereto would be denied as moot because Zareck filed an all-inclusive document setting forth his thirty-six grounds for relief, which would be considered the operable § 2255 motion in this case. (ECF No. 349 at 6-7.) The government did not object to the timeliness of the all-inclusive document filed by Zareck, and, therefore, on September 22, 2021, the court denied as moot the first § 2255 motion and the supplement thereto was denied as moot. On October 25, 2018, the government filed a response in opposition to Zareck's § 2255 motion.

On February 25, 2019, Zareck filed a motion for expansion of record (ECF No. 362) and a reply in support of his § 2255 motion (ECF No. 363). On June 19, 2019, the government filed a response to the motion for expansion of record. (ECF No. 372.) On August 28, 2019, Zareck filed a reply in support of his motion for expansion of record. (ECF No. 375.)

On July 17, 2020, Zareck filed a motion for leave to supplement his § 2255 motion. (ECF

No. 376.) On January 5, 2021, the government filed a response in opposition. (ECF No. 383.) On

April 5, 2021, Zareck filed a reply in support of his motion for leave. (ECF No. 386.)

Zareck's § 2255 motion having been fully briefed is now ripe to be decided by the court.

### III.   <u>Overview of the Evidence Presented at Trial</u>

The court provides the following overview of the evidence presented at Zareck's jury

trial to provide context for the court's analysis of the thirty-seven grounds for relief he asserts in

his § 2255 submissions. The overview is not intended to be an all-inclusive recitation of the

evidence provided at trial.

Robert Manns ("Manns"), a special agent with the Bureau of Alcohol, Tobacco, Firearms

& Explosives ("ATF"), testified as an expert with respect to the nexus of firearms and

ammunition on behalf of the government. (T.T. 11/13/2012 (ECF No. 299) at 131, 135-36.)

Manns testified, among other things, that:

- the ATF took the shotgun and ammunition found in Zareck's home into its custody (<u>id.</u> at 135-36);

- the shotgun was a "870 Wingmaster" 12-gauge shotgun made by Remington Arms Company in Ilion, New York (<u>id.</u> at 137-38, 146);

- the receiver on the shotgun was manufactured in 1951 and the barrel was manufactured in 1952 (<u>id.</u> at 141);

- ammunition found in Zareck's bedroom included "Remmington game load" made in Lonoke, Arkansas, (<u>id.</u> at 144), in 1995, (T.T. 11/ 15/2012 (ECF No. 300) at 10) and in 2007 (<u>id.</u> at 11);

- ammunition found in Zareck's bedroom was ammunition for a 12-gauge shotgun, which fit inside the shotgun found in his bedroom (T.T. 11/13/2012 (ECF No. 299) at 146-47);

- ammunition was found in Zareck's bedroom that was manufactured in 1998 in Hungary (T.T. 11/ 15/2012 (ECF No. 300) at 12-13, 39-41);

- the shotgun found in Zareck's bedroom fit the definition of "firearm" under federal law (T.T. 11/ 15/2012 (ECF No. 300) at 13, 39-41);

- the ammunition found in Zareck's bedroom fit the definition of "ammunition" under federal law (id.);

- the box of ammunition manufactured in Hungary was purchased by "Raymond Zareck" from a Cabela's store in Wheeling, West Virginia (id. at 14-16);

- Zareck was arrested in this case and incarcerated at the Allegheny County Jail (T.T. 11/15/2012 (ECF No. 300) at 17-18);

- Manns obtained recorded telephone conversations between Zareck and others from when Zareck was incarcerated at the Allegheny County Jail (id.)

- Manns listened to all the recorded telephone conversations and identified Zareck's voice on each of the calls (id. at 19); and

- Manns did not know who purchased the shotgun (T.T. 11/15/2012 (ECF No. 300) at 30).

The government presented the testimony of James Wintruba ("Wintruba"), a police officer for the Homestead Police Department. (T.T. 11/15/2021 (ECF No. 300) at 43.) Wintruba testified, among other things, that:

- on April 3, 2009, Zareck was arrested outside his vehicle in Homestead, Pennsylvania (id. at 43-44);

- Zareck was "very upset, very angry" and "was fighting violently" (id. at 70);

- drugs were seized from Zareck's person, including a "plastic knotted clear baggie which contained heroin packages…[and] two individual rocks of crack cocaine (id. at 44, 60-61, Gov't Exs. 25, 26);

- a "pill bottle with no label on it containing eight pills of [Oxycodone]" was retrieved from Zareck's vehicle (id. at 44-45, 83);

- Zareck was taken back to the Homestead Police Station where he agreed to talk to the police (id. at 46);

- Zareck, who appeared to be anxious, told Wintruba that the prior to his arrest he was in Homestead, Pennsylvania, to purchase heroin and crack cocaine, he used those drugs, and returned to Homestead, Pennsylvania, on the night of his arrest to purchase more drugs (id. at 46-47, 71);

- while at the police station, Wintruba placed the drugs seized from Zareck's person

8

and his vehicle on the table at which Zareck was seated (id. at 47);

- Zareck grabbed the evidence and put it in his mouth and tried to swallow it (id. at 47);

- Wintruba and other police officers forcefully opened Zareck's mouth and recovered the crack cocaine, heroin, and seven of the eight Oxycodone tablets (id. at 47-48, 83);

- Zareck ingested one of the Oxycodone tablets (id. at 48, 83);

- on the next day, April 4, 2009, Wintruba and other police officers conducted a search of Zareck's home pursuant to a search warrant (id. at 48-49);

- Wintruba and the other police officers conducting the search found indicia that Zareck lived at the residence searched (id. at 49-54, Gov't Exs. 2-17), numerous empty pill bottles (id. at 54, Gov't Ex. 18-18A), and drug paraphernalia, e.g., new and used syringes, tourniquets, lighters, two glass pipes burnt on the end, a razor blade, push rods, a spoon that contained a drug residue, and straws or tubes used for snorting drugs (id. at 55-57, Gov't Exs. 19-21);

- the police officers searching Zareck's home found "an overwhelming amount" of "indicia of [drug] use" (id. at 74);

- the tourniquets were used to "make...veins pop" to inject substances into the veins with the needles (id. at 55-56);

- Wintruba and the other police officers conducting the search of Zareck's home also found paperwork for a "needle exchange program," pursuant to which a person can obtain clean needles (id. at 59, Gov't Ex. 23), and a brochure about Narcan and what to do if a person overdoes on heroin, (id. at 59, Gov't Ex. 24);

- police officers conducting the search of Zareck's home found the shotgun in Zareck's bedroom to the left of a standalone bureau (id. at 64, Gov't Exs. 36, 40A);

- police officers conducting the search of Zareck's bedroom found ammunition in a nightstand in his bedroom (id. at 64, Gov't Exs. 33, 134);

- police officers conducting the search of Zareck's bedroom found a pill bottle for a prescription of Oxycontin with Zareck's name on it in Zareck's bedroom (id. at 68);

- the telephone number on the telephone bill addressed to Zareck matched a telephone number provided to Cabela's with respect to the purchase of the ammunition by Zareck about which Manns testified (id. at 66-67, Gov't Exs. 12, 38A); and

- Wintruba did not cause the shotgun or the ammunition to be fingerprinted (id. at 81).

The government presented the testimony of Heidi Aubrey ("Aubrey") who was Zareck's

9

neighbor. (T.T. 11/15/2012 (ECF No. 300) at 85-86.) Aubrey testified, among other things, that:

- Zareck lived by himself (id. at 87);

- Aubrey knew Zareck during the two-year-period of time she attended college at the University of Pittsburgh (id. at 104);

- Zareck offered to tutor Aubrey, who was a college student, and he gave her prescription anxiety medication (id. at 87);

- Aubrey smoked crack out of a glass pipe with Zareck (id. at 88);

- Aubrey also saw Zareck crush up pills and snort or swallow them on many occasions (id. at 88, 90);

- Aubrey saw a firearm "propped up in a corner" of one of the second-floor bedrooms in Zareck's house (id. at 90);

- Aubrey never saw Zareck hold the firearm or shoot it and she never saw him in possession of ammunition (id. at 91-92);

- Zareck took prescribed medication in doses larger than what was prescribed (id. at 94);

- on more than ten occasions Zareck obtained "pills" for Aubrey's boyfriend at the time, John Larcinese ("Larcinese") (id. at 95);

- Aubrey never saw Zareck talk about, move, or touch the shotgun (id. at 96-98);

- Larcinese introduced Aubrey to "taking drugs" (id. at 99);

- Aubrey introduced Larcinese to Zareck (id. at 100);

- Zareck bought Aubrey gifts including clothes, designer purses, and jewelry (id. at 101); and

- Aubrey never saw Zareck touch ammunition (id. at 108).

The government called Jamie Rodgers ("Rodgers"), Zareck's friend, to testify. (T.T. 11/16/2012 (ECF No. 301) at 37.) Rodgers testified:

- she knew Zareck for approximately twelve years (id. at 37-38);

- she met him when he worked as a pharmacist for Rite Aid (id. at 38);

- Rodgers was aware that Zareck took prescription medication, but could not conclude whether it "went further into something else," although she noticed changes in his behavior and in their relationship (id. at 41-42);

- "a matter of weeks" before Zareck was arrested in this case, Rodgers asked Zareck to roll up his sleeves so she could see his arms and determine whether he had marks on his arms from using heroin, and she saw marks on his arm, but he denied using heroin (id. at 43-44);

- while Zareck was incarcerated he called Rodgers and they discussed Zareck having someone else admit that the shotgun was his or hers (id. at 47);

- Zareck asked Rodgers for help to find someone to admit the gun was his or hers, but Rodgers refused because she did not want to be criminally charged with perjury (id. at 47);

- Zareck is "[k]ind, intellectual, caring" (id. at 48-49);

- Aubrey took advantage of Zareck and Zareck spent more that $45,000.00 on Aubrey (id. at 50);

- Rodgers never saw the shotgun or Zareck handle the shotgun and she never heard Zareck talk about the shotgun (id. at 53);

- Rodgers had boxed up Zareck's belongings when he was incarcerated (id. at 55);

- when Michael Reinhart ("Reinhart") was released from jail, Reinhart harassed Rodgers until she brought Zareck's belongings back to Zareck's home for Reinhart to sell them (id. at 55-56);

- Reinhart moved into Zareck's home and was eventually charged with theft and burglary (id. at 56-57);

- Zareck sustained a back and neck injury that prevented him from weightlifting (id. at 62);

- he was prescribed Oxycodone for his neck and back pain (id. at 63);

- Rodgers believed Zareck's doctor increased his prescription for Oxycodone as Zareck's tolerance to the medication increased (id. at 63-64);

- in or around 2001, 2002, and 2003, Zareck worked as a pharmacist outside Pittsburgh, Pennsylvania, and had an apartment in another location (id. at 64-65);

- during that time, Zareck had other people living in his home and paying rent (id. at 65);

11

- when Rodgers spoke with Zareck via telephone while he was incarcerated at the Allegheny County Jail, Zareck was "[d]isarrayed, panic, grasping for straws all over the place" (id. at 66);

- Zareck went through drug withdrawal while in the Allegheny County Jail (id. at 66-67);

- Zareck at some point in time lost his pharmacist license (id. at 68); and

- Zareck gave Reinhart permission to live at his home upon Reinhart's release from hail (id. at 69).

The government introduced the testimony of Larcinese. (T.T. 11/16/2012 (ECF No. 301)

at 76.) Larcinese testified, among other things, that:

- he was incarcerated for a federal conviction involving forged prescriptions for Oxycontin, Oxycodone and Roxycodone (id. at 77-78);

- he pleaded guilty to the federal charges pursuant to a plea agreement, in which he agreed to cooperate with the government (id. at 78);

- he was a college graduate who had obtained employment, but he left his job due to his addiction to Oxycodone (id. at 79-80);

- he met Aubrey while attending Clarion University and she became his girlfriend (id. at 80);

- she introduced him to taking Oxycontin (id. at 108-09);

- he saw Aubrey use Oxycontin, cocaine, and Roxycodone (id. at 80);

- in early 2005, he met Zareck through Aubrey (id. at 82-83);

- Larcinese witnessed Zareck do crack cocaine, cocaine, and Oxycodone (id. at 83);

- Larcinese saw Zareck inject Oxycodone into his leg "[p]robably a couple hundred" times (id. at 83-84);

- Larcinese saw Zareck snort prescription medications "[p]robably a couple hundred" times (id. at 84);

- Larcinese snorted cocaine and pills at Zareck's house (id. at 85);

- Larcinese learned to forged prescriptions from Zareck (id. at 85);

12

- Larcinese and Zareck forged prescriptions together to obtain prescription drugs for their drug addictions (id. at 85-86, 104-05);

- at a point in time, Larcinese and Zareck "went and filled prescriptions every day of the week" (id. at 107);

- Larcinese continued to forge prescriptions after Zareck was incarcerated (id. at 86);

- Larcinese during his incarceration illegally obtained drugs and distributed them inside the prison (id. at 87-88);

- Larcinese was not indicted for illegally obtaining and distributing drugs inside the prison (id. at 103-04);

- Larcinese's cooperation against Zareck was going to be brought to the attention of the federal judge who would sentence him on his federal conviction (id. at 88);

- Larcinese was not guaranteed a particular sentence based upon his cooperation against Zareck but he understood that the judge may reduce his sentencing guideline range by 50% (id. at 88-89, 91-92);

- Larcinese saw a firearm, i.e., "a long gun[,]" in Zareck's home, but did not see Zareck touch the firearm or handle it; indeed, it was as if the firearm "wasn't even there" (id. at 109, 123);

- he saw the firearm in two different places in Zareck's home, i.e., "[c]oming through the front door, the first room on the right and then in the bedroom[,]" (id. at 124);

- when a person goes through drug withdrawal, he or she may become disoriented and experience significant pain; the symptoms may last for months (id. at 115-16);

- Larcinese never saw ammunition in Zareck's home (id. at 117); and

- Oxycodone or Oxycontin is the "prescription equivalent of heroin" (id. at 121).

The government in its case-in-chief played five recordings of telephone conversations between Zareck and Rodgers and one recording of a telephone conversation between Zareck and Reinhart's significant other, Linda Kunak ("Kunak"). (T.T. 11/16/2012 (ECF No. 301) at 131-32; T.T. 11/19/2012 (ECF No. 302) at 21.)

The government introduced the testimony of Reinhart. (T.T. 11/19/2012 (ECF No. 302)

at 2.) He testified, among other things, that:

- he was currently incarcerated in the Allegheny County Jail as a pretrial detainee (id. at 2);

- he had a criminal history involving at least six different cases (id. at 2-3);

- Zareck was the victim in one of the cases in which he was charged with criminal trespass and the theft by unlawful taking (id. at 3);

- there were charges pending against him for kidnapping, burglary, robbery, simple assault, recklessly endangering another person, escape, and terroristic threats (id. at 4);

- Reinhart met Zareck two and one-half years before Zareck's trial in this case because they were cellmates at the Allegheny County Jail (id. at 5);

- Zareck told him he was charged with possessing a firearm while being a convicted felon (id. at 13);

- Zareck told him he was "hooked on Oxycodone and heroin" (id. at 14);

- Reinhart had an "extensive drug history" involving, among other things, crack cocaine (id. at 14);

- Reinhart was diagnosed with bipolar depression for which he was previously hospitalized (id. at 15, 17-18);

- Reinhart took medication for his bipolar depression, but stopped taking it prior to his incarceration with Zareck because he was using crack cocaine (id. at 17);

- Reinhart was 37 years old; when he was approximately 18 to 20 years old, he used powdered cocaine (id. at 16);

- a person uses powdered cocaine by sniffing it and the "high is a longer lasting high [than crack cocaine] because it gets into your blood stream so you don't need as much of it" (id. at 16);

- crack cocaine is smoked with a pipe and "the high is extremely intense and you come crashing down when you don't have it…[s]o it takes a lot more of the crack cocaine than it does the powder cocaine" (id. at 16);

- Zareck told Reinhart that it was Ronald Zareck's shotgun, but Ronald Zareck would not "tak[e]…the gun" (id. at 57);

- Zareck was delusional (id. at 58);

14

- Reinhart did not know where Zareck was withdrawing from drugs when they were cellmates at the Allegheny County Jail (id. at 61);

- Zareck asked Reinhart if he could find someone to "take the gun for him" (id. at 19);

- Zareck asked Ronald Zareck for money for Reinhart's bond (id. at 19);

- the judge presiding over Reinhart's case released him from prison on his own recognizance, and, therefore, Reinhart did not need money to be released from jail (id. at 19);

- Zareck asked Reinhart to get his car out of impound and take care of his house upon Reinhart's release from jail (id. at 20-21);

- Rodgers left the key for Zareck's house for Reinhart at Zareck's house (id. at 22);

- Reinhart could not "take the gun" for Zareck because Reinhart was also a convicted felon and could be criminally charged with its possession (id. at 26);

- Reinhart cleaned Zareck's house and stayed there for approximately six months (id. at 27);

- Rodgers pressured Reinhart to find someone to "take the gun" for Zareck; indeed she told Reinhart that if he did not find someone to "take the gun" for Zareck, he could not stay at Zareck's home (id. at 28-29);

- Zareck told Reinhart he had the firearm in his home to protect himself from being robbed of the proceeds of his scheme involving forged prescriptions (id. at 28);

- Reinhart was charged with burglary, theft, and criminal trespass for staying at Zareck's home and taking Zareck's things without permission (id. at 28-29);

- Reinhart pleaded guilty to the charges because he had no way to prove that Zareck gave him permission to live in his home and sell his things (id. at 29-30);

- Reinhart lied to the judge when he pleaded guilty to those charges because he did not commit those crimes (id. at 48);

- Reinhart did not sell Zareck's things to get him out of jail (id. at 31); and

- Reinhart hoped to receive a benefit with respect to his sentence on the charges pending against him for testifying in Zareck's trial, but he was not guaranteed any benefit for his testimony (id. at 33-34).

Emily Ashy ("Ashy"), a scientist with the Allegheny County Office of the Medical

Examiner Forensic Laboratory, whose duties include testing substances to determine whether they are controlled substances, testified as an expert in drug analysis on behalf of the government. (T.T. 11/19/2012 (ECF No. 302) at 64-65.) Ashy testified, among other things, that six substances found in this case were provided to her for testing. She determined that two of the substances were controlled substances, i.e., amphetamine and Oxycodone. (Id. at 70, 72.) She explained the difference between Oxycodone and Oxycontin as follows: "Oxycodone is the actual chemical name of this compound. Oxycontin is a trade name of a drug that is found in tablet form." (Id. at 73.)

The government called Thomas Dayton ("Dayton"), a scientist assigned to the forensic chemistry drug section of the Allegheny County Medical Examiner's Office, to testify as an expert on drug analysis. (T.T. 11/19/2012 (ECF No. 302) at 78.) Dayton testified that the substances obtained by the Homestead Police Department from Zareck on April 3, 2009, were cocaine base (or crack cocaine), Oxycodone, and heroin. (Id. at 78-83.)

The parties stipulated that Zareck's is a "felon." (T.T. 11/15/2012 (ECF No. 300) at 17.) The following exchange between the court and counsel occurred in the jury's presence at trial:

> PROSECUTOR: Your Honor, I believe there is a stipulation between the defense and the government regarding the defendant's preclusion from being able to possess a firearm or ammunition lawfully as a result of his criminal history. It's my understanding that that stipulation would be that the defendant had a prior conviction for an offense punishable by imprisonment for a term exceeding one year and that that was before the time frame of not only this incident but before the time frame of the purchase of the ammunition in question.
>
> ZARECK'S COUNSEL: Correct.
>
> PROSECUTOR: That's correct.

(T.T. 11/15/2012 (ECF No. 300) at 17.)

The government entered 44 exhibits into evidence. (T.T. 11/19/2012 (ECF No. 302) at

87.)

Zareck called his brother Ronald Zareck ("Ronald Zareck") to testify on his behalf. (T.T.

11/16/2012 (ECF No. 301) at 2.) Ronald Zareck testified to the following, among other things:

- Since 1994, he lived in South Carolina (id. at 3);

- he served in the United States Navy, has as security clearance, and worked as a manager for a "major contractor for the United States government" (id. at 3, 9);

- Ronald Zareck always had an interest in firearms, but Zareck did not have an interest in firearms and he did not hunt (id. at 4-5, 25);

- in December 1998 or 1999, Ronald Zareck traveled from South Carolina to McKeesport, Pennsylvania, to purchase firearms, including the shotgun at issue in this case, from his aunt after his uncle died (id. at 7, 24-25);

- Ronald Zareck owns the shotgun at issue in this case (id. at 10);

- after Ronald Zareck purchased firearms from his aunt, including the shotgun at issue in this case, he traveled to stay at Zareck's home (id. at 8);

- Ronald Zareck took his belongings out of his vehicle and into Zareck's home (id. at 9);

- Ronald Zareck did not give any of the firearms to Zareck while he was staying in Zareck's home (id. at 10);

- Ronald Zareck packed his belongings in his vehicle to travel back to South Carolina, but "missed" the shotgun at issue in this case and it was left behind at Zareck's home (id. at 11-12);

- Ronald Zareck left the shotgun at issue in this case at Zareck's home "by accident" (id. at 12);

- Ronald Zareck never told Zareck that the shotgun was his and Zareck never told Ronald Zareck that he was keeping the shotgun (id. at 13);

- Ronald Zareck intended to travel to Zareck's home to retrieve the gun, but never did (id. at 13);

- Ronald Zareck never saw Zareck handle a firearm, including the shotgun at issue in this case (id. at 13);

- Zareck was a pharmacist (id. at 14);

-    Zareck is easily manipulated by other people and his life troubles have been caused by others manipulating him (id. at 15);

-    Ronald Zareck's relationship with Zareck has been "contentious" at times (id. at 15-16);

-    Ronald Zareck was asked to post bail for Reinhart, a friend Zareck met when he was incarcerated, but Ronald Zareck declined to post the bail (id. at 16);

-    Ronald Zareck recalled that Zareck never asked him for the shotgun (id. at 23); and

-    Zareck did not prohibit Ronald Zareck from taking the shotgun from his home (id. at 35.)

The prosecutor during his cross-examination of Ronald Zareck played for the jury a recorded telephone conversation between Ronald Zareck and Zareck when Zareck was incarcerated at the Allegheny County Jail. (T.T. 11/16/2012 (ECF No. 301) at 33.) Zareck during the telephone conversation told his brother: "I should have let you take that home with you with all the others, you know." (Id. at 33.)

Zareck introduced seven exhibits into evidence. (T.T. 11/19/2012 (ECF No. 302) at 124.)

## IV.    **Motion for Expansion of Record** (ECF No. 362)

In Zareck's motion for expansion of record, he requests leave of court to file exhibits in support of his § 2255 motion under Rule 7(b) of the Rules Governing and for additional pages for his reply brief in support of his § 2255 motion. (ECF No. 362.) The government opposes the motion because Rule 7(b) is applicable only if the court does not summarily dismiss the § 2255 motion in the first instance. (ECF No. 372 at 2-3.)

The government is incorrect that Rule 7(b) is inapplicable to Zareck's request for the expansion of the record in this case. Rule 4(b) of the Rules Governing § 2255 Proceedings provides:

**(b) Initial Consideration by the Judge.** The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. **If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order.**

Rule 4(b) of the Rules Governing § 2255 Proceedings (emphasis added). Here, the court did not dismiss Zareck's § 2255 motion; rather, it ordered the government to file a response to the motion. Rule 7 of the Rules Governing § 2255 Proceedings, pursuant to which Zareck filed his motion for expansion of record provides:

(a) In General. **If the motion is not dismissed**, *the judge may direct the parties to expand the record by submitting additional materials relating to the motion. The judge may require that these materials be authenticated.*

(b) Types of Materials. The materials that may be required include letters predating the filing of the motion, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits also may be submitted and considered as part of the record.

(c) Review by the Opposing Party. The judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness.

Rule 7 of the Rule Governing § 2255 Proceedings (emphasis added). One court has explained the interplay between Rule 4 and Rule 7 as follows:

Under Rule 4(b) of the Federal Rules Governing Habeas Cases, the judge who receives a motion under § 2255 must promptly examine it and must dismiss the motion if it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the defendant is not entitled to relief. If the motion is not dismissed, the judge must order the Government to file a response addressing the allegations in the motion. Under Rule 6, a judge may, for good cause, authorize a party to conduct discovery. And under Rule 7, a judge may direct the parties to expand the record by submitting additional materials relating to the motion. The judge must then review the Government's response, the transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

United States v. Boyle, No. CR 16-271, 2018 WL 6505526, at *2 (E.D. Pa. Dec. 11, 2018).

19

Here, the government argues that this court did not determine whether it would "summarily dismiss" Zareck's § 2255 motion, and, therefore, Zareck's request for expansion of the record pursuant to Rule 7 is premature. The government, however, is incorrect. This court upon review of Zareck's § 2255 determined that the motion would not be summarily dismissed and ordered the government to file a response to the motion. The Ninth Circuit Court of Appeals has explained:

> In the context of § 2255 habeas motions, "summarily dismissed" means the district court dismissed the motion based on a facial review without ordering responsive briefing and without conducting a hearing or making "findings of fact and conclusions of law." See, e.g., United States v. Howard, 381 F.3d 873, 877 (9th Cir.2004); Molina v. Rison, 886 F.2d 1124, 1127 n. 4 (9th Cir.1989).

United States v. Withers, 638 F.3d 1055, 1063 (9th Cir. 2011). Based upon the foregoing, this court did not summarily dismiss Zareck's § 2255 motion and it ordered the government to file a response in opposition to the motion. Rule 7 is applicable, and the court may order the expansion of the record. The court is unaware of any authority that suggests a party may not request the court to order the expansion of the record under Rule 7. Zareck's request for expansion of the record is properly raised under that rule.

Pursuant to Rule 7(c), "[t]he judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness." FED. R. CIV. P. 7(c). The government in its response in opposition to Zareck's motion to expand the record argues that, even if Zareck's motion is properly before the court, the court should deny Zareck's request to expand the record. The government asserts that the documents attached to Zareck's motion for expansion of the record do not support his argument that he is entitled to relief under § 2255. Zareck filed a reply brief in support of his motion for expansion of the record in which he explains which exhibits pertain to which ground for relief. Because the government did not object to the "correctness" of the exhibits proffered by Zareck, the court will grant Zareck's motion to expand the record. The

court will consider the attached exhibits in its analysis of each of Zareck's grounds for relief to determine whether an evidentiary hearing is warranted in this case.

The chambers rules of the undersigned judge limit reply briefs to 10 pages. Zareck in the motion for expansion of the record requested additional pages to file his reply brief in support of his § 2255 motion. The government in its response did not oppose that request. On February 25, 2019, Zareck's reply brief was filed on the docket. It consists of 107 pages. In light of the constitutional issues at stake in this case and because Zareck identified 36 issues in his § 2255 motion that he argues warrant relief, Zareck's request will be granted. The court will consider the reply brief to decide Zareck's § 2255 motion.

**V.   Section 2255 Motion**

    **A.   Applicable Law with respect to § 2255 Motions**

Under 28 U.S.C. § 2255, a federal prisoner in custody may move the court which imposed the sentence to vacate, set aside, or correct the sentence upon the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255.  Under § 2255, there are four grounds upon which relief may be granted:

> (1) "that the sentence was imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" and (4) that the sentence "is otherwise subject to collateral attack."

CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 625 (4th ed. 2011) (quoting Hill v. United States, 368 U.S. 424, 426-27 (1962)).  Section 2255 provides as a remedy for a sentence imposed in violation of law that "the court shall vacate and set the judgment aside and

shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255.

"As a collateral challenge, a motion pursuant to [§ 2255] is reviewed much less favorably than a direct appeal of the sentence." United States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014) (citing United States v. Frady, 456 U.S. 152, 167–68 (1982)).  "Indeed, relief under § 2255 is available only when 'the claimed error of law was a fundamental defect [that] inherently results in a complete miscarriage of justice, and... present[s] exceptional circumstances where the need for the remedy afforded by the writ...is apparent.'" Id. (quoting Davis v. United States, 417 U.S. 333, 346 (1974) (internal quotation marks omitted)).

A district court is required to hold an evidentiary hearing on a § 2255 motion if "the files and records of the case are inconclusive as to whether the movant is entitled to relief." United States v. Booth, 432 F.3d 542, 545-46 (3d Cir. 2005).  "[T]he court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." Id. at 545.  The court concludes that an evidentiary hearing is not necessary in this case because, as described below, based upon the file and records in this case Zareck is not entitled to relief.

## 1.  Ineffective Assistance of Counsel

To support a claim that counsel's assistance was so defective as to amount to a deprivation of one's Sixth Amendment right to effective assistance of counsel and require reversal of a conviction, a defendant must show two things: (1) counsel's performance was deficient; and (2) counsel's deficient performance caused him prejudice. Williams v. Taylor, 529 U.S. 362, 390-91 (2000) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)); see Ross v. Dist. Att'y of the Cnty. of Allegheny, 672 F.3d 198, 210 (3d Cir. 2012).  To show deficient performance, the defendant must show that his or her counsel made errors so serious that his or her counsel was not

functioning as the counsel guaranteed a defendant by the Sixth Amendment. <u>Ross</u>, 672 F.3d at 210.

"With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> A "reasonable probability" is a probability sufficient to undermine confidence in the outcome." <u>Harrington</u>, 562 U.S. at 104. It is not enough to show that counsel's errors had "some conceivable effect on the outcome of the proceeding." <u>Id</u>. (citing <u>Strickland</u>, 466 U.S. at 693). If a court determines that defendant did not suffer prejudice, it need not determine whether the performance of the defendant's counsel was deficient. <u>Marshall v. Hendricks</u>, 307 F.3d 36, 87 (3d Cir. 2002) (citing <u>Strickland</u>, 466 U.S. at 697)). Courts should generally address the prejudice prong first. <u>See</u> <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 170 (3d Cir. 1993).

### 2. Prosecutorial Misconduct

Federal habeas relief may be granted when a prosecutor's conduct "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974); <u>see</u> <u>Foy v. Lamas</u>, Crim. No. 12-088, 2013 WL 838191, at *28 (E.D. Pa. Mar. 6, 2013); <u>Pursell v. Horn</u>, 187 F.Supp.2d 260, 341 (W.D. Pa. 2002). To satisfy this standard, the prosecutor's misconduct must constitute a " 'failure to observe the fundamental fairness essential to the very concept of justice.' " <u>Donnelly</u>, 416 U.S. 642 (quoting <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941)). The court must "examine the prosecutor's offensive actions in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." <u>Moore v. Morton</u>, 255 F.3d 95, 107 (3d Cir. 2001); <u>see</u> <u>United States v. Young</u>, 470 U.S. 1, 11 (1985).

### B. Discussion

Zareck raises thirty-seven grounds for relief in his voluminous § 2255 filings. Specifically, he raises thirty-six grounds for relief in his § 2255 motion and one ground for relief in his motion to supplement the § 2255 motion. The court will first address each of thirty-six grounds for relief raised in Zareck's § 2255 motion to determine whether he is entitled to an evidentiary hearing or relief under the statute. The court will thereafter address whether to grant Zareck's motion to supplement the § 2255 motion with the thirty-seventh ground for relief.

### 1. Ground One

Zareck argues that his appellate counsel was ineffective because he did not argue on direct appeal of Zareck's resentencing that Zareck's sentence should be reduced in light of the procedural rule set forth by the Supreme Court in Mathis v. United States, 136 S. Ct. 2243 (2016). (ECF No. 348 at 4; ECF No. 363 at 13.) The government summarily argues that Zareck's argument about Mathis "was previously litigated, procedurally defaulted, and lacks merit under Strickland." (ECF No. 356 at 7.)

In Mathis, the Supreme Court "provided important guidance on how to interpret whether a conviction falls within a given clause of the [Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)]." United States v. Peppers, 899 F.3d 211, 227 (3d Cir. 2018). The Third Circuit Court of Appeals has explained:

> In Mathis, the Supreme Court stated that, "[t]o determine whether a past conviction [falls within the ACCA's enumerated offenses clause], courts compare the elements of the crime of conviction with the elements of the 'generic' version of the listed offense—i.e., the offense as commonly understood." 136 S.Ct. at 2247. The Court made it clear that there is no exception to that rule, even "when a defendant is convicted under a statute that lists multiple, alternative means of satisfying one (or more) of its elements." Id. at 2248. The rule remains "that the prior crime qualifies as an ACCA predicate if, but only if, its elements are the same as, or narrower than, those of the generic offense." Id. at 2247. That rule, well known as the "categorical approach," requires the sentencing court to look solely at the elements of the crime of conviction and the elements of the generic offense, without consulting any of the specific facts of the case. Id.

Id.

The Third Circuit Court of Appeals held that this court erred when it imposed upon Zareck a sentence at each of counts one (a violation of 18 U.S.C. § 922(g)(1)) and two (a violation of § 922(g)(1)) of the superseding indictment based upon a "single incidence of possession." United States v. Zareck, 588 F. App'x 100, 101 (3d Cir. 2014). The case was remanded. On January 25, 2017, this court conducted a resentencing of Zareck limited to correcting the error it made during Zareck's original sentencing. On January 29, 2016, Zareck appealed his resentencing. On June 23, 2016, the Supreme Court issued Mathis. On September 29, 2016, the Third Circuit Court of Appeals affirmed this court's resentencing of Zareck. United States v. Zareck, 662 F. App'x 110, 112 (3d Cir. 2016). Zareck in his § 2255 motion argues that his appellate counsel was ineffective because he did not raise an issue under Mathis to the Third Circuit Court of Appeals during the pendency of his appeal.

Zareck's claim for ineffective assistance of counsel based upon his counsel's failure to argue Mathis before the Third Circuit Court of Appeals fails because he cannot show that he was prejudiced by his counsel's conduct. Zareck argues that under Mathis, his Pennsylvania state-court conviction based upon his nolo contendere plea to a violation of 35 PA. CONS. STAT. § 780-113(a)(14) does not constitute a conviction for a "serious drug offense" as defined by 18 U.S.C. § 924(e)(2). Zareck fails to acknowledge, however, that the Third Circuit Court of Appeals affirmed this court's finding that he was an armed career criminal based upon three ***other*** convictions for serious drug offenses based upon his nolo contedere pleas to violations of 35 PA.

CONS. STAT. § 780-113(a)(30).[4] Under those circumstances and in consideration of Exhibit D[5] to

Zareck's motion for expansion of the record, even if Zareck is correct that his conviction under

section 780-113(a)(14) does not qualify as a serious drug offense under Mathis,[6] he would still

---

[4]       The Third Circuit Court of Appeals in Zareck I explained:

The first of Zareck's ACCA predicate convictions involved a pair of prescription drug sales to the same confidential informant that took place about a week apart back in 1988. Based on these, Zareck was charged with, and entered a plea of nolo contendere to, two counts of violating 35 Pa. Cons. Stat. § 780–113(a)(30), which prohibits "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance." His second conviction came after Zareck engaged in three prescription drug sales over the course of about six weeks later in 1988. Again, he was charged with multiple counts of violating 35 Pa. Cons. Stat. § 780–113(a)(30)….Again, he entered a plea of nolo contendere on all counts. Then, in 1990, Zareck was caught selling prescription drugs to an undercover agent. He was again charged with multiple counts of violating 35 Pa. Cons. Stat. § 780–113(a)(30), as well as several other state-law counts. This time, a jury convicted him.

Zareck I, 662 F. App'x at 114 (footnotes omitted).

[5]       Zareck describes Exhibit D as "copies of official documents from…[Zareck's] prior state conviction adjudicated under terms of a nolo contendere plea agreement…[that] is specific evidence that fully develop[s] claims of ineffective assistance of counsel relevant in Grounds 1 and 4…." (ECF No. 375 at 12.)

[6]       Mathis is not new law. One court has explained:

[T]he Mathis Court made clear that the decision did not break new ground. As Defendant urges, the Supreme Court indicated that its decision did not announce a new rule, but instead was dictated by longstanding precedent. "Our precedents make this a straightforward case. For more than 25 years, we have repeatedly made clear that application of ACCA involves, and involves only, comparing elements…." Mathis, 136 S.Ct. at 2257. Accordingly, in other contexts requiring consideration of whether a case represents "new" law, courts have noted that Mathis "did not recognize a new rule or right; it merely clarified the process for comparing a state conviction to the generic federal offense." See, e.g., United States v. Bryant, No. 3-838, 2017 U.S. Dist. LEXIS 164930, at *3 (E.D. Pa. Oct. 4, 2017) (addressing Mathis and 28 U.S.C. § 2255(f)(3)). As one court observed, "there is nothing 'new' about Mathis." United States v. Gadsden, No. 09-305, 2017 WL 6316566 at *2, 2017 U.S. Dist. LEXIS 202795 at *6 (W.D. Pa. Dec. 11, 2017). Mathis "is not an issue 'on which new law has been made since the time of the appeal.' " Guenther

qualify as an armed career criminal and receive a sentence in accordance with that designation. Under those circumstances, even if his appellate counsel was ineffective for failing to argue Mathis to the court of appeals, Zareck was not prejudiced by that conduct.  His § 2255 motion will be denied with respect to this issue on that basis.

### 2.   Ground Two

Zareck argues that his trial and appellate counsel were ineffective because they did not object to the imposition of a four-level enhancement to his guideline offense level for possessing a firearm in connection with another felony offense, pursuant to U.S.S.G. § 2K2.1(b)(6). The government argues that the enhancement was "appropriately applied" because, among other reasons, "testimony revealed that Zareck possessed the shotgun because of his drug activities in forging prescriptions and selling drugs." (ECF No. 356 at 7.)

This court at sentencing explained:

> Pursuant to United States Sentencing Guidelines, Section 2K2.1(b)(6)(B), if the defendant possessed any firearm or ammunition in connection with another felony offense, the offense level is increased four levels. Following defendant's arrest on April 3, 2009, defendant was found to be in possession of seven stamp bags of heroin, two rocks of cocaine base and eight Oxycodone pills which he intended for distribution to confidential informant. Additionally, witness testimony indicated that defendant had the shotgun because of his drug activities in forging prescriptions and selling drugs. Defendant's adjusted offense level is, therefore, increased by an additional four points for an adjusted offense level of 28.

(H.T. 5/17/2013 (ECF No. 307) at 19-20.)

The Third Circuit Court of Appeals has instructed:

> To ensure that a sentence reflects a defendant's total culpability, the Guidelines provide for an increase in the base offense level—and consequently, the

---

v. Williams, No. 17-231, 2017 WL 5054731 at *2, 2017 U.S. Dist. LEXIS 181619 at *5 (W.D. Wis. Nov. 2, 2017).

United States v. Marrero, No. CR 9-208, 2017 WL 6557475, at *2 (W.D. Pa. Dec. 22, 2017).

base sentencing range—whenever a firearm is used or possessed "in connection with" another felony offense. See United States v. Navarro, 476 F.3d 188, 192 (3d Cir.2007) (citing Loney, 219 F.3d at 287–88). Proper application of the four-level enhancement under § 2K2.1(b)(6) requires finding, by a preponderance of the evidence, that the defendant used or possessed a firearm; that the defendant committed another felony offense, regardless of whether a criminal charge was brought or a conviction obtained; and that the firearm facilitated, or had the potential of facilitating, the felony offense. See U.S.S.G. § 2K2.1, comment. (n.14).

United States v. West, 643 F.3d 102, 110 (3d Cir. 2011).

With respect to the first requirement, the jury found beyond a reasonable doubt that Zareck possessed the shotgun in his home. (ECF No. 243.) With respect to the second requirement, i.e., the defendant committed another felony offense, it is a felony under Pennsylvania law to: (1) acquire or obtain possession of oxycodone by "misrepresentation, fraud, forgery, deception or subterfuge[;]" and (2) administer or dispense oxycodone as a pharmacist unless in good faith, to a patient, and in accordance with "treatment principles accepted by a responsible segment of the medical profession." 35 Pa. Cons. Stat. §§ 780-113(a)(12), (a)(14), and (f) and 780-104(2)(i)(1). Reinhart, who was a former cell mate of Zareck's at the Allegheny County Jail, testified that Zareck told him he possessed the shotgun to protect himself from being robbed of the proceeds of his scheme in which he provided forged prescriptions to individuals and filled those prescriptions for, among other substances, oxycodone. (T.T. 11/19/2012 (ECF No. 302) at 28.) Reinhart testified:

> He told me that they had a scheme from South Hills rehab where he had doctor prescription pads and doctors' license numbers because he was a pharmacist and he had people who were also actively using drug addicts that was using the Oxycodone and Oxycontin and Percocets from the pads he had that would give -- he would give prescriptions -- he would write out the prescription and everything. The people would bring him the prescriptions and he would fill them as the pharmacist, and then they would interact after work and he would meet up with them and they would either exchange money or exchange half the pills for them doing it. That's how he had supported his habit and that's how he made all of his extra money and that he needed that gun in case somebody tried to rob him because he was filling prescriptions for 90 and 120 pills at a time. At $80 a pill for 120 pills, that's quite a

lot of money to be dealing with other people and that he didn't want anybody to rob him.

(Id.)

This court relied upon the foregoing evidence to deny Zareck's motion for judgment of acquittal during trial. At trial, Zareck's counsel argued that the government did not present evidence from which a reasonable jury could find beyond a reasonable doubt that Zareck possessed the shotgun and the ammunition with which he was charged. (Id. at 87.) The court denied the motion and explained:

> At this stage, the Court does have to take the government's evidence in the light most favorable to the government and the Court would conclude that there is sufficient evidence for a jury to find the defendant guilty and the motion is denied. In particular, the Court notes that the weapon in issue had been present in the defendant's residence for many years, that a number of witnesses testified that they observed the weapon in his bedroom, and Mr. Reinhart has testified that the defendant acknowledged that he possessed the gun to protect himself out of concerns for safety, that is, relating to the drugs in which he was dealing. There was ample evidence of the defendant's use of illegal substances, particularly the young woman who testified that she was using drugs with the defendant and she saw the weapon in the bedroom when they were together in the bedroom. So, for those and other reasons, other evidence, the Court would find it is sufficient.

(Id. at 88.)

The court at sentencing relied upon Reinhart's trial testimony to find by a preponderance of the evidence that Zareck possessed the firearm in connection with another felony offense. (H.T. 5/17/2013 (ECF No. 307) at 19-20); United States v. Cicirello, 301 F.3d 135, 142 (3d Cir. 2002) (explaining that the "government bears the burden of proving by a preponderance of the evidence that the facts warrant an enhancement"). Zareck in his § 2255 submissions attacks Reinhart's credibility,[7] but this court observed Reinhart at trial and found him to be credible to the extent he

---

[7]     For example, in his reply brief (ECF No. 363 at 32), Zareck points to testimony by other government witnesses that they never saw Zareck touch the shotgun. That testimony, however, does not contradict Reinhart's testimony that Zareck told him he possessed the shotgun to protect

testified that Zareck told him he possessed the shotgun for protection from being robbed of the proceeds of his forged-prescription scheme. In other words, the court at sentencing found that—based upon Reinhart's trial testimony—it was more likely than not that Zareck possessed the shotgun in connection with another felony offense.

Zareck also argues that there is no evidence that the gun, which was unloaded, was near any indicia of any felony crime, and he cites decisions in support of his argument. The facts of this case, however, are unique because there is evidence that Zareck told Reinhart that he possessed the shotgun to protect himself from being robbed of the proceeds of his other felony crimes, i.e., there is evidence of record that Zareck admitted to Reinhart he possessed the shotgun—unloaded or not—in connection with another felony crime. Zareck attempts to discredit Reinhart, but, as discussed above, this court found Reinhart's testimony credible and relied upon it at sentencing to find that it was more likely than not that Zareck possessed the shotgun in connection with another felony offense.

With respect to the third requirement under § 2K2.1(b)(6)(B), i.e., the firearm had the potential of facilitating the felony offense, the court easily concludes that the shotgun in Zareck's home had the potential of facilitating his violations of section 780-113(a)(12) and (14) because he could use the shotgun to protect himself from anyone attempting to rob him of the proceeds of his illegal activity.

Based upon the foregoing analysis, even considering Exhibits A, B, C, and F[8] to Zareck's

---

himself from being robbed of the proceeds of his illegal drug activity.

[8]      Zareck describes Exhibit A as "a copy of the official 'Supplemental Report'…prepared by Officer/Bomb Technician, Robert Synan, from the County of Allegheny Department of Police, who was a bomb squad officer that participated in the investigation following…[Zareck's] arrest…." (ECF No. 375 at 9.) According to Zareck, Exhibit A "contains specific evidence regarding the cardboard tube found in Movant's vehicle that clearly

motion for expansion of the record, there was sufficient evidence presented at trial to warrant the

application of the four-point enhancement to Zareck's offense level for possessing a firearm in

connection with another felony offense. Under those circumstances, even if Zareck's counsel

would have objected to the four-level enhancement under § 2K2.1(b)(6)(B) before this court or

on appeal to the Third Circuit Court of Appeals, the court would have overruled the objections

---

disqualifies it as constituting an improvised explosive device." (Id.) Zareck argues Exhibit A is
relevant to Ground Two because it demonstrates "that there weas never an improvised explosive
to contribute to the Government's application of the enhancement." (Id. at 10.) The court,
however, did not rely upon Zareck's possession of an improvised explosive device when it
imposed an enhancement pursuant to § 2K2.1(b)(6)(B). Exhibit A, therefore, does not change
this court's conclusion that Zareck is not entitled to relief with respect to Ground Two.

Zareck argues that Exhibits B and F also show that he did not possess an improvised
explosive device. (EF No. 375 at 10.) For the same reason set forth above with respect to Exhibit
A, i.e., the court need not rely upon Zareck's alleged possession of an improvised explosive
device when it imposed an enhancement pursuant to § 2K2.1(b)(6)(B), Exhibits B and F do not
change this court's conclusion that Zareck is not entitled to relief with respect to Ground Two.

Zareck argues that Exhibit C shows that the court relied upon a factual error when it
included the enhancement, pursuant to § 2K2.1(b)(6)(B), in its calculation of the sentencing
guidelines. He explains that Exhibit C "is a copy of the official documents in the Court of
Common Pleas of Allegheny County…that…proves that…[Zareck] was never charged by local
police…with…a[nother] felony drug offense while in constructive possession of a firearm[,]"
and, thus the § 2K2.1(b)(6)(B) enhancement did not apply. (ECF No. 375 at 12.) Note 14 of the
commentary to § 2K2.1(b)(6)(B) clearly states, however, that "another felony offense" includes
"any federal, state, or local offense, other than the explosive or firearms possession or trafficking
offense, punishable by imprisonment for a term exceeding one year, regardless of whether a
criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1(b)(6)(B), cmt.
(n.14(C)). Thus, whether Zareck was actually convicted of violations of section 780-113(a)(12)
and (14) is not dispositive of whether the enhancement applied; rather, the court need only find
that Zareck committed another felony offense by a preponderance of the evidence, which the
court in this case did. United States v. West, 643 F.3d 102, 110 (3d Cir. 2011); United States v.
Hemsher, 893 F.3d 525, 534 (8th Cir. 2018) ("'In applying § 2K2.1(b)(6) when the defendant
has not been convicted of another state or federal felony offense, the district court must find by a
preponderance of the evidence that another felony offense was committed, and that use or
possession of the firearm facilitated that other felony.'") (quoting United States v. Dixon, 822
F.3d 464, 465 (8th Cir. 2016)). Thus, Zareck is not entitled to relief based upon ground two even
in consideration of Exhibit C.

and applied the enhancement.  Zareck's § 2255 motion will be denied with respect to this ground for relief.

### 3.  Ground Three

This court found that Zareck's criminal history score resulted in a criminal history category of VI based upon: (1) his criminal history score resulting from his prior convictions and sentences; and (2) his status as an armed career criminal. Zareck in his § 2255 submissions argues that all his counsel were ineffective for failing to object before this court or the court of appeals to the imposition of one criminal history point for a conviction of tampering with evidence sustained on December 4, 2012, in the Allegheny County Court of Common Pleas (the "tampering with evidence conviction"). (ECF No. 255 ¶ 53.) Zareck argues that the conduct underlying that conviction is relevant conduct with respect to the crimes of conviction in this case, i.e., possession of a firearm and/or ammunition by a convicted felon and possession of a firearm and/or ammunition by an unlawful user of a controlled substance, and pursuant to U.S.S.G. § 4A1.2, criminal history points cannot be awarded for a prior conviction involving conduct that is considered "relevant conduct" to the instant offenses of conviction. The government summarily argues that this court "properly applied criminal history points for the offense" and that even if his counsel was ineffective for failing to raise and argue the issue, "it is of no consequence" because "Zareck was convicted as an Armed Career Criminal…." (ECF No. 356 at 8.)

Zareck cannot prove that he was prejudiced by his counsels' alleged failure to object to the criminal history point awarded for his tampering with evidence conviction because even without consideration of that conviction, his criminal history category would have been a VI because he is an armed career criminal. U.S.S.G. § 4B1.4(c)(3). Thus, Zareck was not prejudiced by any of his counsels' conduct as alleged in his third ground for relief.  Zareck's § 2255 motion will, therefore,

be denied with respect to this issue.

### 4. Ground Four

Zareck argues that his trial counsel at sentencing and both CJA counsel on appeal rendered ineffective assistance of counsel because they failed "to argue that certain prior convictions could not qualify as ACCA predicates since the <u>Shepard</u> documents did not identify the Controlled Substance Schedule for the prescription pills to satisfy <u>Taylor's</u> 'demand for certainty' because all are not subject to [a] ten year maximum penalty." (ECF No. 348 at 8.) The government summarily argues this claim is inadequately plead, procedurally defaulted, and Zareck cannot prove that he was prejudiced by his counsels' allegedly deficient conduct. (ECF No. 356 at 8.)

Section 4B1.4(a) of the sentencing guidelines defines an "armed career criminal" as "[a] defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e)." U.S.S.G. § 4B1.4(a). Section 924(e) provides:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

18 U.S.C. § 924(e)(1). A "serious drug offense" is defined as, among other things:

> an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law[.]

18 U.S.C. § 924(e)(2)(A)(ii).

In 1989, Zareck in the Allegheny County Court of Common Pleas at case number 9511-1989 was charged with three counts of violating 35 Pa. Cons. Stat. § 780-113(a)(30) (counts one-

three) and 35 Pa. Cons. Stat. § 780-113(a)(14) (counts 4-6). (ECF No. 362-4 at 2-3.) At the time

Zareck was charged with the offenses, section 780-113(a)(14) prohibited:

> The administration, dispensing, delivery, gift or prescription of any controlled substance by any practitioner or professional assistant under the practitioner's direction and supervision unless done (i) in good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.

35 Pa. Cons. Stat. § 780-113(a)(14) (1972). Section 780-113(a)(30) prohibited:

> [T]he manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 Pa. Cons. Stat. § 780-113(a)(30) (1972). Section 780-113(a)(14) and (30) were subject to the

same penalty provisions. A violation of either of those provisions with respect to a Schedule I or

II controlled substance was subject to, among other penalties, a maximum term of imprisonment

of fifteen years. 35 Pa. Cons. Stat. § 780-113(f)(1). Zareck was charged with violating § 780-

113(a)(14) and (30) with respect to the distribution of three controlled substances: Morphine

Sulfate, Dilaudid, and Dolophine (methadone)[9]. (Id.) On February 4, 1992, Zareck pleaded nolo

contendere to all six counts. (ECF No. 362-4 at 2-13.) The court sentenced Zareck at count one to

a term of imprisonment of 2 to 6 years with no further penalty imposed at counts two through six.

(ECF No. 255 ¶ 49.)

Zareck argues that the conviction listed in paragraph 49 of the PIR does not constitute a

"serious offense" because it is not clear whether the crimes to which he pleaded nolo contendere

carried a maximum term of imprisonment of ten years or more.  (ECF No. 348 at 8; ECF No. 363

---

[9]      The Supreme Court of the United States has recognized that Dolophine is methadone. United States v. Moore, 423 U.S. 122, 124 (1975).

at 45-48.) Zareck explains that the charging document in that case provides that he committed "the crime or crimes" set forth in the document and that some of the crimes with which he was charged may not carry a maximum term of imprisonment of ten years or more. For example, Zareck was charged with an offense involving Morphine. Under Pennsylvania law, Morphine is a Schedule II controlled substance. 35 Pa. Const. Stat. § 780-104(2)(i)(1). The following quantity of morphine, however, is a Schedule III controlled substance:

> Not more than 50 milligrams of morphine per 100 milliliters or per 100 grams and not more than 2.5 milligrams per dosage unit with one or more active, nonnarcotic ingredients in recognized therapeutic amounts.

35 Pa. Cons. Stat. § 780-104(3)(iii)(8). Zareck argues that the state-court record lacks clarity about whether the charges against him concerned a Schedule II or Schedule III quantity of Morphine, and, thus, it is unclear whether the crimes charged against him with respect to Morphine were subject to a maximum term of imprisonment of at least ten years. He argues that under those circumstances, his counsel was ineffective because they did not argue before this court or to the court of appeals that the conviction listed in paragraph 49 of the PIR does not constitute a serious offense under § 924(e)(2)(A)(ii).

Zareck, however, cannot prove that he suffered prejudice because of his counsels' alleged deficient performance. Along with crimes involving Morphine Sulfate, Zareck was charged with violations of section 780-113(a)(14) and (30) involving Dolophine, which the Supreme Court of the United States has recognized is methadone. United States v. Moore, 423 U.S. 122, 124 (1975). Methadone was a Schedule II controlled substance, pursuant to 35 Pa. Cons. Stat. § 780-104(2)(ii)(11). Thus, Zareck's offenses involving Methadone were subject to maximum terms of imprisonment of at least ten years. Under those circumstances, even if Zareck's counsels would have asserted the arguments about Morphine that he sets forth in his § 2255 submissions, his

convictions set forth in paragraph 49 of the PIR with respect to Methadone would have constituted serious drug offenses for the purpose of his designation as an armed career criminal. Based upon the foregoing, Zareck's § 2255 motion will be denied with respect to this fourth ground for relief.[10]

### 5.  Ground Five

In ground five, Zareck argues that the prosecutor committed prosecutorial misconduct and that his counsel was ineffective. Both arguments concern the testimony of Larcinese. (ECF No. 363 at 49.) Larcinese testified at Zareck's trial that he learned the "craft" of forging prescriptions from Zareck. (T.T. 11/16/2012 (ECF No. 301) at 85.) Zareck argues in his § 2255 briefings that the foregoing testimony by Larcinese: (1) was perjured testimony; (2) the prosecutor committed prosecutorial misconduct by knowingly introducing the perjured testimony at his trial; (3) Zareck's trial counsel was ineffective for failing to request a new trial after Zareck learned that Larcinese's testimony was false; and (4) Zareck's trial counsel was ineffective for

---

[10]    Zareck argues that Exhibit D, which shows his state-court convictions were based upon a nolo contendere plea, is sufficient for this court to conclude that he is entitled to relief with respect to ground four. (ECF No. 375 at 12.) The Third Circuit Court of Appeals, however, rejected this argument and explained:

> Zareck claims that two of his three state-court convictions cannot count as ACCA predicates because they resulted from pleas of nolo contendere. Unfortunately for Zareck, however, all that matters under ACCA is whether the defendant has "three previous convictions." 18 U.S.C. § 924(e)(1) (emphasis added). Under Pennsylvania law, any "adjudication of guilt" constitutes a "conviction" for purposes of § 924(e)(1), United States v. Jefferson, 88 F.3d 240, 243 (3d Cir. 1996), and a plea of nolo contendere appears to have the same legal effect as a guilty plea, see Eisenberg v. Com., Dep't of Pub. Welfare, 512 Pa. 181, 185, 516 A.2d 333 (1986) ("A plea of nolo contendere, when accepted by the court, is, in its effect upon the case, equivalent to a plea of guilty.... The judgment of conviction follows upon such plea as well as upon a plea of guilty." (quoting Commonwealth v. Ferguson, 44 Pa.Super. 626, 628 (1910))). Thus, Zareck cannot hide behind his nolo contendere pleas to contest his ACCA status.

United States v. Zareck, 662 F. App'x 110, 115 (3d Cir. 2016).

failing to object to the evidence under Federal Rule of Evidence 404(b). The first three

arguments are based upon the allegation that Larcinese committed perjury during Zareck's trial,

i.e., he knowingly offered false testimony. United States v. Hoffecker, 530 F.3d 137, 183 (3d Cir.

2008) (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993) ("A witness commits perjury

if he or she 'gives false testimony concerning a material matter with the willful intent to provide

false testimony, rather than as a result of confusion, mistake, or faulty memory.'").

Zareck alleges that while incarcerated he met codefendants of Larcinese, i.e., Eric Kisner

and Michael Schwartzbauer, and those codefendants provided him a presentence investigation

report from their federal case. (ECF No. 362 at 52.) Zareck attached the presentence

investigation report to his motion for expansion of the record and labeled it Exhibit E. According

to Zareck, the presentence investigation report shows that Larcinese previously testified under

oath in contradiction to his statement that Zareck taught him how to forge prescriptions, i.e., he

testified that Shannon Wolfe taught him how to forge prescriptions. (ECF No. 363 at 50.)[11]

Zareck's allegations that Larcinese committed perjury, however, are not supported by the

evidence. As described above, Larcinese testified that Zareck taught him how to forge

prescriptions. The presentence investigation report upon which Zareck relies provides:

> The investigation showed that Shannon Wolfe, who was then employed as a nurse's
> aide at Jefferson Regional Medical Center, stole a blank prescription pad with
> approximately fifty blank prescriptions in March or April of 2009. John Larcinese,
> who had been a friend of Shannon's for most of his life, and Shannon's husband

---

[11]     Zareck argues:

> Shannon Wolfe, who was then employed as a nurse's aid [sic] at a local hospital,
> as the person responsible for teaching him information on how to forge
> prescriptions for his large-scale drug conspiracy. She was also a life-long friend of
> his.

(ECF No. 363 at 50.)

Brian Wolfe, initially started using the blank prescription to obtain oxycodone.

(ECF No. 362-5 at 2.) The foregoing excerpt does not contradict Larcinese's testimony at

Zareck's trial that Zareck taught him how to forge prescriptions or show that Larcinese provided

the government the foregoing information about Shannon Wolfe's role in the fraudulent

prescription scheme.[12] Under those circumstances, this court cannot find support in the record

sufficient to warrant an evidentiary hearing. Specifically, there is no support in the present record

for Zareck's assertions that Larcinese's testimony at Zareck's trial was knowingly false, the

prosecutor committed prosecutorial misconduct by introducing it at trial, or Zareck's trial

counsel was ineffective because he failed to file a motion for a new trial.

Zareck also argues that his trial counsel was ineffective because he failed to object to

Larcinese's testimony that Zareck taught him how to forge prescriptions for medications under

Rule 404(b). According to Zareck, the testimony

> was highly prejudicial by inviting an inference that…[Zareck] acted in conformity
> with his character as an unlawful drug user, and overpersu[a]ded the jury that
> because…[Zareck] committed offenses before, he therefore was more likely to have
> committed the federal firearms offenses.

(ECF No. 363 at 53.)

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character
> of a person in order to show action in conformity therewith.  It may, however, be
> admissible for other purposes, such as proof of motive, opportunity, intent,
> preparation, plan, knowledge, identity, or absence of mistake or accident, provided
> that upon request by the accused, the prosecution in a criminal case shall provide
> reasonable notice in advance of trial, or during trial if the court excuses pretrial
> notice on good cause shown, of the general nature of any such evidence it intends

---

[12]     Zareck alleges that Larcinese "provided federal agents with a confession under oath as part of a plea agreement in his own drug conspiracy case that did not include…[Zareck,]" but did not provide any evidence or support for those allegations. (ECF No. 363 at 49.) In any event, the presentence investigation report provided by Zareck is not inconsistent with the testimony given by Larcinese at trial.

to introduce at trial.

FED. R. EVID. 404(b).  "'The 'threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character.'" United States v. Melton, 131 F. App'x 21, 23 (3d Cir. 2005) (citing United States v. Butch, 256 F.3d 171, 175 (3d Cir. 2001).  The Court of Appeals for the Third Circuit has set forth a four-part standard governing the admissibility of evidence pursuant to Rule 404(b), which requires: (1) a proper evidentiary purpose; (2) relevance under Rule 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under Rule 403; and (4) if requested, a limiting instruction concerning the purpose for which the evidence may be used. United States v. Caldwell, 760 F.3d 267, 275 (3d Cir. 2014).

Here, Zareck's trial counsel did not object to Larcinese's testimony that Zareck taught him how to forge prescriptions. Even if Zareck's trial counsel raised that objection, the objection would have been overruled. Zareck was charged in this case with being a convicted felon in possession of a firearm **and** being an unlawful user of a controlled substance in possession of a firearm. Thus, evidence of Zareck's use of controlled substances and how he obtained those controlled substances was relevant to the charges pending against him. Larcinese's testimony described how he met Zareck and they obtained and used drugs together. The trial transcript provides:

> Q. You told us that you were forging prescriptions that ultimately caused you to be arrested. Who did you learn that craft from?
>
> A. Ray.
>
> Q. What kind of things did he tell you that would help you in that craft?
>
> A. The language that you write on the prescription, what it means -- I don't know if it's Latin or what, but it describes what the pharmacist is supposed to fill.

Q. Let me ask you this, sir. Was Ray forging prescriptions as well during this time frame?

A. Yeah.

Q. Did you see him do it?

A. I did it with him.

Q. Did you help obtain the drugs from prescriptions that you and Ray helped to forge together?

A. Yeah. I mainly went in to fill them.

Q. After Ray was arrested, did you continue that behavior?

A. Yes.

Q. In fact, did you increase it and get other people to help you in that regard?

A. Yes.

Q. Is that what ultimately led to your arrest and your current incarceration?

A. Yes.

Q. How would you know what to say when you went to the pharmacy to get these forged prescriptions?

A. There was like certain things you say that Ray taught me and that I learned over the process of doing it, like what type of doctor it was from, like depending on the doctor that was on the prescription. If it was urologist, we would say that we just had our prostate removed and actually buy extra stuff to make it look like that. Also what particular pharmacist was working and things that you could talk to him about that he knew like hobbies of the pharmacist.

(T.T. 11/16/2021 (ECF No. 301) at 85-86.)

The foregoing testimony had a proper, non-propensity evidentiary purpose, i.e., to show

Zareck was an unlawful user of controlled substances when he possessed the firearm and to explain

Larcinese's background and relationship with Zareck. The evidence was relevant under Rule 402,

i.e., the evidence described the relationship between Larcinese and Zareck and proved that Zareck

was an unlawful user of controlled substances when he possessed the firearm and how Zareck obtained controlled substances for his consumption. The prejudicial aspect of the evidence, i.e., the jury may conclude that because Zareck forged prescriptions he would illegally possess a firearm, is outweighed by the probative value of the evidence because the evidence explains how Zareck illegally obtained controlled substances. Even if Zareck's trial counsel requested a limiting instruction[13] after Larcinese testified about Zareck's forging prescriptions or the court concluded that the testimony would be excluded, Zareck cannot demonstrate that there was a reasonable probability that but for that evidence the jury would have acquitted him. The outcome of the trial would have been the same in light of all the evidence presented that showed Zareck possessed a shotgun and ammunition in his home while he was an unlawful user of controlled substances and a convicted felon.[14] Under those circumstances and even after consideration of Exhibit E attached to Zareck's motion for expansion of the record, Zareck did not show that he suffered prejudice from his counsel's asserted deficient performance. Zareck's § 2255 motion will, therefore, be

---

[13]     For example, Zareck's counsel could have requested a limiting instruction that the jury could consider Larcinese's testimony to determine whether Zareck was an unlawful user of controlled substances when he possessed the firearm or ammunition, but could not use the evidence that Zareck forged prescription medications in the past to conclude that Zareck committed the crimes with which he was charged in this case.

[14]     The parties presented a stipulation to the jury with respect to Zareck being a felon. (T.T. 11/15/2012 (ECF No. 300) at 17.) The government during trial explained:

> Your Honor, I believe there is a stipulation between the defense and the government regarding the defendant's preclusion from being able to possess a firearm or ammunition lawfully as a result of his criminal history. It's my understanding that that stipulation would be that the defendant had a prior conviction for an offense punishable by imprisonment for a term exceeding one year and that that was before the time frame of not only this incident but before the time frame of the purchase of the ammunition in question.

(Id.) Zareck's trial counsel agreed with the foregoing explanation of the parties' stipulation with respect to Zareck's status as a felon.

41

denied with respect to this argument.

### 6. Ground Six

Zareck argues that his trial counsel was ineffective because he did not object to the introduction into evidence at trial of "numerous empty prescription vials as [Zareck's]…personal property." (ECF No. 363 at 56.) The government argues that the evidence was introduced as indicia of Zareck's residence at the home searched following Zareck's initial arrest in this case by Wintruba, a patrolman with the Homestead Police Department. According to the government, Zareck cannot satisfy either prong of Strickland with respect to this issue. (ECF No. 356 at 9.)

Evidence of the empty prescription bottles was entered into evidence during the following exchange between the prosecutor and Wintruba:

> Q. In your search of the residence and when you were collecting indicia or mail or paperwork as we've just shown, did you find any of this type of indicia or mail catalogs, anything of the like for anyone other than Raymond Zareck?
>
> A. No. Throughout the entire house, everything we found was to Raymond Zareck.
>
> Q. I'm going to show you what has been marked as Government's Exhibit 18. What are we seeing in that particular photograph?
>
> A. Numerous bottles of pills that were seized.
>
> Q. Were they empty pill bottles or were there items located within the pill bottles?
>
> A. All these pill bottles were empty. They were located within the plastic bag which was in the upstairs closet of the office area.
>
> Q. I'm going to show you what has been marked as Government's Exhibit 18A. Are these the actual pill bottles that we're seeing in that particular photograph?
>
> A. Yes, they are, these are the pill bottles I seized out of the closet.

(T.T. 11/15/2012 (ECF No. 300) at 54.) Zareck argues that his counsel should have objected to (or filed a motion in limine with respect to) the introduction of the pill bottles under Federal Rule of Evidence 403 because the probative value of the evidence is substantially outweighed by the

danger of unfair prejudice. (ECF No. 363 at 57.) Zareck explains that Wintruba testified that there was other evidence throughout the home that he considered indicia of Zareck's residency at the home. (Id.)

Zareck, however, cannot show that his counsel's failure to object to the evidence prejudiced him, i.e., he did not demonstrate there is a reasonable probability that but for his counsel's failure to exclude that evidence the jury would have acquitted him. In other words, even if his counsel objected to the introduction of the evidence and this court sustained that objection, the outcome of the trial would have been the same. There was overwhelming evidence presented that Zareck was a felon and an unlawful user of a controlled substance when he possessed the shotgun and ammunition in his home. For example, Aubrey, Zareck's neighbor, testified that she saw Zareck smoke crack cocaine, snort crushed pills, swallow pills, and use prescription medication in larger doses than what was prescribed. According to Aubrey, the shotgun was in Zareck's home during the time in which she witnessed him use the crack cocaine and prescribed medication in larger doses than what was prescribed. The jury also heard evidence that Zareck purchased ammunition from Cabela's during the time in which he was an unlawful user of controlled substances. Under those circumstances, even if the jury did not receive evidence of the empty pill bottles, it could have concluded beyond a reasonable doubt that Zareck used controlled substances at the time he possessed the shotgun and ammunition. Zareck's § 2255 motion will, therefore, be denied with respect to this sixth ground for relief.

### 7. Ground Seven

Zareck argues that both trial counsels were ineffective for failing to request to have evidence of his possession of Oxycodone excluded from evidence under Rules 403 and 404(b) because he had legal prescriptions for Oxycodone. (ECF No. 363 at 60-63.) He also argues that

even if that evidence was properly admitted into evidence, his trial counsel should have requested a curative instruction "to inform the jury not to consider any such narcotic pain medication as controlled substances 'unlawfully used'" by him." (Id. at 60.) Specifically, Zareck argues that his counsel should have requested that the following evidence be excluded: (1) the testimony by Wintruba about the empty prescription bottles (and the prescription bottles themselves); (2) testimony by Wintruba that Zareck ingested an Oxycodone pill at the police station; and (3) testimony by Aubrey, Zareck's neighbor, about his use of controlled substances. (Id.) The government summarily argues that these grounds for relief are vague and conclusory and that Zareck cannot show he was prejudiced by his counsels' actions.  (ECF No. 356 at 10.)

For the reasons explained above with respect to ground six, Zareck did not show he was prejudiced by his counsels' alleged failures to object to the introduction of evidence about the prescription pill bottles found in his home because even if that evidence was excluded from evidence, there was overwhelming evidence from which the jury could have found that he was an unlawful user of a controlled substance.

With respect to the testimony by Aubrey, she testified about using controlled substances with Zareck at the time the shotgun was in Zareck's home, e.g., Aubrey testified that she smoked crack out of a glass pipe with Zareck, saw Zareck crush up pills and snort or swallow them on many occasions, saw a firearm in one of the second-floor bedrooms in Zareck's house, knew Zareck took prescribed medication in doses larger than what was prescribed, and Zareck obtained pills for Larcinese. (T/T. 11/15/2012 (ECF No. 300) at 85-108.) Her testimony was extremely probative of Zareck being an unlawful user of controlled substances while possessing the shotgun. The court would have overruled any objection raised by Zareck's trial counsel with respect to Aubrey's testimony. The probative value of the testimony was not substantially

outweighed by the danger of unfair prejudice to Zareck because the evidence was highly probative of his status as an unlawful user of controlled substances, which was an element of one of the offenses of conviction. Zareck argues that he had legal prescriptions for Oxycodone, but Aubrey specifically testified that Zareck used lawfully prescribed medications in amounts in excess of the prescription. Under those circumstances, Zareck cannot show that there is a reasonable probability that the outcome of the trial would have been different if the counsel objected to Aubrey's testimony under Rules 403 or 404(b) because the court would have overruled those objections.

With respect to Wintruba's testimony that Zareck ingested an Oxycodone pill at the police station, Wintruba testified that on April 3, 2009, he arrested Zareck and he found several items on Zareck's person and in his vehicle:

> There was a plastic knotted clear baggie which contained heroin packages that were marked with a blue crown in a stamp that said "king" on it, as well as two individual rocks of crack cocaine, as well as a brownish colored pill bottle with no label on it containing eight pills of Oxycontin.

(T.T. 11/15/2012 (ECF No. 300) at 44.) During an interview following that arrest, Zareck ingested an Oxycodone pill that was seized from Zareck's person during the arrest. (T.T. 11/15/2012 (ECF No. 300) at 47-48.) Even if Zareck's counsel filed a motion in limine to preclude the introduction of that evidence at trial and the court sustained that objection, the evidence was overwhelming that Zareck was an unlawful user of controlled substances. Under those circumstances, Zareck cannot show he was prejudiced by his counsel's failure to object to the evidence that Zareck ingested an Oxycodone while at the police station. Even if Zareck's counsel objected to the evidence of which Zareck complains in this ground for relief, the court sustained the objections, and the evidence was excluded from trial, there existed overwhelming evidence in this case that Zareck as an unlawful user of controlled substances. Based upon the

45

foregoing, Zareck's § 2255 motion will be denied with respect to his seventh ground for relief.

### 8. Ground Eight

Zareck argues his trial counsel was ineffective[15] because he did not object to the opening statement by the government in which the prosecutor stated that Zareck was a "drug abuser." (ECF No. 363 at 63.) The government argues that the opening statement was proper, and, in any event, the court provided instructions to the jury that the opening statements were not evidence and that the jury must determine the facts. (ECF No. 356.)

The court in its preliminary jury instructions explained to the jury:

> The first step in the trial will be the opening statements. The government's attorney will have an opportunity to make an opening statement on behalf of the government at the beginning of the case. The defendant's attorney may make an opening statement on behalf of the defendant, following the opening statement for the government, or may defer the making of an opening statement until the close of the government's case. Neither the government nor the defendant are obligated to make an opening statement.
>
> Just as I told you that the indictment is not evidence, neither are the opening statements evidence. Their only purpose is to help you understand what the evidence will be and what the parties will try to prove
>
> …
>
> It will be your job as jurors to find and determine the facts. Under our system of criminal justice, you are the sole judges of the facts.
>
> …
>
> You will decide whether the government proved beyond a reasonable doubt that the defendant committed the crimes charged in the indictment. You must base that decision only on the evidence in the case and the instructions I, as the Court, will give you about the law.

(T.T. 11/13/2012 (ECF No. 299) at 101-02, 107-08.) The court also reviewed the two crimes with which Zareck was charged and the elements of those offenses. (Id. at 110-12.) The court instructed:

> The government must prove each element of an offense beyond a reasonable

---

[15]     Zareck does not explicitly argue that the government committed prosecutorial misconduct in its opening statement.

doubt in order for the defendant to be found guilty of that offense.

         …

   Unless the government proves beyond a reasonable doubt that the defendant committed each and every essential element of an offense with which the defendant is charged, you must find the defendant not guilty of that offense. The law presumes a defendant to be innocent of crime. Thus, a defendant, although accused, begins the trial with a clean slate. The law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. The burden is always on the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt, as charged, after careful and impartial consideration of all the evidence in the case.

(Id. at 110-12.)

   Following the court's preliminary instructions to the jury, the prosecutor gave her opening statement and explained to the jury, among other things:

   During this trial, we are going to prove to you that he possessed not only a shotgun but ammunition as well and that he's prohibited from doing such.

         …

   There are a number of ways that an individual can be prohibited from possessing a firearm and ammunition. As the Judge had told you a little while ago, the defendant in this matter is charged in two separate counts. The defendant, Raymond Zareck, has been prohibited from possessing both a firearm and ammunition because of a prior conviction which prohibits him from doing so, and also because he was a drug abuser at the time he possessed both the firearm in this case and the ammunition.

         …

   You're going to hear from a number of witnesses in this case. You are going to hear that police officers stopped Raymond Zareck's vehicle and he was found to be in possession of illegal narcotics. After Mr. Zareck was arrested. He was taken to the police station where the officers had the evidence, the illegal narcotics laid out on a table and Mr. Zareck attempted to scoop up the evidence and swallow it.

   While also at the police station, you're going to hear that Mr. Zareck waived his right -- I'm sorry, decided to speak with officers at that time. He waived his right to remain silent. Sometimes you may have heard of that as Miranda Warnings. Mr. Zareck was given those and decided to speak with the officers. At that time, he admitted to being a drug abuser.

You're also going to hear that the officers obtained a search warrant for Mr. Zareck's home. Now, within that -- within his residence, they found a number of items, including a shotgun, ammunition, and drug use paraphernalia. You're going to hear from witnesses about that. You're going to hear from not only law enforcement witnesses, but civilian witnesses who are going to tell you some of the things, such as the snapshot of some of the evidence and some of the things you're going to hear about during this trial.

(T.T. 11/13/2012 (ECF No. 299) at 119-22.)

One district court has explained:

An opening statement presented to a jury is limited in scope to a general statement of facts which are intended or expected to be proved and is designed to generally outline or foreshadow the testimony that follows. United States v. DeRosa, 548 F.2d 464, 470–471 (3d Cir.1977). Thus, the government's opening statement is an overview of what the evidence will show.

United States v. Young, No. 05-CR-0056-16, 2011 WL 4056729, at *11 (E.D. Pa. Sept. 12, 2011).

Another district court has explained:

In evaluating whether a petitioner was denied his right to a fair trial as a result of the prosecutor's argument, the court must look at the prosecutor's comments in the context of the entire trial. Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); Laird v. Horn, 159 F.Supp.2d 58, 129 (E.D.Pa.2001), aff'd, 414 F.3d 419 (3d Cir.2005), cert. denied, 546 U.S. 1146, 126 S.Ct. 1143, 163 L.Ed.2d 1014 (2006). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). A petitioner seeking a writ of habeas corpus will not succeed merely because the prosecutors' actions "were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quotation omitted). Rather, to successfully state a claim for habeas relief based on comments at trial by the prosecutor, a petitioner must show that the prosecutor's comments were so egregious that they fatally infected the proceedings, rendered the entire trial fundamentally unfair, and made the conviction a denial of due process. See Darden, 477 U.S. at 181; Donnelly, 416 U.S. at 643; Werts, 288 F.3d 178; Lesko v. Lehman, 925 F.2d 1527, 1546 (3d Cir.), cert. denied, 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991). See also Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (When an error occurs, the inquiry then becomes whether, in light of the record as a whole, the prosecutor's conduct "had substantial and injurious effect or influence in determining the jury's verdict").

> While a prosecutor's comments during opening and closing statements must be directed to an understanding of the facts and of the law rather than to passion and prejudice, <u>Lesko</u>, 925 F.2d at 1545 (citing <u>United States ex rel. Perry v. Mulligan</u>, 544 F.2d 674, 680 (3d Cir.1976)), the prosecution is "accorded reasonable latitude and may employ oratorical flair arguing its version of the case to the jury." <u>Henry v. Horn</u>, 218 F.Supp.2d 671, 705 (E.D.Pa.2002) (quotation omitted).

<u>Fakhouri v. Thompson</u>, No. 1:12-CV-756, 2014 WL 4165635, at *19 (M.D. Pa. Aug. 20, 2014). Courts have recognized that to state a claim for ineffective assistance of counsel based upon a counsel's failure to object to the government's opening statement is difficult; indeed, one district court explained:

> As has been noted within this Circuit, many lawyers refrain from objecting during opening and closing argument. Thus, barring "egregious misstatements," a failure to object during those arguments does not rise to the level of ineffective assistance of counsel.

<u>United States v. Lignelli</u>, No. CR 11-234, 2018 WL 4828509, at *3 (W.D. Pa. Oct. 4, 2018).

Here, the court[16] instructed the jury that, among other things, the government had the burden of proof beyond a reasonable doubt with respect to each element of the offense and that the opening statements were not evidence. The prosecutor gave her opening statement after the jury received those instructions. The prosecutor explained: (1) the charges against Zareck, which included a charge that he possessed a firearm or ammunition while being an unlawful user of controlled substances; and (2) the evidence the jury would hear to prove those charges. The jury

---

[16]   Zareck in his eighth ground for relief also argues that the court "reinforc[ed]" the government's "improper opening statements" in its final charge to the jury. (ECF No. 363 at 64.) Zareck's argument is without merit. At the beginning of the final charge, the court read to the jury the charges against Zareck. The court stated: "Members of the jury, in the indictment, the defendant, Raymond Zareck, is accused of two counts as follows:" and read the two counts charged against Zareck in the superseding indictment. Under those circumstances, the court's instructions to the jury were not improper and did not reinforce any allegedly improper statements made by the government.

during trial also heard overwhelming evidence that Zareck was an unlawful user of controlled substances during the time in which he possessed the shotgun and ammunition. Under those circumstances, the court cannot find that the prosecutor's opening remarks were "so egregious that they fatally infected the proceedings, rendered the entire trial fundamentally unfair, and made the conviction a denial of due process." Fakhouri, 2014 WL 4165635, at *19. Thus, Zareck's counsel's alleged failure to object to those statements did not prejudice Zareck. In other words, even if Zareck's trial counsel objected to the government's opening statements and the court had sustained that objection, the outcome of the trial would have been the same. Zareck's § 2255 motion will be denied with respect to this ground for relief.

### 9. Ground Nine

Zareck argues that his trial counsel was ineffective because he did not object under Rule 404(b) to the government's evidence that while at the Homestead Police Department he ingested an Oxycodone pill "with an attempt to destroy the other controlled substances, which resulted in the state conviction of tampering with evidence." (ECF No. 363 at 66.) According to Zareck, the government introduced the evidence to prove his character to "show he acted in accordance with that character, and that…[Zareck] knew the shotgun was a firearm as 'consciousness of guilty.'" (Id. at 67.)

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b).

As discussed previously, "'[t]he 'threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character.'" Melton, 131 F. App'x at 23 (citing Butch, 256 F.3d at 175). The four-part standard governing the admissibility of evidence pursuant to Rule 404(b) requires: (1) a proper evidentiary purpose; (2) relevance under Rule 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under Rule 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used. Butch, 256 F.3d at 175.

With respect to the first consideration under 404(b), the prosecutor introduced evidence of Zareck's actions at the Homestead Police Department for a proper evidentiary purpose, i.e., to show that he was an unlawful user of controlled substances. Wintruba testified that he arrested Zareck on April 3, 2009, and the following items were seized from Zareck's person and vehicle:

> There was a plastic knotted clear baggie which contained heroin packages that were marked with a blue crown in a stamp that said "king" on it, as well as two individual rocks of crack cocaine, as well as a brownish colored pill bottle with no label on it containing eight pills of Oxycontin.

(T.T. 11/15/2012 (ECF No. 300) at 44.)

Wintruba testified that Zareck waived his Miranda rights, agreed to speak with him, and told Wintruba the following about his drug use:

> Mr. Zareck stated that he was in Homestead the night before and he purchased a quantity of heroin as well as crack cocaine. He stated that he used those drugs up, so he came back to Homestead Borough again to buy more drugs. He stated that he paid $15 for each one of the individual stamp bags of heroin and he also had the crack cocaine which he purchased at the same time.

(Id. at 46-47.) Wintruba placed evidence recovered from Zareck's person on the table in front of Zareck, and when Wintruba turned his back, Zareck placed crack cocaine, heroin, and eight Oxycontin tablets in his mouth. (T.T. 11/15/2012 (ECF No. 300) at 47-48.) Wintruba

retrieved all that evidence, except for one of the eight Oxycontin tablets, from Zareck's mouth. (Id. at 48.) The evidence is relevant to prove that Zareck unlawfully used controlled substances; he not only possessed the substances, but he put them in his mouth. That evidence along with evidence by other witnesses, including Aubrey, was sufficient for the jury to find that Zareck unlawfully used controlled substances. Zareck argues that he had a lawful prescription for OxyContin, but Wintruba testified that Zareck placed eight tablets in his mouth and Aubrey testified that Zareck used lawfully prescribed controlled substances in amounts greater than called for by the prescription. Under those circumstances, Wintruba's testimony was probative of Zareck's status as an unlawful user of controlled substances, and the probative value of that testimony was not substantially outweighed by the danger of unfair prejudice to Zareck. Importantly, Zareck did not point to anywhere in the trial record in which the jury heard evidence about the crimes with which Zareck was charged in state court based upon the drugs Wintruba found on Zareck's person and in Zareck's vehicle or Zareck's conduct at the Homestead Police Department.  Based upon the foregoing, Zareck's trial counsel did not render ineffective assistance of counsel when he did not object to Wintruba's testimony about Zareck ingesting drugs at the police station. Had he made the objection, it would have been overruled by the court. Even excluding testimony about Zareck's use of Oxycontin does not change the outcome of the trial due to the other overwhelming evidence of unlawful controlled drugs use by Zareck for which he did not have a prescription, e.g., heroin and crack cocaine. See e.g., (T.T. 11/15/2021 (ECF No. 300) at 43.)

With respect to the fourth consideration, the court did not give a limiting instruction to the jury with respect to Wintruba's testimony about the evidence concerning Zareck's conduct underlying his state charges (which were not mentioned or described to the jury). Even assuming

that Zareck's trial counsel's performance was deficient because he did not request a limiting instruction from the court, Zareck did not show that he suffered prejudice due to his counsel's failure to request a limiting instruction. The jury received evidence that Zareck had a criminal record, i.e., he was a felon. The jury also heard overwhelming testimony against Zareck, i.e., he possessed a shotgun and ammunition in his home when he was an unlawful user of controlled substances. Under those circumstances, even if the court gave a limiting instruction to the jury with respect to the proper consideration of the conduct underlying Zareck's state charges (which were not mentioned or explained to the jury) and his ingestion of controlled substances while in police custody, there existed evidence from which a jury could find him guilty beyond a reasonable doubt. Under those circumstances, Zareck did not satisfy his burden to show that he was prejudiced by his counsel's allegedly deficient performance. Zareck's § 2255 motion will be denied with respect to this ground for relief.

### 10. Ground Ten

Zareck argues his trial counsel was ineffective because he did not object to Reinhart testifying as an expert. Reinhart testified that he was 37 years old and began to use crack cocaine at approximately 21 years old. (T.T. 11/19/2012 (ECF No. 302) at 14.) He explained his history of drug abuse as follows:

> I've had an extensive drug history. It started with alcohol at a younger age. I had a lot of family members that I was around drinking. That's how I started out drinking. Eventually, in the end, I ended up using crack cocaine usage. That's the stem of mostly all of my problems, both legal and family-wise and things of that nature have come from basically my using drugs as kind of really messing my life up.

(Id.) Reinhart used crack cocaine approximately three days before he met Zareck in the Allegheny County Jail. (Id. at 14-15.) Reinhart described his history of mental health issues as follows:

> My mental health history that I'm diagnosed as bipolar depression. During

my depressions, I would go up and down with my mood swings and ultimately that led to me drinking a lot. I had gone into a depression and my earliest usage was drinking, around 16 or 18, I guess you could say, just started out in high school. I was on the wrestling team. I knew some of the football players, just being a normal kid between 16 and 18 on the weekends, trying to get beer, and, you know, trying to get a girlfriend and things like that. I ultimately crossed a line to the point where I don't know exactly when or where it was, but I started drinking heavily day after day after day. It got me into a deep depression, affected my mental illness. This is over a period of time and eventually led to the cocaine experimentation at first and then heavy usage.

(Id. at 15-16.) Reinhart testified that before he met Zareck, he had used powder cocaine "a couple times" when he was approximately 18 to 20 years old. (Id. at 16.) The prosecutor asked Reinhart whether he could explain to the jury the difference between using crack cocaine and powder cocaine. Reinhart responded:

When you use powder cocaine, you sniff it. The high is a longer lasting high because it gets into your blood stream so you don't need as much of it.

When you use crack cocaine you smoke it through a pipe and it's just like smoking anything else, like it's if you would smoke a cigarette, like, you take a couple puffs and that nicotine high seems to be gone so you need another cigarette. Crack cocaine is about 100 times worse than that, when you smoke it, the high is extremely intense and you come crashing down when you don't have it. So it takes a lot more of the crack cocaine than it does the powder cocaine.

For myself, when I was using crack cocaine, at first I was functional, meaning that I could go to work, I could keep a job, I could pay the bills, I was somewhat responsible. And then another time came when, you know, I had been using all day, I had been using all night, and I became nonfunctional and that's where my criminal history began because I had to basically rob and steal in order to get the money to use crack cocaine.

(T.T. 11/19/2012 (ECF No. 302) at 16-17.) Reinhart explained to the jury that he took medication for his depression and was using the medication until he started doing crack cocaine. (Id. at 17.) While doing crack cocaine, he would take himself to the hospital for mental health treatment:

I would just go to the hospital and I would explain to them my problems. They would try to get me help. Sometimes I would stay for a few days. My longest stint was for about six to eight weeks, but that was later on down the road. But before I met Raymond, I think my longest stay was like two weeks. They would

54

give me some treatment, I'd go to classes and the groups and they would feed me. When you're doing crack cocaine you don't eat, so you lose a lot of weight. You become -- you just become dysfunctional. I would kind of say I would get healthy for a couple weeks. Then once I was doing well, they would set me up with a outpatient treatment with a mental health specialist and outpatient drug and therapy specialist.

(T.T. 11/19/2012 (ECF No. 302) at 18.)

Federal Rule of Evidence 701 provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(a) rationally based on the perception of the witness,

(b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The Third Circuit Court of Appeals has explained the requirements of lay testimony under

Rule 701 as follows:

We require lay testimony to be grounded either in experience or specialized knowledge. In Asplundh Manufacturing Division v. Benton Harbor Engineering,

we held that "in order to be 'helpful,' an opinion must be reasonably reliable," and Rule 701 therefore "requires that a lay opinion witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses." 57 F.3d 1190, 1201 (3d Cir. 1995).

In the time since Congress amended Rule 701, we have repeatedly affirmed our holding in Asplundh that the reliability of lay opinion testimony should be assessed in light of the witness's relevant specialized knowledge and experience. See, e.g., Eichorn v. AT&T Corp., 484 F.3d 644, 649–50 (3d Cir. 2007) ("In order to satisfy these ... Rule 701 requirements, the trial judge should rigorously examine the reliability of the lay opinion by ensuring that the witness possesses sufficient special knowledge or experience which is germane to the lay opinion offered." (quoting Asplundh, 57 F.3d at 1201)); Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 83 (3d Cir. 2009) ("A trial judge must rigorously examine the reliability of a layperson's opinion by ensuring that the witness possesses sufficient specialized knowledge or experience which is germane to the opinion offered." (citing Asplundh, 57 F.3d at 1200–01)). We have clarified that "[w]hen a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." United States v. Fulton, 837 F.3d 281, 301 (3d Cir. 2016) (quoting Donlin, 581 F.3d at 81)….

Thus, "as long as the technical components of the testimony are based on the lay witness's personal knowledge, such testimony is usually permissible" under Rule 701…..Id.; see also, e.g., United States v. El-Mezain, 664 F.3d 467, 514 (5th Cir. 2011) ("Testimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation."); United States v. Rollins, 544 F.3d 820, 831–32 (7th Cir. 2008) (agent's testimony as to the meaning of coded terms is based on experience in the particular case and is therefore permissible under Rule 701).

United States v. Savage, 970 F.3d 217, 285–86 (3d Cir. 2020) (footnotes omitted).

Here, Zareck argues that his trial counsel was ineffective because he did not object to Reinhart—who was not a recognized expert under Rule 702—testifying about the difference between crack cocaine and powder cocaine, i.e., crack cocaine is smoked and powder cocaine is sniffed and provides a longer lasting high. Reinhart, however, testified that in the past he used crack cocaine and powder cocaine. Thus, his testimony about the use of those drugs, i.e., cocaine powder is sniffed and crack cocaine is smoked, was based upon his personal knowledge, i.e.,

"rationally based on the perception of the witness[,]" and it was also "helpful to a clear understanding of the witness' testimony" about his use of crack cocaine. FED. R. EVID. 701. Reinhart's testimony about how a person uses crack cocaine and powder cocaine was not based upon technical, scientific, or specialized knowledge that required him to be qualified as an expert under Rule 702. See Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g, 57 F.3d 1190, 1198 (3d Cir. 1995) (citing United States v. Sweeney, 688 F.2d 1131, 1145–46 (7th Cir.1982) (holding that a lay-witness drug user could testify as to identity of drugs based upon his prior use and knowledge, including his sampling of the drug and conclusion that the drug affected him in the same manner as it had before)). Under those circumstances, Zareck's counsel's performance was not deficient when he did not object to Reinhart's testimony as impermissible expert testimony because the court would have overruled the objection with respect to Reinhart's testimony about how powder cocaine and crack cocaine are used and that powder cocaine provides a longer-lasting high.

Arguably, Reinhart's testimony that "[t]he high [from sniffing powder cocaine] is a longer lasting high ***because it gets into your blood stream*** so you don't need as much of it[,]" (T.T. 11/19/2012 (ECF No. 302) at 16-17), required scientific knowledge within the scope of Rule 702. Zareck, however, did not show that he suffered prejudice because of his counsel's failure to object to that evidence as impermissible expert testimony. In other words, even without the testimony about why powder cocaine provides a longer-lasting high than crack cocaine, there was other overwhelming evidence sufficient for the jury to find beyond a reasonable doubt that Zareck was guilty of the crimes charged in this case. Zareck's § 2255 motion will be denied with respect to this ground for relief.

### 11. Ground Eleven

Zareck argues his trial counsel was ineffective because he did not challenge Reinhart's competency by requesting a competency evaluation of him before he testified at trial. Zareck explains that Reinhart has bipolar depression, which can affect a person's memory, and Zareck argues that Reinhart's testimony was untruthful. (ECF No. 363 at 70-73.)

Every witness is presumed competent to testify, pursuant to Federal Rule of Evidence 601. Gov't of Virgin Islands v. Joseph, 162 F. App'x 175, 176 (3d Cir. 2006) (citing FED. R. EVID. 601 ("Every person is competent to be a witness unless these rules provide otherwise."). One treatise has defined "competency" as: "[T]he presence of those characteristics that qualify and the absence of those disabilities that disqualify a person from testifying." 27 CHARLES ALAN WRIGHT AND VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6003 (2d Ed. 2007). With respect to the characteristics that qualify a person, the Third Circuit Court of Appeals has explained:

> Every witness is presumed competent to testify, Fed. R. Evid. 601, so long as the witness (1) has personal knowledge of the matter, Fed. R. Evid. 602, and (2) gives an oath or affirmation to testify truthfully, Fed. R. Evid. 603. There are "[n]o mental or moral qualifications for testifying as a witness," and "[a] witness wholly without capacity is difficult to imagine." Fed. R. Evid. 601, Advisory Committee Notes to 1972 Proposed Rules. "[M]ental capacity [is] ... highly relevant to credibility and require[s] no special treatment to render [evidence about mental capacity] admissible along with other matters bearing upon perception, memory, and narration of witnesses." Id. Because "[t]he question is [ ] particularly suited to the jury as one of weight and credibility," "[d]iscretion is regularly exercised in favor of allowing the testimony." Id. The trial court "must decide any preliminary question about whether a witness is qualified," Fed. R. Evid. 104, and its determination about the competency of a witness to testify falls within its sound discretion, United States v. Hicks, 389 F.2d 49, 50 (3d Cir. 1968).

United States v. Meehan, 741 F. App'x 864, 874 (3d Cir. 2018); United States v. Roebuck, 334 F. Supp. 2d 833, 835 (D.V.I. 2004) (explaining that the defendant's challenge to the witness' "credibility, veracity, and reliability" did not fall under Rule 601 and competency).

The same treatise has explained the second category of the "disabilities" that disqualify a witness from testifying as follows:

> Competency laws of the second type describe the disabilities that disqualify a witness. These disability rules are themselves classifiable into two groups. The first group assumes it is unfair or otherwise inappropriate to permit certain people to testify given their status in the case at bar. Article VI contains two such provisions, one disqualifying the judge…and the other disqualifying members of the jury….The second group of disability rules assumes that testimony from certain kinds of witnesses is inherently incredible. For example, the common law prohibiting a party's spouse from testifying and the Dead Man's Act are premised on the assumption that certain interested witness pose a serious a threat of perjury.

27 CHARLES ALAN WRIGHT AND VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6003 (2d Ed. 2007) (footnotes omitted).

Competency of a witness to testify is often confused with *admissibility of evidence*, but Rule 601 "regulates witnesses, not the admissibility of evidence." Id. Competency, which is determined by the court, also is confused with credibility, which is determined by the jury. United States v. Roebuck, 334 F. Supp. 2d 833, 835 (D.V.I. 2004) (explaining that the defendant's challenge to the witness' "credibility, veracity, and reliability" did not fall under Rule 601 and competency).

The district court has the discretion to order a psychological evaluation of a witness to aid the court's assessment of the witness' competency. Gov't of Virgin Islands v. Scuito, 623 F.2d 869, 875 (3d Cir. 1980). The challenger of a witness' competency "must show that a 'substantial need' for such testing exists 'in order to aid in the assessment of witness reliability.'" Joseph v. Gov't of Virgin Islands, 226 F. Supp. 2d 726, 732 (D.V.I. 2002), aff'd sub nom. Gov't of the Virgin Islands v. Joseph, 67 F. App'x 146 (3d Cir. 2003)). The Third Circuit Court of Appeals has explained that to determine whether there is a "substantial need" for a psychological evaluation, the court should consider whether there is evidence:

(1) "reasonably indicating something peculiar, unique, or abnormal about the…witness that would influence the witness's competence or the court's ability to assess that competence, or raise unusual difficulties in assessing the witness's credibility[;]" or

59

> (2) "of some deviation from acceptable norms, such as an identifiable or clinical psychiatric or similar disorder, beyond the realm of those human conditions that ordinary experience would confirm as normal."

Joseph, 162 F. App'x at 176.

Here, the court is not persuaded by Zareck's argument that his trial counsel provided ineffective assistance because he did not challenge Reinhart's competency or that Zareck was prejudiced by his counsel's failure to raise that issue with the court. First, Reinhart was presumed competent to testify, pursuant to Rule 601; indeed, he testified under oath about matters of which he has personal knowledge. Zareck argues that Reinhart has bipolar depression, which can affect his memory. A person's mental illness, however, will not prevent a finding of competency so long as he or she has "'sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue.'" Swanger v. Diversified Treatment Alternatives, No. 4:11-CV-894, 2019 WL 430929, at *2 (M.D. Pa. Feb. 4, 2019) (quoting D.C. v. Arms, 107 U.S. 519, 521 (1883)). The court observed Reinhart during his testimony and cannot discern any basis upon which to find that he did not understand the obligation of his oath or that he was incapable of answering the questions posed to him. The court cannot find that Reinhart's bipolar depression rendered him incompetent. Second, Zareck did not point to any evidence to show that Reinhart was otherwise disqualified from testifying or that Reinhart was a certain kind of witness that rendered his testimony inherently incredible.

Based upon the foregoing, the court cannot find that there was anything abnormal about Reinhart or his bipolar depression to warrant a finding that: (1) there was a substantial need for a psychiatric or psychological evaluation to determine his competency; or (2) he was incompetent to testify under Rule 601. Under those circumstances, Zareck's counsel did not provide ineffective

assistance of counsel because he did not challenge Reinhart's competency or request a psychiatric or psychologic evaluation of Reinhart's testimony. Even if Zareck's counsel raised those issues to this court, the court would have denied any request to preclude Reinhart from testifying at trial or to order a psychiatric or psychological evaluation to determine his competency. Alternatively, even if Zareck's counsel successfully challenged Reinhart's competency and the court prohibited Reinhart from testifying at trial, there was sufficient evidence of record for a jury to convict Zareck of possessing a firearm and ammunition while a convicted felon and unlawful user of controlled substances. Zareck's § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 12. Ground Twelve

Zareck argues his trial counsel was ineffective because he did not object to Reinhart's testimony about Zareck's uncharged criminal activity under Rule 404(b). (ECF No. 363 at 74.) Zareck argues his trial counsel should have objected to the following testimony by Reinhart:

> He told me that they had a scheme from South Hills rehab where he had doctor prescription pads and doctors' license numbers because he was a pharmacist and he had people who were also actively using drug addicts that was using the Oxycodone and Oxycontin and Percocets from the pads he had that would give -- he would give prescriptions -- he would write out the prescription and everything. The people would bring him the prescriptions and he would fill them as the pharmacist, and then they would interact after work and he would meet up with them and they would either exchange money or exchange half the pills for them doing it. That's how he had supported his habit and that's how he made all of his extra money and that he needed that gun in case somebody tried to rob him because he was filling prescriptions for 90 and 120 pills at a time. At $80 a pill for 120 pills, that's quite a lot of money to be dealing with other people and that he didn't want anybody to rob him.
>
> …
>
> There were many people coming and going at all hours of the days and nights, knocking on the doors asking where Ray was? Is he getting out of jail? Asking me if I could help them out with this whole scheme that they had going on. It finally stopped when I had just made statements to them if they kept coming, I was calling the police.

(T.T. 11/19/2012 (ECF No. 302) at 28, 31.)

Zareck did not show that his counsel was ineffective for failing to object to the foregoing testimony under Rule 404(b), or that he suffered prejudice as a result of his counsel's failure to request a limiting instruction with respect to that evidence.  As discussed above, when an objection is made under Rule 404(b), the court must: (1) consider whether there exists a proper evidentiary purpose; (2) the evidence is relevant under Rule 402; (3) weigh the probative value of the evidence against its prejudicial effect under Rule 403; and (4) if requested, issue a limiting instruction concerning the purpose for which the evidence may be used. Caldwell, 760 F.3d at 275.  Here, the proper evidentiary purpose for Reinhart's testimony about Zareck's prescription scheme was to show: (1) Zareck was an unlawful user of controlled substances and supported his habit via the prescription scheme; and (2) Zareck's motive for possessing the shotgun, i.e., for protection from being robbed of the proceeds of the prescription  scheme. Reinhart's testimony was relevant under Rule 402 to show that Zareck was an unlawful user of controlled substances and that he possessed a shotgun after being convicted of a felony and while an unlawful user of controlled substances. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Rule 403 because the evidence tended to prove elements of the offenses with which Zareck was charged. Based upon the foregoing, if Zareck's trial counsel objected to Reinhart's testimony under Rule 404(b), the court would have overruled the objection. Thus, Zareck did not show that his counsel was ineffective for failing to raise that objection with the court.

Arguably, Zareck's trial counsel could have requested a limiting instruction after Reinhart testified about Zareck forging prescriptions that the jury could consider the evidence to conclude that (1) Zareck was an unlawful user of controlled substances and supported his habit via the prescription scheme, and (2) Zareck's motive for possessing the shotgun, i.e., for

protection from being robbed of the proceeds of the prescription scheme, but the jury could not consider the evidence to conclude that Zareck committed the offenses with which he was charged in this case merely because he forged prescriptions in the past. Even if the court gave the jury the limiting instruction, however, the outcome of the trial would have been the same in light of all the evidence presented that showed Zareck possessed a shotgun and ammunition in his home while he was an unlawful user of controlled substances and a convicted felon. Under those circumstances, Zareck did not show that—even if his counsel's performance was deficient for falling to object to Reinhart's testimony under Rule 404(b)—he suffered prejudice. Zareck's § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 13. Ground Thirteen

Zareck argues his counsel was ineffective because he did not object to the prosecutor's statements to the jury that Zareck was "shooting heroin." (ECF No. 363 at 77-80.) The prosecutor posed the following leading question about items found in Zareck's home question to Ronald Zareck, Zareck's brother:

> We saw in the items that were seized from his house by the police that he had a 1999 utility bill still in there. **He had not just one tie-off strip for shooting heroin, but dozens of them.** Not only hundreds of unused needles, but way more than that and used needles, so he was keeping used needles as well. We saw that there were over 100 pill bottles from over different times that he had collected the empty pill bottles as well and even saved many of the bloody cotton balls from when he was shooting up, we saw that in the picture?

(T.T. 11/16/2012 (ECF No. 301) at 26 (emphasis added).) Zareck's trial counsel objected to the foregoing question as "irrelevant" and "beyond the witness' knowledge[.]" (Id.) Before the court ruled on the objection, the prosecutor told the court it would "move on" from that line of questioning. (Id. at 27.) During the prosecutor's closing arguments, it argued to the jury that Zareck told Rodgers during a telephone call from the Allegheny County Jail that it was the "fault" of the

doctors who prescribed him pain medication that "he had thousands of needles in his house and was shooting heroin in his house[.]" (T.T. 11/20/2012 (ECF No. 303) at 9.) The prosecutor also argued to the jury that it saw evidence during trial of "the needles that are used to shoot heroin." (Id. at 14.) According to Zareck, the following statements made by the prosecutor to the jury were not supported by the evidence, and, thus, his counsel was ineffective because he did not object to those statements.

The jury received the following evidence at trial:

- Wintruba recovered heroin from Zareck's person when he was arrested on April 3, 2009 (T.T. 11/15/2012 (ECF No. 300) at 44);

- Zareck told Wintruba that he used heroin on April 2, 2009 (id. at 46-47, 71-72)

- Rodgers, Zareck's friend whose brother was addicted to heroin, suspected Zareck was using heroin after he had been taking pain medication for a period of time and their friendship changed (T.T. 11/16/2012 (ECF No. 301) at 38);

- Rodgers asked Zareck to roll up his shirt sleeve to see if there was any indication that he was injecting heroin into his arms and she saw marks on his arms, which Zareck said were from gardening (T.T. 11/16/2012 (ECF No. 301) at 38, 42-43);

- after Zareck was arrested, he told Rodgers that he began using heroin because either his pain medication was no longer working or he could not afford the pain medication (id. at 45);

- Reinhart testified that Zareck told him he was "hooked on Oxycodone and heroin" (H.T. 11/19/2012 (ECF No. 302) at 14);

- Larcinese testified that he saw Zareck inject Oxycodone into his leg (H.T. 11/16/2012 (ECF No. 301) at 83.); and

- during the search of Zareck's home after his arrest on April 3, 2009, police officers found, among other things, "rubber tourniquets commonly used in hospitals for taking blood or having your veins pop out," "[n]umerous used needles," clean and unused needles, and "a bunch of papers that had drug residue on them[;]" (T.T. 11/15/2012 (ECF No. 300) at 57).

The government also played a recorded telephone conversation between Zareck and Rodger during which the following exchange took place:

Rodgers: When did it get to the point of heroin and shooting that again?

Zareck: Recently.

Rodgers: Really?

Zareck: When the OxyContins quit working, yeah.

Rodgers: They actually stopped working.

Zareck: Yeah, they weren't,  I was immune to them. I was doing six to eight of them at a time.

Rodgers: Wow….That's nuts.

(Gov't Ex. 39, 04.14.09 at 09:51.)

The government entered into evidence photographs of items obtained from Wintruba's search of Zareck's home, which showed hundreds of needles. (T.T. 11/15/2012 (ECF No. 300) at 55-58; Gov't Exs. 19-21.)

Based upon the foregoing, the evidence supported the prosecutor's statements that: (1) heroin is used by injecting it into a person's arm with a needle, which can leave marks on a person's arms; (2) Zareck used, among other drugs, heroin; (3) Zareck had numerous needles, used and unused, in his home; and (4) Zareck used heroin by injecting it into his arm. Under those circumstances, even if Zareck objected to the prosecutor's statements because they were not supported by the evidence, the court would have overruled the objection. Thus, Zareck did not show that he was prejudiced by his counsel's alleged failure to object to the prosecutor's statements. In any event, even if the trial counsel made the objection, the court sustained the objection, and the court struck the prosecutor's statements objected to by Zareck, the outcome of the trial would have been the same because there was ample evidence from which the jury could find beyond a reasonable doubt that Zareck was a felon and an unlawful user of controlled substances at the time he possessed the shotgun and ammunition.

The evidence, however, did not support the prosecutor's statement during closing argument that Zareck had "thousands of needles in his house…." (T.T. 11/20/2012 (ECF No. 303) at 9.) Exhibits 19, 20, and 21 showed approximately three hundred needles found in Zareck's home. To determine whether Zareck's counsel provided him ineffective assistance when he did not object to the prosecutor's closing argument, the court must determine whether the prosecutor's statement was improper, and, if it was, whether it prejudiced Zareck. The Third Circuit Court of Appeals has explained:

> Improper statements made during summation may warrant a new trial when such statements "cause[ ] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Shareef, 190 F.3d 71, 78 (2d Cir.1999) (internal quotation marks and citations omitted). Our first task is to determine whether the prosecutor's comments were improper. United States v. Mastrangelo, 172 F.3d 288, 297 (3d Cir.1999). "If we conclude that a comment was improper, we must apply a harmless error analysis, looking to see if 'it is highly probable that the error did not contribute to the judgment.' " Id. (quoting United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir.1995) (en banc)).

United States v. Brown, 765 F.3d 278, 296 (3d Cir. 2014). "'It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact.'" Id. (quoting 3 CHARLES ALAN WRIGHT AND SARAH N. WELLING, FEDERAL PRACTICE & PROCEDURE § 588 (4th ed. 2011)). The court of appeals has explained:

> We have looked to three factors to determine whether there was prejudice: the scope of the improper comments in the overall trial context, the effect of any curative instructions given, and the strength of the evidence against the defendant. Id.

United States v. Mastrangelo, 172 F.3d 288, 298 (3d Cir. 1999).

With respect to the first and third factors, i.e., the scope of the improper comments in the over trial context and the strength of the evidence against Zareck, the prosecutor's statement during closing argument that there were thousands of needles found in Zareck's home was not material

to a finding that Zareck was guilty in this case. The parties stipulated that Zareck was a convicted felon and there was overwhelming evidence presented that he was an unlawful user of controlled substances when he possessed the firearm and ammunition. Under those circumstances, whether there were hundreds of needles found in Zareck's home or thousands of needles found in his home, was not material a finding of guilt in this case.

With respect to the third factor, i.e., the effect of any limiting instructions given to the jury, Zareck's trial counsel did not object to the prosecutor's comment that thousands of needles were found in Zareck's home. The court during the final charge to the jury, however, instructed:

> You must make your decision in this case based only on the evidence that you saw and heard in the courtroom. Do not let rumors, suspicions, or anything else you may have seen or heard outside of court influence your decision in any way.
>
> The evidence from which you are to find the facts consists of the following.
>
> One, the testimony of the witnesses.
>
> Two, documents and other things received as exhibits.
>
> And, three, any fact or testimony that was stipulated, that is, formally agreed to by the parties.
>
> **The following are not evidence:**
>
> One, the indictment.
>
> **Two, statements and arguments of the lawyers for the parties in this case.**
>
> Three, questions by the lawyers and questions I might have asked.
>
> Four, objections by lawyers, including objections to which the lawyers stated facts.
>
> Five, any testimony I struck or told you to disregard.
>
> And, six, anything you may have seen or heard about this case outside the courtroom.

(T.T. 11/19/2012 (ECF No. 302) at 129-30 (emphasis added).) Thus, the court instructed the jury that their decision in this case must be based only upon the evidence presented at trial and the prosecutor's statements were not evidence.

Based upon the foregoing and assuming that Zareck's counsel's performance was deficient because he did not object to the prosecutor's improper statement that there were thousands of needles found in Zareck's home, Zareck did not show that he suffered prejudice as a result of the allegedly deficient conduct because the overwhelming evidence against him. Had Zareck's counsel objected to that portion of the closing argument, the court would have struck those statements from the record. The court, however, would not have granted a motion for a mistrial based upon those statements. For the foregoing reasons, the § 2255 motion will be denied with respect to this ground for relief.

### 14. Ground Fourteen

Zareck argues his trial counsel provided him ineffective assistance because he did not object to the prosecutor's statements about a photograph of Zareck and his brother and insinuation that Zareck lost muscle mass because his drug addiction. (ECF No. 363 at 80.) The government summarily argues that this ground for relief is inadequately plead, was procedurally defaulted, and, in any event, the trial counsel did not provide ineffective assistance when he failed to object to the photograph or ask for a curative instruction.

At trial, Zareck's counsel introduced the testimony of Ronald Zareck, Zareck's brother. Ronald Zareck testified that the shotgun at issue in this case was his, and in December 1998 or 1999 he left it at Zareck's house when he stayed with him after the Christmas holiday. (T.T. 11/16/2012 (ECF No. 301) at 8-9.) Zareck's counsel introduced a picture into evidence of Zareck and Ronald Zareck standing in the bedroom in which Zareck's brother stayed during the visit. (Id.

at 12.) During the prosecutor's cross-examination of Ronald Zareck, the following exchange took

place:

> PROSECUTOR: We see in the picture the defense showed you, I put it up on the board there, that Raymond was much different in stature back then as well. He appeared to be very muscular; is that fair to say?
>
> RONALD ZARECK: Yes.
>
> PROSECUTOR: I know we all change over time, I'm sure that each of us may have been more muscular earlier in our lives, but this is a significant difference. He probably has what, what would you say, maybe 40 pounds of raw muscle on him? More than what he has now?
>
> RONALD ZARECK: I don't know if 40 is an accurate number, but significantly more. He was an avid workout guy at the time.
>
> PROSECUTOR: He did a lot of weightlifting back then?
>
> RONALD ZARECK: Yes.
>
> PROSECUTOR: You talked in your direct about Raymond's past some as well. It's fair to say that prior to that picture being taken, Raymond had become addicted to drugs before that, correct?
>
> RONALD ZARECK: I don't know if he was an addict, so to speak, but there were some indications that he had used, yes.

(T.T. 11/16/2012 (ECF No. 301) at 27-28.)

Even if Zareck's counsel was ineffective for failing to object to the foregoing line of

questioning, Zareck cannot show that he was prejudiced by his counsel's performance. If the trial

counsel objected to the questioning, the court sustained the objection, and the court struck the

prosecutor's questioning and Ronald Zareck's response, there existed sufficient evidence of record

for the jury to find beyond a reasonable doubt that Zareck was a felon and unlawful user of

controlled substances the time he possessed the shotgun and ammunition without consideration of

the comparison between Zareck's appearance at the time of trial and his appearance in the

photograph. For example, Aubrey and Larcinese testified about witnessing Zareck's illegal drug

use, Wintruba, Rodgers, and Reinhart testified that Zareck told them he unlawfully used controlled substances, Aubrey testified that the shotgun was in Zareck's home during his illegal drug use, and Reinhart testified that Zareck told him he possessed the shotgun for his protection. Under those circumstances the § 2255 motion will be denied with respect to this issue.

### 15. Ground Fifteen

Zareck objects to the prosecutor's statements during closing argument that Zareck was selling drugs "because the only evidence regarding this uncharged criminal conduct was not credible in the testimony of Reinhart." (ECF No. 363 at 81.) The government summarily opposes this ground for relief. As discussed above, the court determined that the jury could rely upon Reinhart's testimony to convict Zareck. Under those circumstances, Zareck did not show his counsel's performance was deficient or that he was prejudiced by his counsel's performance. His § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 16. Ground Sixteen

Zareck argues that his trial counsel was ineffective because he did not object to the prosecutor's statement during closing arguments that Rodgers "had seen the shotgun in…[Zareck's] home…." (ECF No, 363 at 81.) The government summarily opposes this ground for relief. (ECF No. 356 at 14.)

During trial, Rodgers testified that she never saw the shotgun or Zareck handle the shotgun and she never heard Zareck talk about the shotgun (T.T. 11/16/2012 (ECF No. 301) at 53.) The prosecutor played for the jury recorded telephone calls between Rodgers and Zareck when Zareck was incarcerated at the Allegheny County Jail. (T.T. 11/16/2012 (ECF No. 301) at 71-72.) Specifically, the jury heard the following exchange between Zareck and Rodgers:

| | |
|---|---|
| Zareck: | Yeah, well listen, I'm gonna be in here. The feds put a fucking detainer on me for that shotgun because I'm a convicted… |

| | |
|---|---|
| Rodgers: | **<u>Felon. And you're not allowed to have it. I told you that before.</u>** |
| Zareck: | Right. And I thought I was allowed to have it in my house, but if somebody were to say that's not a convicted felon that it was theirs and they stayed there the night before and left it they couldn't charge me with it. |
| Rodgers: | Right. Well, maybe it was someone else's. |
| Zareck: | It was someone else's. I was gonna say my brother's and it was, but you know, that was like he was in South Carolina. |
| Rodgers: | Correct….That's just such a mess for you guys. You and Kenny both, dude. |
| Zareck: | I know. |
| Rodgers: | Its stressful to me, my mom, everybody. Its just like, Joe is pretty upset because you never said bye to him. |
| Zareck: | Yeah, I'm sorry. I uh, I had to go get a hit myself I wasn't feeling good either. |

(Gov't Ex. 39, 04.14.09 at 01:55 (emphasis added).) The prosecutor played for the jury an exchange between Zareck and Rodgers during which they discussed why Zareck "took a turn" with respect to his drug use and what would happen to him upon his release. (<u>Id.</u> at 11:42-12:45.) The following exchange then took place:

| | |
|---|---|
| Rodgers: | This is just so sad to see all this with everybody. I tried to tell you a billion times. |
| Zareck: | I know Jamie, I'm sorry. |
| Rodgers: | Now, do you know exactly did they give you paperwork on what the feds have on you? |
| Zareck: | Yeah, it says right here, uh: "U.S. Marshals detainer based on Federal arrest warrant." It says "possession of a firearm by a convicted felon." The only way I can beat that is either by illegal search and seizure, which means I need a lawyer. There'd be a quicker of doing it is by having someone to say it was theirs and they stayed over and left it in my house. And when I went to work, I-I didn't realize it was there. Because they arrested me right after |

71

work.

Rodgers:     Yeah, but you can get in trouble like if you didn't have a license or---

Zareck:      No—

Rodgers:     permit to carry for that…

Zareck:      A shotgun does not require a license.

Rodgers:     But then again you're right because people take them hunting.

Zareck:      Right. That's all you have to say, is you like target shooting or hunting.

Rodgers:     Right. [Sigh].

Zareck:      And that's an antique shotgun; that's worth hundreds of dollars.

(Gov't Ex. 39, 04.14.09 at 12:45.)

The prosecutor during his closing argument stated:

Jamie Rodgers told you on the jail tapes that she as well had seen it, a million times she had told him he had a gun in there and he couldn't have it, that he was a felon who couldn't have it.

(T.T. 11/20/2012 (ECF No. 303) at 21.)

As discussed above, to determine whether Zareck's counsel provided him ineffective assistance when he did not object to the prosecutor's closing argument, the court must determine whether the prosecutor's statement was improper, and, if it was, whether it prejudiced Zareck. "'It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact.'" Brown, 765 F.3d at 296 (quoting 3 CHARLES ALAN WRIGHT AND SARAH N. WELLING, FEDERAL PRACTICE & PROCEDURE § 588 (4th ed. 2011)). The court is to consider three factors to determine whether an improper statement in a closing argument by a prosecutor prejudiced a defendant and warranted a new trial:

"the scope of the improper comments in the overall trial context, the effect of any curative instructions given, and the strength of the evidence against the defendant." Mastrangelo, 172 F.3d at 298.

Here, Rodgers testified that she did not see the shotgun in Zareck's home. The jury heard the recorded telephone conversations between Zareck and Rodgers during which Rodgers told Zareck that she had told him he could not possess the shotgun because he was a felon. That evidence circumstantially showed that prior to the arrest of Zareck, Rodgers *knew* about the shotgun in Zareck's home.  There is no direct or sufficient circumstantial evidence of record, however, that Rodgers actually saw the shotgun in Zareck's home. For example, there was no evidence in the record that Rodgers was in Zareck's bedroom or in his home when he had the shotgun in plain sight. A jury would have to impermissibly speculate that Rodgers actually saw the shotgun in Zareck's home based upon Rodgers' statement to Zareck that she had told him that he could not possess the shotgun because he was a felon.

Whether Rodgers told Zareck "a million times" that he was a felon and could not possess the shotgun in his home is also speculative. The jury heard evidence that Rodgers had told Zareck that he could not possess the firearm because he was a felon, but the jury did not receive evidence upon which it could find that Rodgers told Zareck that information "a million times." The jury heard evidence that Rodgers and Zareck during a telephone call discussed Zareck's drug use and that she "tried to tell…[Zareck] a billion times[.]" It is unclear, however, exactly what Rodgers tried to tell Zareck "a billion times[.]"

Under those circumstances, the prosecutor improperly argued to the jury that: (1) Rodgers saw the shotgun in Zareck's home; and (2) Rodgers told Zareck "***a million times***

[that]…he had a gun in there and he couldn't have it, that he was a felon who couldn't have it."[17] (T.T. 11/20/2012 (ECF No. 303) at 21 (emphasis added).) To determine whether Zareck was prejudiced by his counsel's failure to object to those statements during the closing argument, the court must consider whether—if Zareck's counsel objected to the prosecutor's improper statements—the outcome of the trial would have been different.

With respect to the first factor the court must consider, i.e., the scope of the improper comments in the overall trial, the prosecutor's improper comments that (1) Rodgers saw the shotgun in Zareck's home,  and (2) Rodgers told Zareck a million times that he could not possess firearm, were relevant—but not material—to the jury's finding that Zareck possessed the shotgun. In other words, there existed overwhelming evidence from which the jury could have found beyond a reasonable doubt that Zareck possessed the shotgun even if the jury did not consider the prosecutor's improper commentary. For example, evidence was presented to the jury that Rodgers knew about the shotgun and at least once told Zareck he could not possess it because he was a felon, Aubrey and Larcinese saw the shotgun in Zareck's home, and Zareck told Reinhart that he had the shotgun in his home to protect himself in light of his forged prescription scheme.

With respect to the second factor, i.e., the effect of any curative instructions given, this court did not give a specific instruction with respect to the prosecutor's improper recitation of the evidence. As discussed above, however, the court specifically instructed the jury that the statements by the attorneys, including the closing arguments, were not evidence upon which their

---

[17] In other words, the prosecutor greatly exaggerated the number of times that Rodgers told Zareck that he was a felon who could not possess a firearm. See Klah v. Att'y Gen. New Jersey, No. CV 16-8791 (PGS), 2020 WL 5869079, at *18 (D.N.J. Oct. 2, 2020) (noting that the prosecutor improperly exaggerated the evidence, but the petitioner failed to show he was prejudiced by the exaggeration because the court instructed the jury that the attorneys' statements were not evidence and there was other evidence upon which the jury could rely to convict the petitioner).

decisions should be made. (T.T. 11/19/2012 (ECF No. 302) at 129-30.)

With respect to the third factor, i.e., the strength of the evidence against the defendant, as the court discussed above, there existed overwhelming evidence against Zareck that, among other things, he possessed the shotgun inside his home. Thus, this factor weighs heavily against the awarding of a new trial based upon the prosecutor's improper comments. Even if the prosecutor did not misstate the evidence and there was no evidence that Rodgers saw the shotgun inside Zareck's home or told him a million times that he was a felon and could not possess it, there existed overwhelming evidence against Zareck that he possessed the shotgun and ammunition while a felon and an unlawful user of controlled substances.

Based upon the foregoing and assuming that Zareck's counsel's performance was deficient because he did not object to the prosecutor's improper statements about Rodgers, Zareck did not show that he suffered prejudice as a result of the allegedly deficient conduct. There was overwhelming evidence against Zareck. Had Zareck's counsel objected to that portion of the closing argument, the court would have struck those statements from the record. The court, however, would not have granted a motion for a mistrial based upon those statements. The § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 17. Grounds Seventeen and Eighteen

Zareck argues that his trial counsel provided him ineffective assistance because he did not object to the prosecutor's closing argument in which the prosecutor: (1) provided the jury with an "interpretation" of recorded telephone calls between Ronald Zareck and Zareck when Zareck was incarcerated at the Allegheny County Jail (ground seventeen); and (2) improperly vouched for Reinhart (ground eighteen). (ECF No. 363 at 82-85.)

A prosecutor during closing argument may not "vouch" for a witness. One court has

explained:

> "Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." United States v. Walker, 155 F.3d 180, 184 (3d Cir.1998) (citations omitted). Such conduct threatens to "convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant," thereby "jeopardiz[ing] the defendant's right to be tried solely on the basis of the evidence presented to the jury," and "induc[ing] the jury to trust the Government's judgment rather than its own view of the evidence." Id. For a prosecutor's conduct to constitute vouching, (1) "the prosecutor must assure the jury that the testimony of a Government witness is credible," and (2) "this assurance [must be] based on either the prosecutor's personal knowledge, or other information not contained in the record." Id. at 187.

United States v. Berrios, 676 F.3d 118, 133 (3d Cir. 2012).

Upon review of the portions of the transcript cited by Zareck, the only arguably improper portion of the prosecutor's closing argument with respect to the recorded telephone calls are the prosecutor's remarks about Reinhart. Reinhart during trial testified that he had six different criminal cases in which he was convicted of one or more crimes. (T.T. 11/19/2012 (ECF No. 302) at 3.) He explained that Zareck was the victim of his most recent convictions for criminal trespass and theft by unlawful taking. (Id. at 3-4.) As discussed above, the jury heard evidence that Zareck and Reinhart were cellmates at the Allegheny County Jail after Zareck was arrested in this case. Reinhart testified that Zareck and Reinhart had many discussions during their incarceration, including discussions about Reinhart helping Zareck upon Reinhart's release. Reinhart explained:

> Raymond had asked me to take care of his house and to get his car out of impound. We had discussed earlier that I wasn't sure where I was going to go or what I was going to do. Within -- we spent about three weeks in the cell together, like 20 hours a day, so we got to talk a lot and about a lot of different things. One of the things was where I was going to go and what I was going to do and that he needed help with the house, with trying to get his car out, and finding somebody to take ownership of the gun and say that it was their gun so that way he wouldn't get in trouble for it.
>
> …

76

So, this was in the first couple weeks of being in jail before I actually knew where I was going. Me and Ray had talked about going to his house and that he wanted me to take care of the house. He had said that it was -- it had been raided by the police because of what had happened with him and that that's where the gun had been found, and that he also needed me to try to get his car out of the impound. I had made an agreement with him to go to the house, to clean it up, to take care of the bills, to try to get his car out of impound.

… 

The key was left underneath a rug in -- there's like a little cubbyhole foyer between the screen door and the regular door. Jamie Rodgers, which is Ray's friend, I had contact with her. Ray had given me her number to get the key from her. I had contacted her and got the key from her. Well, she left it underneath -- like there was this little TV on top of a rug between that foyer area and when I had gotten out, I went over there. That's where the key was. That's how I get in the house.

… 

Ray signed two different pieces of paper. One of the pieces of paper that he had signed, I had written up a letter for him to allow me to get his car out of impound, and I had also drawn up another letter for me to be allowed to stay at his house and live there and take care of the house.

… 

I had stayed at Ray's house I am guessing somewhere around six months. There would be days here and there that I would go to Linda's for a couple days and then come back. But my residence was at Ray's house. My mail was going there. I got the utilities, the TV and the phone on. I could not get his car out because they needed a notarized signature and the impound fee was so much and the towing fee was so much after being in jail for a couple weeks, there was just no way for me to get the car out. I had left his house on two different occasions to go to the hospital for a very short period of time.

(T.T. 11/19/2012 (ECF No. 302) at 20-27.)

Reinhart explained how he learned that charges were pressed against him for living in

Zareck's house:

I had been hospitalized. I had got sent to Harrisburg for an extended intermediate unit type of care, which means I would stay anywhere from three to six months. This was a voluntary stay, that I could leave at any time. When I was getting ready to apply for Social Security Disability, when I went down to the Lebanon County Social Security office, they told me that I was ineligible because I had a warrant out for my arrest for burglary, theft and criminal trespass. I had no idea what it was for. So, I went back to the hospital. I got the hospital to call the local police station. They faxed the criminal complaint over to the hospital and I voluntarily told them to come get me, that I would answer to the charges because I

wasn't guilty of that.

I came back to the Allegheny County Jail to find out that this affidavit of probable cause stated that I had burglarized Raymond Zareck's home, that I had stayed there without permission, that I had taken several items. And I couldn't believe it at first because he had been calling Linda ask Linda if everything was okay with the house and if everything was all right and how things were going, and of that nature. I had that piece of paper and I had lost it, between my transfer of going between here and the hospital and Harrisburg. When I had gotten before the courts, I had a choice of either taking a plea bargain of a year to two years in jail and a year of probation, or face five to ten years of incarceration if I lost at trial, **I had no way to prove** – I couldn't find the papers. I couldn't believe Ray was doing this. I had no reason why he was doing it. I come later to find out --

(T.T. 11/19/2012 (ECF No. 302) at 29-30 (emphasis added).)

As previously explained, the prosecutor during the trial played recorded telephone conversations between Zareck and others, including Rodgers, Ronald Zareck, and Reinhart's girlfriend, from when Zareck was incarcerated at the Allegheny County Jail. During one of the recorded telephone conversations between Zareck and Rodgers during which Zareck and Rodgers discussed Reinhart staying at Zareck's home, Zareck told Rodgers:

> ZARECK: All I wanted [Reinhart] to do was to get the keys so he could get in there and fix the house up and take care of it while I was in here. That's all.
>
> …
>
> ZARECK: I thought he was going to take care of the house . . .

(Gov't Ex. 39, 05.02.09 at 01:40, 08:54.)

The jury heard a recorded telephone conversation between Zareck and Kunak during which the following exchange took place:

> KUNAK: Um, Michael is at your house.
>
> ZARECK: Right. Yeah. That is what I figured 'cause Jamie said she went down and dropped the keys off with him.
>
> KUNAK: Yeah, 'cause when he first came he was frustrated because I guess

she wouldn't let him in.

ZARECK:      Right, that's because she hadn't talk to me because I didn't know he was getting out that day. I was supposed to call her and let him let her know to do that and she didn't talk to me yet--

KUNAK:       Okay. I don't know…

ZARECK:      That's why.

KUNAK:       But um, I heard from him once last night when he was over there. He said your house is a mess.

ZARECK:      I know.

KUNAK:       I guess the police or whoever came and searched your house. He said he would clean it up and do what he needs to do for you….
                        …

ZARECK:      So uh, I mean if he has any questions about bills or anything, you know, who he needs to pay or how…He can get a money order and write it out in my name or something whatever but or go down and pay it…. If he can just collect the mail and put it all somewhere. You what I mean?

KUNAK:       Right. Uh huh. How long is he supposed to be staying there?

ZARECK:       I don't know . . .

(Gov't Ex. 39, 04.23.09 at :43-1:26, 3:52-4:18.)

The prosecutor during his closing argument stated:

**And then perhaps the saddest of all the things that was there during the course of the conversation**, because we heard what happened to Michael Reinhart, that he was charged by Jamie and by the defendant for not having permission to be in the house, he says: Hey, Mike Reinhart is going to be coming over there to take care of the bills and he's going to live at the house. Jamie says: Okay. We know what they later did. They charged him with not having permission to be in the house at all. But they're in the jail tapes it was. **Michael Reinhart didn't have the ability to have this particular jail call at the time for his own defense.**
                        …
Ray calls Linda. You'll recall that Linda is the girlfriend, fiance of Michael Reinhart. The first thing that Linda says to Ray is: Michael is at your house. And Ray doesn't say, what, Michael is at my house? I never gave him permission to be at my house. He says: Okay, how am I going to get in contact with him. He's going

79

to help take care of things for me. **Again, Mr. Reinhart didn't have the opportunity to have those calls available for his defense.** But he confirmed nonetheless that Michael Reinhart was to go to his house and had permission to do so.

(T.T. 11/20/2012 (ECF No. 303) at 10, 12 (emphasis added).)

There are three arguably improper statements in the foregoing excerpt of the prosecutor's closing argument: (1) the prosecutor's personal opinion that the evidence about Reinhart was "the saddest of all the things[;]" and (2) the prosecutor's two statements that during Reinhart's state-court criminal case, Reinhart did not have the recording of the telephone calls between Zareck and Rodgers and Zareck and Kunak, during which they discussed Zareck's agreement to have Reinhart live at Zareck's house upon Reinhart's release.

With respect to the prosecutor's commentary about Reinhart's situation being the "saddest of all the things," Zareck cannot show that he was prejudiced by his counsel's failure to object to that comment. Even though that comment was improper because the jury must decide the case based upon the facts and not its sympathy for any party or witness, Gov't of the Virgin Islands v. Mills, 821 F.3d 448, 458 (3d Cir. 2016), the comment did not "infect…the trial with unfairness as to make the resulting conviction a denial of due process." Berrios, 676 F.3d at 133. Thus, even if the prosecutor did not make the comment or Zareck's trial counsel objected to the comment and the court struck the comment from the record, the outcome of the trial would have been the same. Under those circumstances, Zareck cannot show that he was prejudiced by his counsel's failure to object to the prosecutor's statements that Reinhart's situation was the "saddest of all the things."

Zareck argues that his counsel provided ineffective assistance because he did not object to the prosecutor's closing argument in which the prosecutor improperly vouched for Reinhart when it stated that Reinhart did not have the recorded telephone calls between Zareck and

Rodgers and Zareck and Kunak, during his criminal trial for his own defense. As discussed above, "[f]or a prosecutor's conduct to constitute vouching, (1) 'the prosecutor must assure the jury that the testimony of a Government witness is credible,' and (2) 'this assurance [must be] based on either the prosecutor's personal knowledge, or other information not contained in the record.'" Berrios, 676 F.3d at 133 (quoting United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998)). Zareck can satisfy the first prong because Reinhart's convictions were introduced into evidence to impeach his credibility. The prosecutor's statement that Reinhart did not have the recorded telephone calls between Zareck and Rodgers and Zareck and Kunak, invited the jury to draw the conclusion that Reinhart was wrongfully convicted in that case because if he had the recorded telephone call, he would have been acquitted, and, thus, his credibility could not be impugned by those convictions.

Zareck, however, cannot prove the second prong because the government's statement that Reinhart did not have the recorded telephone call during his criminal trial was based upon evidence in the record. Reinhart testified to the jury that during his criminal case, he "had no way to prove" his innocence in that case and the prosecutor played for the jury the recorded telephone calls between Zareck and Rodgers and Zareck and Kunak, during which they discussed Zareck's and Reinhart's arrangement for Reinhart to live at Zareck's home upon his release from the Allegheny County Jail. Thus, the jury received evidence that Reinhart did not have the recorded telephone calls between Zareck and Rodgers and Zareck and Kunak, during his criminal trial. Based upon the foregoing, the prosecutor did not improperly vouch for Reinhart during its closing argument, and, therefore, his counsel's performance was not deficient because the trial counsel did not object to that part of the closing argument.

The court notes, however, that even if (1) the prosecutor improperly vouched for Reinhart

during its closing argument, and (2) Zareck's counsel was ineffective because he did not object to the closing argument, Zareck cannot show that he was prejudiced by his counsel's allegedly ineffective performance. The jury heard evidence that Reinhart sustained convictions in six criminal cases, including the case involving Zareck, he suffered from bipolar depression, and was a drug addict. Under those circumstances and in light of all the evidence presented to the jury, the court does not find that even if Zareck's trial counsel objected to the closing argument that the outcome of the trial would have been different. The prosecutor's commentary about Reinhart did not "infect…the trial with unfairness as to make the resulting conviction a denial of due process." Berrios, 676 F.3d at 133. A mistrial would not have been warranted and there existed sufficient evidence from which the jury could convict Zareck beyond a reasonable doubt.

Zareck also failed to show that his trial counsel's performance was ineffective when the counsel did not object to the prosecutor's closing argument with respect to the prosecutor's review of the evidence with respect to the *other* telephone calls between Zareck, Rodgers, Ronald Zareck, and Reinhart's girlfriend. (T.T. 11/20/2012 (ECF No. 303) at 7-13.) The conclusions presented by the prosecutor during the closing argument about those telephone calls were based upon the evidence adduced at trial, i.e., the recorded telephone calls that were played for the jury, and were not improper opinions or assessments of the evidence based upon the prosecutor's knowledge of facts that were not presented at trial. Under those circumstances, Zareck did not show that his counsel was ineffective for failing to object to that portion of the closing argument.

Zareck's reliance upon Yohn v. Love, 76 F.3d 508 (3d Cir. 1995), is misplaced. In that case, the Third Circuit Court of Appeals held that a state-court defendant's constitutional rights were violated when the counsel for the state had an ex parte discussion with the Pennsylvania

Supreme Court Chief Justice, which led to the admission of a tape recording that the trial judge held was otherwise inadmissible. The court of appeals explained that the tape recordings were heavily relied upon at trial, including the prosecutor's closing arguments, and, therefore, the constitutional error was not harmless. Id. at 524.  Yohn does not stand for the proposition that a prosecutor cannot during closing argument review the contents of recorded telephone calls that were otherwise properly admitted into evidence at trial.

Based upon the foregoing, Zareck's § 2255 motion will be denied with respect to this ground for relief.

### 18. Ground Nineteen

Zareck argues that his trial counsel provided him ineffective assistance because he did not object to the prosecutor's closing argument in which the prosecutor incorrectly stated "that Ron[ald] Zareck was unsure whether…Zareck had asked him to leave the gun or whether he accidentally left it in [Zareck's home]." (ECF No. 363 at 85.) The government summarily opposes this ground for relief.

During the prosecutor's cross-examination of Ronald Zareck, the following exchange took place:

> Q. Am I correct you didn't recall exactly whether the guns were dropped off -- the guns and all these other things were dropped off at your brother's house before you got there for Christmas or whether you had brought them there, that you didn't remember which one of those it was, but whatever mechanism they got there by, you took basically almost everything when you left after Christmas?
>
> A. That's correct.
>
> …
>
> Q. And one of the other things we talked about was when you left, you told us about how you don't like to dillydally. You scooped up all the stuff you thought you had and you couldn't remember whether Ray had asked you to leave the shotgun or whether you had accidentally left it; is that fair to say as well? You just don't remember which one of those two things it was?

A. **I do recall that he never asked for the shotgun.**

(T.T. 11/16/2012 (ECF No. 301) at 22-23.) The prosecutor during his cross-examination of

Ronald Zareck played for the jury a recorded telephone call between Zareck and Ronald Zareck.

(Id. at 33.) During the recorded telephone call, Zareck states to Ronald Zareck: "I should have let

you take that home with you with all the others, you know." (Id.)

During the redirect examination of Ronald Zareck by Zareck's trial counsel, the

following exchange took place:

> Q.    Did your bother stop you from taking…[the shotgun] home with you?
>
> A.    Not to my knowledge.
>
> Q.    Well, he didn't say, leave the shotgun, don't take it to South Carolina, did he?
>
> A.    No, sir.
>                                       …
> Q.    How was it left in the house?
>
> A.    I forgot to take it.
>                                       …
> Q.    Did your bother at any point in time attempt to preclude you from taking the gun back to South Carolina?
>
> A.    Not that I'm aware of, no.
>
> Q.    Did you want to take it back to South Carolina?
>
> A.    It was my intent, yes.
>
> Q.    Did you leave it there on purpose?
>
> A.    No, sir.
>                                       …
> Q.    How did it come that you left the gun in the house?
>
> A.    I can only assume it was overlooked when my wife and I were packing the vehicle. If I would have known it was or that we had forgotten it, I would have taken it with me. I didn't know.

(T.T. 11/16/2012 (ECF No. 301) at 33-36.)

The prosecutor during his closing argument stated:

Can it be an accident that the defendant possessed the firearm in his house for ten years? At what point can we prove the fact that there is no debate about whether the defendant possessed the firearm as well as the ammunition because he had the power to control and the intent to control. The answer in this case is pretty clear. April 2, 1999, just after he acquired the gun, **whether it was left there accidently or whether he asked his brother to leave it**, it was left there during Christmas, and just a couple months later, on April 2, 1999, he calls up Cabela's and orders ammunition for that gun and he orders other 12-gauge rounds for that gun as well. They're bird bombs. You saw the receipt there. They're the type of ammunition that goes out and makes a loud bang so you can scare crows off your garden or geese off your pond, perhaps, something like that. You saw the defendant as of April 2, 1999 possessed the gun as well because he knew it was there and he bought ammunition for it.

…

The debate over whether this thing was left there accidentally or not is one we can probably make, but need not because the defendant tells us in his own words whether the gun was left there accidently. You may recall the brother said, I don't really remember exactly how the guns and the tools and the China [sic] that I was going to get from my aunt got there. I don't remember if they left it at Ray's house for me or if I picked it up and then took everything out of my car, he didn't recall which one of those things it was. **And he was also unsure of whether Ray had asked him to leave it or whether he accidently left it. I know that when he was asked by defense counsel after my questions, he said that he did not leave it there intentionally. I would submit to you when I asked him, he said that he was unsure whether Ray had asked him to leave it. But the defendant himself tells us whether that gun was left there accidentally or whether he asked his brother to leave it.**

I want to see if we can play the call from May 4, 2009. The defendant was in jail for a month at this point and he's talking to his brother for the last of the recorded calls that we have. They discuss the shotgun and whether it was left there accidentally or not.

…

**The defendant told you when they were talking about the shotgun: I should have let you take that home with you with all the others, you know. And the brother said nothing.**

(T.T. 11/20/2012 (ECF No. 303) at 21-23.)

Zareck's trial counsel during his closing argument told the jury the following with respect

to Ronald Zareck leaving the shotgun at Zareck's house:

> Can [sic] let's talk about Ronald Zareck for a moment. He has two children. Five stepchildren. A security clearance. And he loves his brother and he wouldn't lie for his brother. He purchased them from the wife of his uncle, Dolly. **He came here, dropped the guns off, and why wouldn't he take them? Because it was an accident. He left it by accident. He didn't do it intentionally. He didn't give it to his brother. He wanted to take it back. That's why he came here, to get them. His brother, according to him, has no interest, and never did, to firearms whatsoever.** The only thing missing, quite frankly, and I thought he was going to do it was that he was going to cry. He lives in South Carolina and he's talked to you about his difficulties with his brother. His brother is well educated. His brother screws up regularly. He's in South Carolina on the jail tapes and said, I've had enough. You keep going with this stuff. You keep doing this. I'm not helping you anymore. That's tough love. That's what that is. That isn't, I didn't leave the gun there. So when he told Raymond that, what does Raymond do in a panic state? I better come up with Plan B. We will get to Plan B.

(T.T. 11/20/2012 (ECF No. 303) at 32-33 (emphasis added).)

As discussed above, to determine whether Zareck's counsel provided him ineffective assistance when he did not object to the prosecutor's closing argument, the court must determine whether the prosecutor's statement was improper, and, if it was, whether it prejudiced Zareck. "'It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact.'" Brown, 765 F.3d at 296 (quoting 3 CHARLES ALAN WRIGHT AND SARAH N. WELLING, FEDERAL PRACTICE & PROCEDURE § 588 (4th ed. 2011)). The court is to consider three factors to determine whether an improper statement in a closing argument by the prosecutor prejudiced a defendant and warranted a new trial: "the scope of the improper comments in the overall trial context, the effect of any curative instructions given, and the strength of the evidence against the defendant." Mastrangelo, 172 F.3d at 298.

Zareck is correct that the prosecutor misstated the evidence during his closing argument. Ronald Zareck testified on cross-examination by the prosecutor: "I do recall that he never asked

for the shotgun." (T.T. 11/16/2012 (ECF No. 301) at 22-23.) The prosecutor during closing argument, however, stated that Ronald Zareck "was unsure of whether Ray had asked him to leave it or whether he accidently left it." (T.T. 11/20/2012 (ECF No. 303) at 21-23.) To determine whether Zareck was prejudiced by his counsel's failure to object to the closing argument, the court must consider whether an objection to the closing argument would have changed the outcome of Zareck's trial.

As discussed above, the court is to consider three factors to determine whether an improper statement in a closing argument by a prosecutor prejudiced a defendant and warranted a new trial. With respect to the first factor, i.e., the scope of the improper comment in the overall trial, the prosecutor's improper comment that Ronald Zareck could not remember whether Zareck asked him to leave the shotgun at his home was relevant—but not material—to whether Zareck possessed the shotgun, which is an element of one of the offenses with which he was charged. In other words, although Ronald Zareck's statement that Zareck did not request the shotgun is relevant to prove that Zareck did not possess the shotgun, the jury could have found beyond a reasonable doubt that Zareck possessed the shotgun even if it believed the testimony of Ronald Zareck that Zareck did not request the shotgun. The court also finds significant that Zareck's counsel on redirect examination asked Ronald Zareck at least two times whether he intentionally left the shotgun at Zareck's home and Ronald Zareck clearly testified that he left the shotgun at the home by accident. Zareck's trial counsel stressed the same point—that Ronald Zareck left the shotgun at Zareck's home accidentally and not intentionally—during his closing argument.

With respect to the second factor, i.e., the effect of any curative instruction given, Zareck's counsel did not object to the prosecutor's closing argument, and, therefore, this court did not give a specific instruction with respect to the prosecutor's improper recitation of the evidence. As

discussed above, however, the court specifically instructed the jury that the statements by the attorneys, including the closing arguments, were not evidence upon which their decisions should be made. (T.T. 11/19/2012 (ECF No. 302) at 129-30.)

The third factor, i.e., the strength of the evidence against Zareck, weighs heavily against the awarding of a new trial based upon the prosecutor's improper comments. Even if the prosecutor did not misstate the evidence and the jury believed Ronald Zareck that he accidentally—and not at Zareck's request—left the shotgun at Zareck's home, there existed overwhelming evidence against Zareck that he possessed the shotgun and ammunition while a felon and an unlawful user of controlled substances.

Based upon the foregoing analysis of the three factors set forth by the court of appeals, if Zareck's counsel would have objected to the prosecutor's improper statement at the time of trial, the court would have struck those statements and provided a curative instruction to the jury. The court, however, would not have granted Zareck a new trial. Even without striking or the curative instruction, there existed overwhelming evidence against Zareck to support a jury finding beyond a reasonable doubt that he possessed the shotgun and ammunition while a felon and unlawful user of controlled substances. Zareck did not show that he suffered prejudice as a result of his counsel's ineffective assistance, i.e., his failure to object to the prosecutor's misstatement of Ronald Zareck's testimony. Zareck's § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 19. Ground Twenty

Zareck argues that the prosecutor "impermissibly invited the jury to believe his opinion of the evidence[,]" i.e., that Zareck on the recorded telephone conversations from the Allegheny County Jail "admitted guilt to possessing the shotgun knowingly in violation of the law." (ECF No. 363 at 86.) The government summarily opposes this ground for relief. (ECF No. 356 at 14.)

Zareck argues the prosecutor committed prosecutorial misconduct when he stated the following in his closing argument: (1) "[T]he defendant told you himself from the jail tapes he possessed the gun[;]" and (2) "If you believe the jail tapes where the defendant says that he's guilty, you must find the defendant guilty of both counts." (T.T. 11/20/2012 (ECF No. 303) at 21, 24.)

This ground for relief, however, has been procedurally defaulted. When a defendant fails to raise a claim on direct review the claim becomes procedurally defaulted. Bousley v. United States, 523 U.S. 614, 622 (1998). A defendant can only raise a procedurally defaulted claim in a habeas proceeding when the defendant "can first demonstrate either 'cause' and actual 'prejudice' ... or that [the defendant is] 'actually innocent.' " Id. (citing Murray v. Carrier, 477 U.S. 478 (1986); Wainwright v. Sykes, 433 U.S. 72, (1977); Smith v. Murray, 477 U.S. 527 (1986)).

The "cause and actual prejudice" standard set forth in Davis v. United States, 411 U.S. 233 (1973), and expanded upon in Francis v. Henderson, 425 U.S. 536 (1976) and Wainwright v. Sykes, 433 U.S. 72 (1972), applies when a defendant is seeking collateral relief based on trial errors that were not previously objected to by defendant. United States v. Frady, 456 U.S. 152, 167-68 (1982). In order to prevail under this standard, a defendant must show both "cause" for the default as well as "prejudice" that resulted from the error. Smith v. Murray, 477 U.S. 527, 533 (1986); Francis, 425 U.S. at 542.

"Cause" legitimizes a default and it exists when a defendant can "show that some objective factor external to the defense impeded counsel's efforts to comply with the ... procedural rule." Murray, 477 U.S. at 488. Under this standard, the impediment must have prevented counsel from raising the claim. McClesky v. Zant, 499 U.S. 467, 497 (1991); Murray, 477 U.S. at 492. External impediments have been found to constitute cause when: (1) a novel

legal claim exists that was not "reasonably available to counsel," Bousley 523 U.S. at 622 (citing Reed v. Ross, 468 U.S. 1, 16 (1984)); (2) the factual basis for the claim was not available to counsel, Murray, 477 U.S. at 488; (3) when government officials interfered with compliance, Coleman v. Thompson, 501 U.S. 722, 753 (1991); and (4) when the default occurred due to ineffective assistance of counsel in violation of the Sixth Amendment, Coleman, 501 U.S. at 752; Murray, 477 U.S. at 488.

Once a legitimate "cause" excusing the procedural default is shown, a defendant must also establish actual "prejudice." Frady, 456 U.S. at 170. To do so the defendant has "the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. (emphasis in original). This standard requires a defendant to prove that, if not for the error, the proceeding would have likely ended in a different result. *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)). The Supreme Court has explained that a court should determine whether, with the absence of the defaulted claim, defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Whitley, 514 U.S. at 434.

Here, Zareck did not raise this ground for relief on direct appeal, and, therefore, it is procedurally defaulted. He did not show cause for the default; indeed, he argues only prosecutorial misconduct in this ground for relief. Under those circumstances, his § 2255 motion will be denied with respect to this ground for relief.

### 20. Ground Twenty-One

Zareck argues that his trial counsel was ineffective because he failed to object to the prosecutor's impermissible vouching for the witnesses in its closing argument. (ECF No. 363 at

87.) Specifically, Zareck argues that the prosecutor improperly told the jury: "Even though you don't need those witnesses to convict the defendant in this case, their testimony rang true." (Id.) The government summarily opposes this ground for relief.

The prosecutor during his closing argument stated:

> At what point during ten years, if possession is momentary, is it that he possessed this firearm? What about the fact that he had ammunition for this particular firearm right to the side of his bed as well. He had the ammunition to one side and he had the gun at his feet. Common sense leads you to conclude that the defendant possessed this item. He told you himself in the jail tapes that he did, he was going to have to do fed time, but the government's witnesses told you that same thing. I would submit to you that many of these people are not the people you would want to come home and babysit your children, but your determination isn't whether you want them to babysit your children, it's whether they were believable. Did they look you in the face when they talked to you? Did they answer the questions as best they could, or did they duck the questions? Did they have testimony that seemed to make sense to you? Probably, most importantly, did their testimony fit together with other evidence? Was it supported by other evidence? Did the jail tapes tell you the same thing that all those witnesses said? And did each one of those witnesses help to support each other? **Even though you don't need those witnesses to convict the defendant in this case, their testimony rang true.** Heidi Aubrey told you she had seen the gun on many occasions in the defendant's house. John Larcinese told you he had seen the gun in the defendant's house on many occasions. He actually saw it downstairs at one point and then upstairs at another. Jamie Rodgers told you on the jail tapes that she as well had seen it, a million times she had told him he had a gun in there and he couldn't have it, that he was a felon who couldn't have it. Michael Reinhart told you that the defendant had the gun to protect himself because of his drug activities. So if you think of those, those are circumstantial evidence, many of them, that the defendant possessed the gun. Then Michael Reinhart tells you by direct evidence that he possessed the gun, and the defendant told you himself from the jail tapes he possessed the gun.

(T.T. 11/20/2012 (ECF No. 303) at 20-21.)

As discussed above, "[f]or a prosecutor's conduct to constitute vouching, (1) 'the prosecutor must assure the jury that the testimony of a Government witness is credible,' and (2) 'this assurance [must be] based on either the prosecutor's personal knowledge, or other information not contained in the record.'" Berrios, 676 F.3d at 133 (quoting United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998)). In other words:

> [I]t is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible. The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record.

United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998).

Here, the prosecutor assured the jury that the testimonies of the government's witnesses were credible when he told the jury that their testimonies "rang true[.]" (T.T. 11/20/2012 (ECF No. 303) at 20-21.) Zareck, however, did not show that the prosecutor's assurance was based upon the prosecutor's personal knowledge or other information not contained in the record. To the contrary, the prosecutor supported his assertion that the testimonies "rang true" with an explanation of the evidence in the record showing that the recorded telephone conversations from the Allegheny County Jail were generally consistent with the testimony by Aubrey, Rodgers, Larcinese, and Reinhart.[18] Under those circumstances, Zareck's trial counsel was not ineffective when he failed to object to the prosecutor's statement that the testimonies of the government's witnesses "rang true." In any event, considering the overwhelming evidence against Zareck, he did not show that he was prejudiced by his counsel's failure to object. In other words, if his counsel had objected, the outcome of the trial would have been the same because the court would not have granted a new trial and there existed sufficient evidence from which the jury could convict him beyond a reasonable doubt. Zareck's § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 21. Ground Twenty-Two

---

[18]    As explained in this opinion, to the extent the prosecutor misstated certain evidence in his closing argument, e.g., the prosecutor stated that Rodgers saw the firearm and told Zareck he could not have the firearm a million times, Zareck cannot show he was prejudiced by his counsel's failure to object to the improper statements in light of the overwhelming evidence presented against him.

Zareck argues that his trial counsel was ineffective when he did not object to the

prosecutor's closing argument in which he stated:

> [Zareck and Rodgers (during a recorded telephone conversation while Zareck was in jail)] go on to say, however, that Ray has already hatched his plan in the 11 days that he's been in. His plan is to have someone say that it's theirs, that they stopped by and left it. He even tells you why it wouldn't work to say that it was his brother's. I was gonna say it's my brother's but he lives in South Carolina. **What twelve people could you put in a jury box to believe that this shotgun had been in his house accidentally for ten years? That's what he was telling you.** I had to come up with some other plan because no one is going to believe that this shotgun was accidentally in my house for ten years.

(T.T. 11/20/2012 (ECF No. 303) at 8-9 (emphasis added).) According to Zareck, the foregoing

emphasized portion of the prosecutor's closing argument impermissible inflamed the jury, and,

therefore, Zareck was deprived of a fair trial. (ECF No. 363 at 88.) The government summarily

opposes this ground for relief.

As discussed above, the court must first determine whether the prosecutor's remarks were

improper, i.e., whether the remarks "'cause[d] the defendant substantial prejudice by so infecting

the trial with unfairness as to make the resulting conviction a denial of due process.'" Brown, 765

F.3d at 296 (quoting United States v. Shareef, 190 F.3d 71, 78 (2d Cir.1999)). Here, the prosecutor

reviewed for the jury the recorded telephone conversation between Zareck and Rodgers in which

Zareck planned to have another person take responsibility for the shotgun. The prosecutor argued

that—based upon that evidence—Zareck knew a jury would find that he possessed the gun if they

heard that his brother, who lived in South Carolina, left the gun at his home in 1999, i.e., ten years

before he was arrested in this case. The court finds that the prosecutor's argument is based upon

evidence presented at trial, e.g., Ronald Zareck's testimony that he left the shotgun at the home in

1999, Zareck's statements on the recorded telephone calls that the shotgun was left in the open,

and Zareck's attempts to have someone else claim the shotgun. The trial was not impacted, and

Zareck's due process rights were not violated. Even if the comments were improper, however, a new trial was not warranted considering the overwhelming evidence against Zareck. Based upon the foregoing, Zareck cannot show that his counsel was ineffective for failing to object to the prosecutor's closing argument or that he was prejudiced by his counsel's alleged ineffective assistance. Zareck's § 2255 motion will be denied with respect to this ground for relief.

### 22. Ground Twenty-Three

Zareck argues that his trial counsel and appellate counsel were ineffective because they did not "adequately investigate the facts and law regarding the search warrant to advance an obviously stronger Fourth Amendment claim not previously litigated[,]" i.e., the affidavit by Wintruba did not support a finding that there existed probable cause to believe that Zareck had committed a crime. (ECF No. 363 at 89.) Zareck also argues that his trial counsel was ineffective because he did not request a hearing to "evaluate the mental state of [Wintruba]." (Id. at 92.)

The affidavit of probable cause authored by Wintruba in support of a search warrant for Zareck's arrest provided:

> The Homestead Police Department was conducting a narcotic buy bust with in [sic] the borough of Homestead. Officers arrested Raymond J. Zareck with in [sic] his 2007 Chevrolet Malibu SDN at the Waterfront McDonalds. Officers observed a green fuse sticking out of the center console. Officers are familier [sic] with this type of fuse which is consistent with an improvised explosive device. Officers opened the center console & observed a pipe type object which was approximately 8″ long. The object was wrapped with tape & had glue on each end. A 12″ green fuse was sticking out of one end. The device appeared to be a homemade pipe bomb. Officers secured the area & contacted the Allegheny County Bomb Squad. Raymond Zareck was transported to WHPD then to HPB for processing. Zareck was mirandized and questioned regarding the improvised explosive device. Zareck stated to Ofc. Wintruba & Fusco that he purchases "Bumble Bee" commercial fireworks at Target Department Stores. Zareck then takes the fireworks to his residence at 3379 Parkview Ave. Pittsburgh, PA 15213 disassembles them and creates improvised explosive devices. Zareck stated that he takes the flash powder out of several commercial fireworks and condenses the flash powder into one cardboard tube. He them applies a fuse and glue to each end. Finally he tapes the tube up with cloth tape. Zareck is unsure how much additional

flash powder is with [sic] his residence, but did state that it is not in any type of fire retardent [sic] cabinet nor does he have any type of automatic fire supression [sic] devices. Zareck's residence is a row house with multiple family residences on each side.

Homestead Police and Fire Departments evacuated the Waterfront McDonalds & Get Go gas station prior to the bomb squads [sic] arrival. Allegheny County Bomb Squad arrived on scene & took possession of the device. The device was transported to a vacant area on the Waterfront & detonated. Bomb Technicians Robert Synan & Mark Divelbiss advised officers that the device was infact [sic] an improvised explosive device. They went on to state that the flash powder Zareck is using in these types of devices is extremely volitile [sic] & dangerous. In addition, depending on how much flash powder is located with in [sic] Zareck's residence this could prove to be a dangerous and hazardous condition for the surrounding neighbors & the public. The technicians Synan & Divelbiss stated that they have had prior experience with bomb makers of this type. They stated that these bomb makers do not make just one improvised explosive device, but infact [sic] make several at a[sic] one time.

During officers [sic] interactions with Zareck he appeared to be unstable in his demeaner [sic] and possesses a violent criminal history, with multiple weapon and drug charges. While being interviewed at HPD Zareck assaulted officers, attempted to escape & attempted to destroy evidence. Officers managed to subdue Zareck, but not before he destroyed one piece of evidence.

Based on the above information and the advice of the Allegheny County Bomb Squad Technicians we respectfully request the issuance of a search warrant for the residence & curtilage located at 3379 Parkview Ave. Pittsburgh, PA 15213 for the safety of the public as a whole.

(Gov't Ex. 2 from the Suppression Hr'g (H.T. 5/27/2010 (ECF No. 85) at 31).)

Because Zareck's home was searched pursuant to a warrant issued by a judge, the court must only determine whether the judge had a " 'substantial basis for ... conclud[ing]' that probable cause existed.' " United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The Third Circuit Court of Appeals has explained:

This standard "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983), cert. denied sub nom., Sanchez v. United States, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984). Nevertheless, the role of the reviewing court is quite limited. The Supreme Court has directed that "although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable

> cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) (emphasis added), quoted with approval in Gates, 462 U.S. at 237 n. 10, 103 S.Ct. at 2331 n. 10.

Conley, 4 F.3d at 1205.

"Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Grubbs, 547 U.S. 90, 96 (2006) (quoting Gates, 462 U.S. at 238). Probable cause determinations require the magistrate judge to make a "practical, common-sense decision." Gates, 462 U.S. at 238. "The supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." Conley, 4 F.3d at 1206 (citing Gates, 462 U.S. at 230–31).

One district court has explained:

> The Fourth Amendment "specifies only two matters that must be 'particularly describ[ed]' in the warrant: 'the place to be searched' and 'the persons or things to be seized.' " United States v. Grubbs, 547 U.S. 90, 97, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006). The Supreme Court has "rejected efforts to expand the scope of [the Fourth Amendment's particularity requirement] to embrace unenumerated matters." Id. Thus, "there is no per se requirement that a search warrant describe the criminal activity alleged." United States v. Kofsky, No. 06–392, 2007 WL 2480971, at *16 (E.D.Pa. Aug.28, 2007) (citing United States v. Slaey, 433 F.Supp.2d 494, 495 n. 1 (E.D.Pa.2006)); accord 2 Wayne R. LaFave, Search and Seizure § 3.1(b), at 7 n. 28 (3d ed.1996) (noting that "[i]t need not be certain precisely what crime was committed" and citing cases in support).

United States v. Fumo, 565 F. Supp. 2d 638, 644 (E.D. Pa. 2008)

The Third Circuit Court of Appeals affirmed this court's decision that the search warrant issued in this case was valid:

> Zareck admitted to disassembling explosive devices in his home. He told the police that explosive powder remained in his home and that he had not taken any safety precautions to minimize the risk of fire or explosion. Experienced members of the bomb squad believed that this created a potential risk of an explosion and they urged police to obtain a search warrant for Zareck's residence to alleviate what they viewed as an obvious and immediate danger to the neighborhood. Thus, the

> magistrate clearly had a substantial basis for finding probable cause to issue the search warrant and Zareck's argument to the contrary is frivolous.

United States v. Zareck, 588 F. App'x 100, 101 (3d Cir. 2014). Zareck now argues that the search warrant was invalid because the affidavit of probable cause upon which it was issued did not specify a crime that he committed.

The search warrant, however, did specify crimes, evidence of which was believed to be in Zareck's home. The search warrant provided, in pertinent, part:

> VIOLATION OF (*Describe conduct or specify statute):*

> PACC 2716 (a), PACC 2716 (b), PACC 3302 (a), PACC 3303 (2) & PACC 2705

(Search Warrant dated April 6, 2007 at 1.) Thus, Zareck's arguments are moot.

Second, As discussed above, the Fourth Amendment mandates that the warrant particularize the place to be searched and the items to be seized. There is no requirement that the search warrant identify a particular crime committed. In any event, the magistrate judge had a substantial basis upon which to conclude that there existed a fair probability that evidence of Zareck's alleged violation of, among other statutes, 18 Pa. Cons. Stat. § 2705 would be found in Zareck's home.

> Section 2705 provides:

> A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa. Cons. Stat. § 2705.

As the court of appeals recognized, Zareck told the police that explosive powder remained in his home and was not secured and members of the bomb squad believed the items in his home created "an obvious and immediate danger to the neighborhood." Zareck, 588 F. App'x at 101. The magistrate judge clearly had a substantial basis upon which to conclude that there existed evidence

in Zareck's home that he committed and continued to commit a violation of section 2705. Based upon the foregoing, Zareck did not show that his trial or appellate counsel provided him ineffective assistance. Any argument the search warrant was invalid because it did not specify a crime allegedly committed by Zareck is incorrect because the search warrant identified crimes evidence of which Wintruba believed would be found in Zareck's home.

Zareck failed to show that his trial counsel was ineffective or that he was prejudiced because his trial counsel "failed to move for an evidentiary hearing to evaluate the mental state of [Wintruba]." (ECF No. 363 at 92.) This court in its opinion denying Zareck's motion for reconsideration of his motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) explained:

> In order to obtain a Franks hearing, defendant must first make a "substantial preliminary showing" that (a) the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth and (b) is material to the finding of probable cause. Id. To make a substantial preliminary showing, "the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." Id. at 383 n. 8.
>
> …
>
> For a court to decide that an officer's affidavit of probable cause was made with "reckless disregard" of the truth, " 'the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.' " Brown, 631 F.3d at 645 (quoting Wilson, 212 F.3d at 788). Unless defendant presented evidence that Officer Wintruba should have had serious doubts about the bomb squad's information or had obvious reasons to doubt such information, defendant cannot establish that Officer Wintruba's statements were made with reckless disregard for the truth and request for a Frank's [sic] hearing must be denied. Defendant failed to present any affidavit or statement of a reliable witness which would call into question Officer Wintruba's reliance on the information given to him by the bomb squad. Attacking the credibility of the bomb squad's investigation without setting forth reasons why Officer Wintruba should have entertained doubt pertaining to that investigation is not enough. The court must conclude that defendant did not make a preliminary substantial showing that Officer Wintruba acted in deliberate or reckless disregard of the truth.

United States v. Zareck, No. CRIM. 09-168, 2012 WL 2872468, at *6 (W.D. Pa. July 12, 2012).

Zareck in his § 2255 motion argues that his counsel should have requested an evidentiary hearing with respect to Wintruba's mental state and argued that Wintruba "entertained serious doubts" about the accuracy of the information he received from the Allegheny County Bomb Squad (the "bomb squad") and relied upon in his affidavit of probable cause. (ECF No. 363 at 92.) Zareck, however, did not show that his counsel's performance was deficient because he did not point to any evidence or make any argument  to "call into question Officer Wintruba's reliance on the information given to him by the bomb squad[.]" Id. Zareck relies upon United States v. Wright, 777 F.3d 635 (3d Cir. 2015), to support this argument. In that case, the issue before the court was whether the exclusion of evidence obtained pursuant to a facially invalid search warrant was warranted. The court of appeals explained that the police officer's knowledge and experience was relevant to whether it was objectively reasonable for that officer to believe a search conducted pursuant to the facially invalid warrant was valid. Id. at 639. Wright does not stand for the proposition that based upon the facts of this case—where the search warrant was facially valid— the court should have held an evidentiary hearing with respect to Wintruba's mental state or there existed evidence upon which Zareck's counsel should have argued that Wintruba entertained serious doubts about the information he received from the bomb squad.

Based upon the foregoing, if Zareck's trial counsel would have requested an evidentiary hearing with respect to Wintruba's mental state or argued that Wintruba should have entertained serious doubts about the information he received from the bomb squad based upon the evidence presented to this court and the allegations made by Zareck in his § 2255 motion, the court would have denied his request.[19] Under those circumstances, Zareck did not show that his counsel's

---

[19]     Zareck's reliance upon Exhibits A, B, and F does not alter the court's conclusion that he is not entitled to relief with respect to ground twenty-three. Neither the report by bomb squad officer Synan (Exhibit A), the transcript of an examination of Synan (Exhibit B), or the

performance was deficient or that he was prejudiced by his counsel's failure to request an evidentiary hearing with respect to Wintruba's mental state. Zareck's § 2255 will, therefore, be denied with respect to this ground for relief.

### 23. Grounds Twenty-Four and Twenty-Five

Zareck argues that both his trial counsels were ineffective because they did not hire an expert witness to testify that the cardboard tube found inside Zareck's vehicle at the time he was arrested by Wintruba "can not [sic] be used as a weapon to qualify under the law as an 'improvised explosive device' or 'bomb.'" (ECF No. 363 at 93.) Zareck argues that—under those circumstances—the cardboard tube "could not have established probable cause to search…[Zareck's] home for explosives, especially since the 'firework' was not tested for containing explosive material after determined by x-ray not to contain any metal or fragmental components by the Allegheny County Bomb Squad." (Id. at 94.) The government summarily opposes this ground for relief.

Zareck via his trial counsel filed a motion for a Franks hearing (ECF No. 84) to challenge the search warrant for his home issued based upon the affidavit of probable cause authored by Wintruba. (ECF No. 174.) The court held a two-day hearing on the motion and determined that Zareck was not entitled to a Franks hearing. Zareck via his trial counsel filed a motion for reconsideration of the court's decision to deny his request for a Franks hearing. (ECF No. 174.) In the motion for reconsideration, Zareck argued that the court lacked sufficient information in

---

newspaper article published nearly six years after Zareck was found with the cardboard tube with the fuse in his vehicle (Exhibit F) are sufficient to show that Zareck's counsel provided ineffective assistance of counsel as alleged in ground twenty-three. In other words, those exhibits do not alter this court's conclusions that the search warrant specified crimes evidence of which Wintruba believed would be found in Zareck's home and that a request for a hearing about Wintruba's mental state would have been futile.

the form of an expert's affidavit to challenge information the Allegheny County Bomb Squad

("bomb squad") provided to Wintruba, which Wintruba relied upon and used to obtain the search

warrant at issue. Zareck argued that the expert affidavit of Dr. Frederic W. Whitehurst, J.D.,

Ph.D. ("Dr.Whitehurst"), was sufficient to show that Wintruba should not have believed the

bomb squad technicians' assessment of the device found in defendant's vehicle because the bomb

squad's investigation of that device was incomplete. (ECF No. 174, Ex. D.)

> This court in its opinion with respect to the motion for reconsideration explained:

> > Dr. Whitehurst found that the bomb squad's investigation was incomplete because the bomb squad failed to retrieve the contents of the device left in the crater after the explosion. Id. at 1–3, ¶¶ 6–7. Dr. Whitehurst opined that the bomb squad should have retrieved the contents of the crater to conduct a forensic residue analysis to determine whether there were chemicals in the residue which would be present if an explosive was actually in the device. Id. at 1–2, ¶ 6. Dr. Whitehurst explained that the use of an x-ray was an insufficient method to use to determine the chemical make-up of the device. Id. at 2–3, ¶ 7. Instead, in order to conclude whether or not the device was an IED, the bomb squad needed to conduct a chemical analysis of its contents to determine four factors: (1) the kinds of atoms present in the device; (2) which, if any, atoms were attached to each other; (3) what proportion those chemicals were to each other; and (4) the form in which the chemicals were present. Id. at 3, ¶ 7. Dr. Whitehurst opined that the failure to retrieve the contents of the device was in violation of accepted protocol found in the U.S. Department of Justice's Guide for Explosion and Bombing Scene Investigation. Id . at 2, ¶ 6. Dr. Whitehurst opined that the bomb squad's failure to collect and analyze the data from the crater after the device's destruction left the bomb squad with inadequate information to conclude that the device found in defendant's vehicle was an IED, "hot," "volatile," or dangerous. Id. at 3–4, ¶¶ 7–8. It was those conclusions that Officer Wintruba relied upon to obtain a search warrant of defendant's residence. See (ECF No. 37, Ex. A .) Notably, however, Dr. Whitehurst's expert affidavit did not contain any opinion regarding Officer Wintruba's state of mind and whether he had reason to doubt the adequacy of the bomb squad's investigation or the bomb squad's conclusions, which he included in his affidavit for probable cause. See (ECF No. 174, Ex. D.)

United States v. Zareck, No. CRIM. 09-168, 2012 WL 2872468, at *3 (W.D. Pa. July 12, 2012).

This court assumed Whitehurst's affidavit was "new" evidence, and, therefore, reconsideration of

the court's decision denying Zareck's request for a Franks hearing was warranted. Id. at *6.

This court recognized that Zareck had the burden to prove that Wintruba's affidavit contained a false statement. Id. ("Under Franks, the defendant must first make a substantial showing that the affidavit of probable cause contained a false statement."). Based upon Whitehurst's affidavit and the government's failure to address "the specifics of the bomb squad's investigation and does not provide further insight into the information they did or did not have after they detonated the device," the court assumed Zareck made the preliminary showing that the affidavit contained a false statement. The court then explained that under Franks Zareck had to make a substantial showing that those false statements in the affidavit of probable cause were made knowingly, deliberately, or with a reckless disregard for the truth. Id.

The court held that Zareck failed to make the requisite showing because—although Whitehurst's affidavit attacked the credibility of the bomb squad's work—Zareck did not show that any false statement by Wintruba in the affidavit of probable cause was made knowingly, deliberately, or with a reckless disregard for the truth. The court explained:

> The Court of Appeals for the Third Circuit has held that "information received from other law enforcement officials during the course of an investigation is generally presumed to be reliable ... [and] government agents should generally be able to presume that information received from a sister governmental agency is accurate." Yusuf, 461 F.3d at 378, 385. Under Yusuf, the information given to Officer Wintruba from the bomb squad, a government agency, was presumably reliable, and defendant presented no affidavit or statement of a reliable witness to show Officer Wintruba had or should have had reason to doubt what the bomb squad told him. The evidence the court does have is that Officer Wintruba had no military, ordinance or explosive training, and the Homestead Police Department does not have its own bomb squad. (Hr'g Tr. 12, May 27, 2010.) There was no information presented to the court to show that Officer Wintruba had any reason to doubt the information he received from a sister government agency.

Zareck, 2012 WL 2872468, at *6. The court applied the two-part test set forth in United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006), to determine whether Wintruba acted in reckless disregard of the truth when he relied upon the information supplied to him by the bomb squad. The

court explained:

> Applying the principles set forth in <u>Yusuf</u> to the present case, it is clear there is no basis for this court to conclude that Officer Wintruba acted in reckless disregard of the truth by relying upon the information supplied to him from the bomb squad. Officer Wintruba knew that the fire chief described the device as dangerous. (Hr'g Tr. 21, May 27, 2010.) He also knew the bomb squad took control of and x-rayed the device, and detonated it in a "safe open grassy area." <u>Id.</u> at 27, 28, 64. The bomb squad advised Office Wintruba that the device was an IED, contained flash powder, and was extremely hot and volatile, unstable and dangerous. <u>Id.</u> at 27–8. Defendant failed to present any affidavit or statement showing that Officer Wintruba had reason to doubt the bomb squad's investigation or that as required by <u>Yusuf</u>, that the information would have put a reasonable officer on notice that further investigation was required. Dr. Whitehurst's opinions do not explain why Officer Wintruba should have been aware of obvious reasons to doubt the bomb squad's investigation. <u>See</u> (ECF no. 174.) Based on the foregoing, the court concludes that defendant failed to make a substantial showing that even assuming the statements made by the bomb squad to Officer Wintruba were false, Officer Wintruba's reference to those statements in his affidavit of probable cause were made deliberately or in reckless disregard of the truth. Since defendant failed to satisfy part one of the <u>Franks</u> hearing analysis, the court need not comment on whether defendant made a substantial showing that paragraph two of the affidavit of probable cause is material to the determination of probable cause necessary for the issuance of a search warrant.

<u>Zareck</u>, 2012 WL 2872468, at *7.

In his twenty-fourth ground for relief in his § 2255 motion, Zareck essentially raises the same argument his counsel raised in the motion for reconsideration, which this court denied. He argues that his trial counsels' performances were deficient because they did not hire an expert to challenge the findings of the bomb squad. First, Zareck's second trial counsel did hire an expert to challenge the work of the bomb squad. Second, this court previously explained that "[a]ttacking the credibility of the bomb squad's investigation without setting forth reasons why Officer Wintruba should have entertained doubt pertaining to that investigation is not enough" to show that Zareck is entitled to relief under <u>Franks</u>. <u>Zareck</u>, 2012 WL 2872468, at *6. Zareck in his § 2255 motion did not present any evidence or credible argument that Wintruba should have (1) entertained serious doubts as to the truth of his statements made in reliance on the bomb

squad, or (2) had obvious reasons to doubt the accuracy of the information he reported. Zareck, therefore, cannot show that hiring an expert would have changed the outcome of this court's ruling on his suppression motion and request for a <u>Franks</u> hearing. In other words, he did not show that either trial counsel's performance was deficient or that he was prejudiced by any alleged deficiencies.

In his twenty-fifth ground for relief in his § 2255 motion, Zareck argues that his trial counsels were ineffective because they did not challenge the conduct of the bomb squad. (ECF No. 363 at 98.) According to Zareck, the correct inquiry is whether the bomb squad officers who supplied information to Wintruba possessed probable cause. Zareck argues that the information the bomb squad provided to Wintruba was unreliable because it was "junk science" and "the physical features of the cardboard tube clearly did not qualify as an improvised explosive device capable of being used as a weapon notwithstanding that the contents were never identified to [be] explosive." (<u>Id.</u> at 99.) This court already held, however, that it is insufficient for Zareck to attack the credibility of the bomb squad to show that Wintruba knowingly or with reckless disregard for the truth made a false statement in his affidavit of probable cause. Under those circumstances, he is not entitled to a <u>Franks</u> hearing.

Zareck relies upon <u>Rogers v. Powell</u>, 120 F.3d 446 (3d Cir. 1997), for the proposition that "fellow officers conveying that there is probable cause for a person's arrest, by themselves, cannot provide the facts and circumstance necessary to support a finding of probable cause." (ECF No. 363 at 98.) <u>Rogers</u>, however, is easily distinguishable from this case. In <u>Rogers</u>, state troopers relied upon information provided *by other state troopers* to arrest a person. The Third Circuit Court of Appeals instructed that "[p]robable cause exists only if the statements made by fellow officers are supported by actual facts that satisfy the probable cause standard." <u>Id.</u> at 453.

Here, Wintruba did not rely upon a statement by a fellow officer of *his* agency, i.e., the Homestead Police Department, that the fellow officer had probable cause to arrest Zareck to effectuate Zareck's arrest; rather, Wintruba in the affidavit of probable cause relied upon his own observations, statements provided by Zareck, *and* information received from the Allegheny County Bomb Squad, *a sister governmental agency*, [20] to apply for a search warrant from a neutral magistrate judge. The governing case law under these facts is <u>Yusuf</u> upon which this court relied to deny Zareck's motion for reconsideration. Pursuant to <u>Yusuf</u>, "information received from other law enforcement officials during the course of an investigation is generally presumed to be reliable ... [and] government agents should generally be able to presume that information received from a sister governmental agency is accurate." <u>Yusuf</u>, 461 F.3d at 378, 385.

> [A] defendant may still be able to show that an officer acted recklessly in relying on the information by meeting a two-pronged test. First, he must "show that the information would have put a reasonable official on notice that further investigation was required." <u>Id.</u> If the defendant can establish that this is so, he then "may establish that the officer acted recklessly by submitting evidence: (1) of a systemic failure on the agency's part to produce accurate information upon request; or (2) that the officer's particular investigation into possibly inaccurate information should have given the officer an obvious reason to doubt the accuracy of the information." <u>Id.</u>

---

[20] In this court's opinion denying Zareck's motion for reconsideration with respect to the motion to suppress explained that the Allegheny County Bomb Squad was a sister governmental agency of the Homestead Police Department, for whom Wintruba was a police officer. <u>Zareck</u>, 2012 WL 2872468, at *6; <u>see also</u> <u>United States v. Gay</u>, No. CRIM. 14-154, 2012 WL 12288826, at *1 (W.D. Pa. July 27, 2012), <u>aff'd</u>, 724 F. App'x 122 (3d Cir. 2018) (explaining that the City of Pittsburgh Bureau of Police is a sister governmental agency of the Pennsylvania Board of Probation and Parole); <u>United States v. Wecht</u>, No. CR 06-0026, 2007 WL 9759318, at *2 (W.D. Pa. Nov. 26, 2007) (explaining that the Allegheny County Coroner's Office is a "sister governmental agency" of the Federal Bureau of Investigation). The Third Circuit Court of Appeals affirmed this court's denial of Zareck's motion to suppress. <u>United States v. Zareck</u>, 588 F. App'x 100 (3d Cir. 2014).

United States v. Humbert, 336 F. App'x 132, 137 (3d Cir. 2009). Based upon the foregoing,

Zareck did not show that his counsels' performances were deficient because they failed to

challenge whether the bomb squad had probable cause to arrest or search Zareck. Had Zareck's

counsels raised those arguments with this court, the court would have rejected them because the

correct inquiry in this case was whether Wintruba should have (1) entertained serious doubts as

to the truth of his statements made in reliance on the information provided by the bomb squad, or

(2) had obvious reasons to doubt the accuracy of the information he reported. Because Zareck

did not present any credible information to this court to challenge those issues,[21] he cannot show

that his counsels' performances were deficient. Zareck's § 2255 motion will, therefore, be denied

with respect to the twenty-fourth and twenty-fifth grounds for relief.

### 24. Ground Twenty-Six

Zareck argues that his trial counsels were ineffective because they did not request a

hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 594–595

(1993), in order to challenge the information the bomb squad provided to Wintruba, which

Wintruba included in the affidavit of probable cause. The government summarily opposes this

ground for relief.

Zareck cannot show that his trial counsel was ineffective because he did not request a

Daubert hearing with respect to the information bomb squad provided to Wintruba. A Daubert

---

[21]      Zareck's reliance upon Exhibits A, B, and F does not alter the court's conclusion. He is
not entitled to relief with respect to grounds twenty-four and twenty-five. The report by bomb
squad officer Synan (Exhibit A), the transcript of an examination of Synan (Exhibit B), and the
newspaper article published nearly six years after Zareck was found with the cardboard tube with
the fuse in his vehicle (Exhibit F) do not make a sufficient showing that Wintruba should have
(1) entertained serious doubts as to the truth of his statements made in reliance on the bomb
squad, or (2) had obvious reasons to doubt the accuracy of the information he reported.

hearing is a pretrial hearing during which "district court judges…perform a screening function, to insure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence." Elcock v. Kmart Corp., 233 F.3d 734, 744 (3d Cir. 2000). A Daubert hearing is inapplicable under the circumstances presented by Zareck, i.e., to challenge the contents of an affidavit of probable cause submitted to a magistrate judge.[22] As explained by this court several times, the pertinent issue is Wintruba's knowledge and whether he had reason to know the information the bomb squad provided to him about the alleged improvised explosive device was false. The evidence presented to the court was insufficient for the court to find that Wintruba knew or had reason to know the information provided to him about the alleged improvised explosive device was false. Under those circumstances, if Zareck's counsel requested a Daubert hearing to challenge the information the bomb squad provided to Wintruba to include in the affidavit of probable cause, the court would have denied that request. Thus, Zareck cannot show his counsel's performance was deficient. Zareck's § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 25. Ground Twenty-Seven

Zareck argues that his trial counsel was ineffective because he did not question members of the bomb squad "to determine what they actually imputed as information and instructions to…Wintruba." (ECF No. 363-1 at 2.) According to Zareck, if his trial counsel questioned members of the bomb squad, he would have learned that the bomb squad "deliberately laundered the falsity that the cardboard tube device was an improvised explosive device through the unwitting officer-affiant who was ignorant of the falsity." (Id.) The government summarily

---

[22]     Exhibits A, B, and F do not show that Zareck was entitled to a Daubert hearing with respect to his criminal pretrial motions because they do not show that Wintruba had any reason to doubt the information provided to him from the bomb squad.

opposes this ground for relief.

As explained above, it is not sufficient for Zareck to attack the credibility of the bomb squad. He must show that Wintruba knew or had reason to know that the information the bomb squad provided to him about the alleged improvised explosive device was false. The evidence presented to the court was insufficient for the court to find that Wintruba knew or had reason to know the information provided to him about the alleged improvised explosive device was false. The exhibits relied upon by Zareck, i.e., the report by bomb squad officer Synan (Exhibit A), the transcript of an examination of Synan (Exhibit B), and the newspaper article published nearly six years after Zareck was found with the cardboard tube with the fuse in his vehicle (Exhibit F), do not show that Wintruba had reason to doubt what he was told by the bomb squad; indeed, those exhibits do not show that Wintruba had or should have had reason to doubt what the bomb squad—a sister governmental agency which is presumably reliable—told him. Zareck, 2012 WL 2872468, at *6. Under those circumstances, Zareck cannot show that his counsel's performance was deficient because he failed to examine members of the bomb squad or that he was prejudiced by the alleged deficient performance. Zareck's § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 26. Ground Twenty-Eight

Zareck argues that his trial counsel was ineffective because he did not object to Wintruba testifying about statements made by the bomb squad. (ECF No. 363 at 3.) Zareck also argues that his trial counsel was ineffective because he did not object to Wintruba's testimony that "certain items…[were] drug paraphernalia when they had never been tested to corroborate that they were paraphernalia under…[applicable state law]." (Id.)

Zareck cannot show that he was prejudiced because his counsel failed to object to

Wintruba's testimony. First, Zareck does not specify whether his trial counsel should have objected to Wintruba's testimony during the suppression hearing or during trial and did not specify the portions of the record to which his argument applies. With respect to Wintruba's testimony at the suppression hearing, which was relied upon to determine whether a <u>Franks</u> hearing was warranted, the rules of evidence are not applicable in a pretrial hearing to determine the admissibility of evidence, such as a suppression hearing or <u>Franks</u> hearing. FED. R. EVID. 1101; <u>United States v. Karmo</u>, No. 20-CR-170-1-JPS, 2021 WL 1712669, at *5 (E.D. Wis. Apr. 30, 2021) ("[I]t is clear that Magistrate Joseph was not bound by the Federal Rules of Evidence when she evaluated Defendant's request for a Franks hearing and his motion to suppress. It follows that Magistrate Joseph could not have violated rules to which she was not confined."). To the extent Zareck's arguments are based upon Wintruba's trial testimony, the court did not locate and Zareck did not point to, testimony by Wintruba about what the bomb squad said on the day of Zareck's arrest. Under those circumstances, Zareck did not show that his trial counsel's performance was deficient.

With respect to Zareck's conclusory argument that his counsel should have objected to Wintruba testifying that certain items were drug "paraphernalia" because the items were not tested to confirm they were drug paraphernalia, the following exchange took place during the prosecutor's direct examination of Wintruba:

Q. I'm going to show you what has been marked as Government's Exhibit 19. What are we seeing in that photograph?

A. These are drug paraphernalia items which were seized out of Mr. Zareck's residence, including syringes, tourniquets, lighters.

Q. Why would you seize these types of items?

A. They're indicative to the ingestion and to the use of illegal drugs for a couple different style of drugs.

109

(T.T. 11/15/2012 (ECF No. 300) at 55.) The jury also received overwhelming evidence that Zareck used controlled substances in his home. Under those circumstances, the court cannot discern a basis upon which the foregoing testimony should have been objected by Zareck's counsel. In any event, even if Zareck's counsel objected to the testimony and the court struck the testimony from the record, the outcome of the trial would have been the same in light of the overwhelming evidence against Zareck that showed he was an unlawful user of controlled substances when he possessed the firearm and ammunition.

Based upon the foregoing, Zareck's § 2255 motion will be denied with respect to this ground for relief.[23]

### 27. Ground Twenty-Nine

Zareck argues that his trial counsel was ineffective because he did not argue that Zareck's due process rights were violated when the bomb squad destroyed the device found in Zareck's vehicle. According to Zareck, the device was "exculpatory evidence that would have proven…[him] innocent of having an improvised explosive device." (ECF No. 363 at 3.) The government argues in response that this ground for relief "has no bearing on the ultimate outcome in this case" and that Zareck's trial counsel "could not have been ineffective for failing raise a claim that in no way resulted in outcome determinative prejudice." (ECF No. 356 at 15.)

Zareck cannot prove that his counsel's performance was deficient because he did not argue that Zareck's due process rights were violated when the bomb squad detonated the device

---

[23]     Exhibits A, B, F do not compel the court to provide Zareck relief based upon ground twenty-eight because they do not alter this court's conclusions that: (1) the rules of evidence did not apply to Wintruba's testimony from the suppression hearing about what the bomb squad told him; (2) Zareck did not identify Wintruba's testimony at trial about what the bomb squad told him; or (3) Wintruba's testimony about "drug paraphernalia" in this case was somehow improper.

found inside Zareck's vehicle. Had his counsel raised that argument, the outcome of this case would have been the same. Whether Zareck was *actually* guilty of possessing an improvised explosive device is not outcome determinative of any issue in this federal case. As this court has explained, the relevant inquiry is with respect to the search warrant pursuant to which evidence supporting the crimes charged in this case was seized, i.e., whether Wintruba knew or had reason to know that the information provided to him by the bomb squad was false.[24] Whether the device found in Zareck's vehicle was *actually* an improvised explosive device has no impact on this court's rulings on Zareck's suppression motion, his request for a <u>Franks</u> hearing, or the trial (at which this issue was not discussed). Under those circumstances, Zareck cannot show that he was prejudiced by his counsel's failure to argue his due process rights were violated because the bomb squad detonated the device.[25]

### 28. Ground Thirty

Zareck argues his trial counsel was ineffective because he did not subpoena Zareck's

---

[24]     As discussed above, Exhibits A, B, and F upon which Zareck relies for this ground for relief do not call into question Wintruba's reliance upon the bomb squad's information. Thus, they are of no help to Zareck with respect to this twenty-ninth ground for relief.

[25]     To the extent Zareck finds fault in the procedure used by the bomb squad at the scene of his arrest, his expert did not find any fault with the "render safe" procedures used by the bomb squad; indeed, this court in its opinion denying Zareck's motion for reconsideration of a <u>Franks</u> hearing explained:

> Dr. Whitehurst did not find fault with the render safe procedures followed by the bomb squad technician, Officer Robert Synan ("Officer Synan"), when he first arrived on the scene, x-rayed the device believed to be an improvised explosive device ("IED"), removed it to a safe location, and destroyed it utilizing sheet explosives. <u>Id.</u> at 1, ¶¶ 4-5. Dr. Whitehurst opined that Officer Synan's assumption that the device contained energetic material was appropriate and evidenced his proper training in handling crime scenes of this nature. <u>Id.</u> at 1, ¶ 5.

<u>Zareck</u>, 2012 WL 2872468, at *2.

cousin, Ed Hartnett, Jr. ("Hartnett"), whose mother gave the shotgun to Ronald Zareck. According to Zareck, Hartnett was an "impeccable witness" and "would have provided testimonial evidence that…[Zareck] had no 'intention' to exercise dominion and control over the shotgun." (ECF No. 363-1 at 4.) Zareck attached to his motion for expansion of the record an affidavit from Hartnett, i.e., Exhibit G, which Zareck argues proves that Hartnett was willing to appear at trial on Zareck's behalf. (ECF No. 375 at 15-16.) The affidavit provided by Hartnett details that Hartnett's father owned the shotgun, upon his father's death his mother owned the shotgun, and his mother sold the shotgun to Ronald Zareck. (ECF No. 362-7.) The government argues that Hartnett's testimony would "have made absolutely no difference in the outcome of the case." (EC No. 356 at 15.)

Here, there was overwhelming evidence presented to the jury to show that Zareck possessed the shotgun including—but not limited to—that the shotgun was in his home for approximately ten years, the recorded telephone conversations from the Allegheny County Jail that showed he knew the shotgun was in his home, Aubrey and Larcinese saw the shotgun in Zareck's home, Reinhart testified that Zareck said he had the shotgun for protection in light of his prescription scheme, and he purchased ammunition for the shotgun. Under those circumstances, even if Hartnett testified as proposed by Zareck and set forth in Exhibit G, Zareck cannot show that the outcome of the trial would have been different. Thus, Zareck failed to show he was prejudiced by his counsel's alleged deficient performance. The § 2255 motion will be denied with respect to this ground for relief.

### 29. Ground Thirty-One

Zareck argues that his trial counsel was ineffective for his failure to argue that the ammunition recovered from Zareck's home should have been suppressed because it "was not

criminal evidence under Pennsylvania to have been seized in plain view…by local police officers not federal agents." (ECF No. 363-1 at 5.) The government argues, among other things, that Zareck cannot show that his counsel's performance was deficient because the instant claims arise under federal law and Zareck is prohibited from possessing ammunition under federal law. (ECF No. 356 at 16.)

The search warrant in this case identified the following items to be seized:

> Improvised explosive devices which are a danger to the public & surrounding homes. Explosive & bomb making material. To include explosive powders, components, fuses, & any instructional material used to manufacture explosive devices.

(Search Warrant dated April 6, 2007 at 1.) At trial, Wintruba testified that the ammunition was found during the execution of the search warrant in the nightstand beside Zareck's bed, in the same room where the shotgun was found.  (T.T. 11/15/2012 (ECF No. 300) at 64-66.)

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. COST. AMEND. IV.  The plain view doctrine allows for the warrantless seizure of an item when three requirements are met: (1) the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the incriminating character of the evidence must be immediately apparent; and (3) the officer must have a lawful right of access to the object itself. United States v. Stabile, 633 F.3d 219, 241 (3d Cir.2011) (citing United States v. Menon, 24 F.3d 550, 559–60 (3d Cir.1994)). Courts are careful to distinguish between mere observation of an object in plain view and a "plain view seizure." Id. at 241 n. 17. Mere observation of an item left in plain view generally does not implicate the Fourth Amendment. Id. (citing Texas v. Brown, 460 U.S. 730, 738 n. 4 1983)). When police observe an

item left in plain view, " 'information obtained ... may be the basis for probable cause or reasonable suspicion of illegal activity. In turn, these levels of suspicion may, in some cases ... justify police conduct affording them access to a particular item.' " Id. (quoting Brown, 460 U.S. at 738 n. 4). Pursuant to the plain view doctrine, a police officer may seize items that are not included in the search warrant's list of items to be seized so long as the requirements of the doctrine are satisfied. For example, in this case the court explained in the opinion denying Zareck's suppression motion:

> While the shot gun was not within the scope of the search warrant, it is noteworthy that the evidence adduced supports the applicability of the plain view doctrine. "Under the plain view exception, evidence that is inadvertently discovered by police officers may, under certain circumstances, be seized without a warrant." United States v. Humphries, No.Crim. 04–CR–535, 2004 WL 2743432, at * *4–5 (E.D.Pa. Nov. 29, 2004) (citing Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)). Evidence discovered in plain view need not be suppressed provided that: "(1) the officers did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the incriminating character of the evidence is immediately apparent, and (3) the officers have a lawful right to access the object seized." Id. (citing Horton v. California, 496 U.S. 128, 136–37 (1971)). Here, the officers arrived lawfully at defendant's residence pursuant to a valid search warrant and observed the shot gun in plain view. The incriminating character of the shot gun was immediately apparent because the officer was aware that defendant was a convicted felon who was prohibited from possessing a firearm.

United States v. Zareck, No. CRIM. 09-168, 2010 WL 5053916, at *18 (W.D. Pa. Dec. 3, 2010), adhered to on reconsideration, No. CRIM. 09-168, 2012 WL 2872468 (W.D. Pa. July 12, 2012), and aff'd, 588 F. App'x 100 (3d Cir. 2014).

Here, if Zareck's counsel filed a suppression motion with respect to the ammunition based upon the arguments set forth by Zareck in this ground for relief, the court would have denied the motion because the ammunition was properly seized pursuant to the plain view doctrine. With respect to the first and third elements of the plain view doctrine, i.e., the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence

114

could be plainly viewed and the officer must have a lawful right of access to the object itself, this court already held that the search warrant was valid and the police officers permissibly entered Zareck's bedroom to conduct the search. Id. The police officers were searching for, among other things, "instructional material used to manufacture explosive devices." (Search Warrant at 1.) It was reasonable for the police officers conducting the search to believe that the instructional material could be located inside the nightstand beside Zareck's bed. Thus, the police officers did not violate Zareck's Fourth Amendment rights by opening the nightstand in his bedroom. With respect to the second element of the plain view doctrine, i.e.,  the incriminating character of the evidence must be immediately apparent, police officers conducting the search knew Zareck was a felon, and, therefore, he was prohibited from possessing ammunition under federal law. See United States v. Le, 173 F.3d 1258, 1270 (10th Cir. 1999) (explaining that when a police officer of the Tulsa Police Department knew the defendant was a felon and that it was a federal offense for a felon to possess a firearm, the police officer lawfully seized  "guns and ammunition…discovered pursuant to a valid warrant-based search for methamphetamine, and were in the plain view of the searching officers"); United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996) (explaining that because agents involved in the lawful search of the premises knew the defendant was a convicted felon, the agents could lawfully seize a firearm that was in plain view); United States v. Friel, 448 F. Supp. 2d 222, 227 (D. Me. 2006) (explaining that during an otherwise lawful search, "the police knew that the defendant was a felon[,]….[and] [t]herefore…they were entitled to seize the weapon in 'plain view," because…it was reasonable for them to believe that the gun was evidence of a crime.").

Zareck argues that the search in this case was conducted by state police officers, and, therefore, they could not seize the ammunition because it is evidence of a *federal* and not *state*

crime. The First Circuit Court of Appeals directly addressed this issue and stated: "[W]e are not aware of any state or federal law that prohibits state police from seizing a weapon, in plain view, that they reasonably believe constitutes evidence of a federal crime." United States v. Smith, 899 F.2d 116, 118 (1st Cir. 1990). The court held that "whether or not state law specifically authorize[d] [the seizure at issue]" it was a permissible seizure under the Fourth Amendment. Id.

Based upon the foregoing, if Zareck's counsel filed a motion to suppress the ammunition because the police officers unlawfully seized it, the court would have concluded that the ammunition was lawfully seized pursuant to the plain view doctrine and denied the suppression motion on that basis. Zareck, therefore, did not show that his counsel's performance was deficient or that he was prejudiced by his counsel's performance. His § 2255 motion will, therefore, be denied with respect to this ground for relief.

### 30. Ground Thirty-Two

Zareck argues that his trial counsel was ineffective because he failed to argue that Zareck "did not know the characteristics of the weapon for hunting that brought [it] within the scope of the statute." (Id.) The government argues in response that—as the court instructed the jury—the government did not have to prove that Zareck knew his acts were against the law.

The government is correct; it did not have the burden to prove beyond a reasonable doubt that Zareck knew his actions, i.e., possession a firearm or ammunition while being a convicted felon or unlawful user of controlled substances, were illegal. The Third Circuit Court of Appeals has recognized that 18 U.S.C. § 922 does not require the government to prove that the defendant possessed the firearm or ammunition with knowledge that such possession was unlawful. United

States v. Dodd, 225 F.3d 340, 344 (3d Cir. 2000), as amended (Oct. 27, 2000).[26] Under those

circumstances, even if Zareck's counsel argued to this court that Zareck did not know his actions

were unlawful, the outcome of the trial would have been the same. Zareck's counsel's

performance was not deficient and Zareck was not prejudiced by his counsel's performance. The

§ 2255 motion will, therefore, be denied with respect to this ground for relief.

### 31. Ground Thirty-Three

Zareck argues that his trial counsel was ineffective because he did not file a motion to

dismiss the superseding indictment on the basis that it included multiplicitous counts, i.e.,

violations of 18 U.S.C. § 922(g)(1) and (3), and because he did not request that the government

"select only one count to charge [Zareck]." (ECF No. 363-1 at 6.) The government argues

summarily in response that Zareck's counsel was not ineffective because the counts are in the

superseding indictment not multiplicitous and Zareck was properly resentenced. (ECF No. 356 at

16.)

---

[26]     The Third Circuit Court of Appeals' model jury instructions provide:

> [N]either of the two knowledge-focused elements requires the government to prove
> that the defendant knew that the possession or receipt of a firearm was unlawful or
> that the defendant intended to use the firearm to cause harm. *See Rehaif v. United
> States*, 139 S. Ct. 2191 (2019); *United States v. Higdon*, 638 F.3d 233, 239-40 (3d
> Cir. 2011); *United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000).

Third Circuit Model Jury Instructions for Firearm Offenses (18 U.S.C. §§ 922, 924)
at 16, available at
https://www.ca3.uscourts.gov/sites/ca3/files/2020%20Chap%206%20FirearmOffenses%20revisi
ons%20final.pdf,  Instruction 6.18.922G cmt.; but see Forrest v. Parry, 930 F.3d 93, 119 (3d Cir.
2019), cert. denied sub nom. City of Camden, New Jersey v. Forrest, 140 S. Ct. 902, 205 L. Ed.
2d 465 (2020) (explaining that "despite [sic] their label, the Third Circuit Model Jury
Instructions are not drafted by members of this Court, and are thus 'neither law nor
precedential.'") (quoting Robinson v. First State Cmty. Action Agency, 920 F.3d 182, 189–90
(3d Cir. 2019)).

A grand jury returned a superseding indictment against Zareck charging him with being a felon (18 U.S.C. § 922(g)(1)) and an unlawful user of controlled substances (18 U.S.C. § 922(g)(3)) in possession of a firearm and ammunition. Both counts were tried before the jury, which found him guilty of both counts. As detailed above, the court initially imposed a sentence upon Zareck at each count. The Third Circuit Court of Appeals vacated the judgment of sentence and remanded the case for resentencing. The court of appeals explained:

> To his credit and the credit of his office, Assistant United States Attorney Michael Leo Ivory appropriately concedes that the district court erred by imposing sentences for the violation of 18 U.S.C. § 922(g)(1) as well as § 922(g)(3). Though we have not yet resolved this particular issue, our sister circuit courts of appeals have unanimously found that although a defendant may be charged with violations of multiple subsections of 18 U.S.C. § 922(g), it is impermissible to impose separate sentences for each subsection of the statute based on a single incident of possession.

United States v. Zareck, 588 F. App'x 100, 101 (3d Cir. 2014). On remand, this court merged count two, i.e., the violation of § 922(g)(3), into count one, i.e., the violation of § 922(g)(1). The court of appeals upheld the judgment of conviction and sentence imposed upon the resentencing. United States v. Zareck, 662 F. App'x 110, 115 (3d Cir. 2016).

The issues underlying Zareck's ineffective assistance of counsel claim in this ground for relief have been addressed by courts of appeals. First, convictions under § 922(g)(1) and (3) do not violate the Double Jeopardy Clause because each count involves an element that the other does not, i.e., for § 922(g)(1) the government must prove that Zareck is a convicted felon while under § 922(g)(3), the government must prove that Zareck is an unlawful user of controlled substances. United States v. Shea, 211 F.3d 658, 673 (1st Cir. 2000).

Zareck is correct, however, that that separate convictions for § 922(g)(1) and § 922(g)(3) arising out of a single act of firearm possession are multiplicitous. The courts of appeals that have addressed the issue have held that "Congress intended the 'allowable unit of prosecution' to

be an incident of possession regardless of whether a defendant satisfied more than one § 922(g)

classification, possessed more than one firearm, or possessed a firearm and ammunition. United

States v. Richardson, 439 F.3d 421, 422 (8th Cir. 2006) (collecting decisions). Under those

circumstances, charges may be filed in a single indictment under both § 922(g)(1) and (g)(3) and

the government may try both counts simultaneously before a jury. As the Third Circuit Court of

Appeals recognized, however, "it is impermissible to impose separate sentences for each

subsection of the statute based on a single incident of possession." Zareck, 588 F. App'x at 101.

Based upon the foregoing, Zareck's trial counsel's performance was not deficient and Zareck did

not suffer any prejudice from the matters raised in ground thirty-three.

 With respect to Zareck's argument that his trial counsel was ineffective because he did

not request that the court order the government to try its case based upon only one charge in the

superseding indictment, Zareck cannot show that he was prejudiced by his trial counsel's

allegedly deficient performance. The Eighth Circuit Court of Appeals has explained that when

multiplicitous counts are charged in an indictment, "the district court has discretion to require the

government to elect between multiple counts of…[the] indictment." United States v. Platter, 514

F.3d 782, 786 (8th Cir. 2008). The court of appeals in Platter also explained:

>  [T]he Supreme Court has recognized that the government has "broad
> discretion to conduct criminal prosecutions, including its power to select the
> charges to be brought in a particular case." Ball v. United States, 470 U.S. 856, 859,
> 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985). Generally, the government is free to prove
> a defendant's liability for one criminal offense using multiple theories of guilt.
> Federal Rule of Criminal Procedure 7(c)(1) expressly permits the government to
> allege "that the defendant committed [an offense] by one or more specified means."
> We have observed that "where a statute specifies two or more ways in which one
> offense may be committed, all may be alleged in the conjunctive in one count of
> the indictment, and proof of any one of the methods will sustain a conviction." Roy,
> 408 F.3d at 492 n. 4 (internal marks omitted); see also United States v. Shea, 211
> F.3d 658, 673 (1st Cir.2000) ("[I]t is clear enough that the government is entitled
> to get both theories[—that the defendant was a drug-user and felon in possession

of a firearm—] before the jury, whether in one count or two."), cert. denied, 531 U.S. 1154, 121 S.Ct. 1101, 148 L.Ed.2d 973 (2001).

Id. at 786–87. The court of appeals in Platter held that—"[i]n light of the government's broad discretion in carrying out criminal prosecutions and Rule 7(c)(1)'s express approval of the government's prosecution of one offense using alternative theories of liability, with the facts of [that]…case—the district court did not abuse its discretion when it denied the defendant's motion to compel the government to select one multiciplitous count to be tried before the jury." Id.

Here, if Zareck's counsel would have filed a motion to compel the government to select one of the multiplicitous counts to be tried before the jury, the court would have denied the motion in light of the government's broad discretion in how it tries its cases. In any event, in light of the overwhelming evidence against Zareck, even if the court would have granted the motion to compel, Zareck did not show that the outcome of Zareck's trial on either count would have been different.

Based upon the foregoing, Zareck's § 2255 motion will be denied with respect to this ground for relief.

### 32. Ground Thirty-Four

Zareck argues that his trial counsel was ineffective because he did not object to the "joint possession" jury instruction. According to Zareck, the overwhelming evidence showed that he could not have jointly possessed the shotgun with his brother. (ECF No. 363-1 at 7.) The government summarily opposes this ground for relief and argues that the court's jury instruction was proper. (ECF No. 356 at 17.)

There was evidence adduced at trial from which a reasonable jury could find beyond a reasonable doubt that Zareck *possessed* the firearm and ammunition, i.e., it was within his

control. See United States v. Zwibel, 181 F. App'x 238, 243 (3d Cir. 2006) (holding that the district court "correctly" instructed the jury that "possession" under § 922(g)(1) is defined as "a person's control over an object"). For example, police officers found the shotgun and ammunition in Zareck's bedroom during the execution of the search warrant, Aubrey and Larcinese testified that they saw the shotgun in Zareck's home, Ronald Zareck testified that he accidentally left the shotgun in Zareck's home in 1999 and never retrieved it, and Rodgers and Zareck's recorded telephone conversations from the Allegheny County Jail showed that Zareck knew the shotgun was in his home. With respect to the ammunition, Wintruba testified that the ammunition was found in Zareck's nightstand in the same room as the shotgun and the government presented evidence to show that Zareck purchased the ammunition from Cabela's. The evidence presented, however, also showed that Ronald Zareck was the actual *owner* of the shotgun, and, thus, also may have had control over it. Under those circumstances, the court instructed the jury as follows with respect to the legal concept of "joint possession:"

> The law also recognizes that possession may be sole or joint. If one person alone possesses a firearm, that is sole possession. That would include also the ammunition. However, more than one person may have the power and intention to exercise control over a firearm and/or ammunition. This is called joint possession if you find that the defendant had such power and intention that he possessed the firearm and/or ammunition, even if he possessed it jointly with another.

(T.T. 11/19/2012 (ECF No. 302) at 149-50.)

One district court has explained:

> Propriety of jury instructions is to be determined by assessing the entire set of instructions. See Victor v. Nebraska, 511 U.S. 1, 5 (1994); United States v. Issac, 134 F.3d 199, 203 (3d Cir. 1998). The primary point of inquiry is "whether, viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury, and [we] reverse only if the instruction was capable of confusing and thereby misleading the jury." Bennis v. Gable, 823 F.2d 723, 727 (3d Cir. 1987) (internal quotations omitted); United States v. Zehrbach, 47 F.3d 1252, 1264, (3d Cir. 1995).

Rainey v. SCI-Coal Twp. Supt., No. 4:CV-13-1806, 2016 WL 3364752, at *8 (M.D. Pa. June 17, 2016). The Third Circuit Court of Appeals has recognized that a "joint possession" jury instruction is proper in a variety of cases, including cases in which: (1) the defendant and his girlfriend share a bedroom in which the firearm was located, United States v. Lowery, 265 F. App'x 111, 114 (3d Cir. 2008) ("Given that Lowery shared the bed and bedroom with his girlfriend, the District Court did not err in including the concept of joint possession in its charge."); and (2) the defendant argued that a third-party was the owner of the gun and that the jury should not credit the testimony of police officers that the defendant possessed the gun, United States v. Smith, 99 F. App'x 372, 375 (3d Cir. 2004) ("[D]efense counsel's primary argument was that Ealey was the owner of the gun, and that the jury should disbelieve the police with respect to Smith's possession of it."). In Smith, the court of appeals recognized that the defendant's argument that a third-party owned the gun was not inconsistent with the police officer's testimony that the defendant possessed the gun. The court explained:

> [T]he two views are not necessarily inconsistent or irreconcilable. The joint possession instruction took into account the situation where the jury could believe that in fact Ealey was the owner of the gun, as defense counsel argued, but could also believe that Smith had some involvement in possessing it. Accordingly, we find no error in the giving of the instruction.

Id. at 375–76.

Here, Zareck argues that the court should not have provided the jury the foregoing joint-possession instructions because there was insufficient evidence for the jury to find that *he* possessed the firearm or ammunition. In other words, Zareck's "attack" on the joint-possession jury instruction is an attack on the sufficiency of the evidence presented to show that he possessed the firearm or ammunition. This court already held that the evidence was sufficient for the jury to convict Zareck when it denied his motion for judgment of acquittal at trial. As

detailed in this opinion, there was overwhelming evidence presented against Zareck to show that

he possessed the shotgun and ammunition.  Under those circumstances, and considering the jury

instructions as a whole, the joint possession instructions were supported by the evidence and not

misleading to the jury. Under those circumstances, Zareck's trial counsel's performance was not

deficient when he did not object to those instructions and Zareck cannot show that he was

prejudiced by his counsel's performance. Zareck's § 2255 motion will, therefore, be denied with

respect to this ground for relief.

### 33. Ground Thirty-Five

Zareck argues that his trial counsel was ineffective because he did not object to the

definition of "unlawful drug user" in the jury instructions as an incomplete instruction, which

reduced the government's burden of proof. (ECF No. 363-1 at 7.) The government argues in

response that Zareck misstates the law with respect to the definition of an "unlawful user" and

the court properly instructed the jury. (ECF No. 356 at 17.)

The court instructed the jury as follows:

> Definition of Unlawful User.
>
> With respect to an element of the second count, the phrase "unlawful user
> of a controlled substance" means a person who uses a controlled substance in a
> manner other than as prescribed by a licensed physician. The defendant must have
> been actively engaged in the use of a controlled substance during the time he
> possessed the firearm and/or ammunition, but the law does not require that he used
> the controlled substance at the precise time he possessed the firearm and/or
> ammunition. Such use is not limited to the use of drugs on a particular day or within
> a matter of days or weeks before, but rather that the unlawful use has occurred
> recently enough to indicate that the individual is actively engaged in such conduct.
> An inference that a person is a user of a controlled substance may be drawn from
> evidence of a pattern of use or possession of a controlled substance that reasonably
> covers the time the firearm and/or ammunition was possessed. The term "drug
> addict" means any individual who habitually uses any controlled substance so as to
> endanger the public morals, health, safety, or welfare, or who is so far addicted to
> the use of a controlled substance as to have lost the power of self-control with
> reference to his addiction. You are instructed that heroin, Oxycodone, Oxycontin,

cocaine and cocaine base, crack, are controlled substances.

(T.T. 11/19/2012 (ECF No. 302) at 152-53.) These jury instructions are derived from the federal

regulation interpreting § 922(g)(3), i.e., 27 C.F.R. § 478.11. Section 478.11 provides:

> Unlawful user of or addicted to any controlled substance. A person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year; or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year. For a current or former member of the Armed Forces, an inference of current use may be drawn from recent disciplinary or other administrative action based on confirmed drug use, e.g., court-martial conviction, nonjudicial punishment, or an administrative discharge based on drug use or drug rehabilitation failure.

Id. The Third Circuit Court of Appeals has relied upon 27 C.F.R. § 478.11 to define "unlawful

user of controlled substances" for the purpose of § 922(g)(3). United States v. Cheeseman, 600

F.3d 270, 280 (3d Cir. 2010).

Based upon the foregoing, Zareck has not shown that his counsel was ineffective for failing

to object the definition of "unlawful user of controlled substances" provided to the jury. Had

Zareck's counsel made such an objection, the court would have overruled the objection because

the instructions given are supported by 27 C.F.R. § 478.11. Under those circumstances, Zareck did

not show his trial counsel's performance was deficient or that he was prejudiced by his counsel's

allegedly deficient performance. Zareck's § 2255 motion will, therefore, be denied with respect to

this ground for relief.

### 34. Ground Thirty-Six

Zareck argues that his trial counsel was ineffective because he did not challenge the addition of the state charge of tampering with evidence to the written jury instructions, which prejudiced defendant by allowing the jury to decide whether defendant was guilty based on other criminal charges not handed down by the grand jury in the indictment. (ECF No. 363-1 at 7.) The government argues in response that the court's jury instructions were proper. (ECF No. 356 at 17.)

During the final charge conference held in this case, the following exchange took place between the court, the government, and Zareck's trial counsel about a "consciousness of guilt" jury instruction:

> PROSECUTOR: In regard to Consciousness of Guilt, you have included in there about the alleged attempts to get other people to claim the firearm is his, however, we also heard that the defendant attempted to swallow the drugs that were seized by police. That is also consciousness of guilt, so I believe at the conclusion of the first sentence, it should say: Firearm as theirs, and that he attempted to swallow the drugs seized by police.

> ZARECK'S COUNSEL: We would object to that, Your Honor, being that the evidence that the defendant attempted to swallow the drugs is not consciousness of guilt for being a felon in possession of a firearm.

> PROSECUTOR: It is, however, consciousness of guilt of a person who is a drug user in possession of a firearm, which is Count Two of the indictment, so that would appear to be accurate, Your Honor.

> THE COURT: And that he attempted to swallow the drugs –

> PROSECUTOR: -- seized by police.

(T.T. 11/19/2012 (ECF No. 302) at 109-10.) The court during the final charge to the jury instructed:

> Consciousness of Guilt - Concealment.

> You have heard testimony that after the crime was supposed to have been

committed, the defendant made recorded calls which included attempts to get other individuals to claim the firearm as theirs **and that he attempted to swallow the drugs seized by police.** If you believe that the defendant did so, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crime charged. This conduct may indicate that he thought he was guilty of the crime charged and was trying to avoid punishment. On the other hand, sometimes an innocent person may do so for some other reason. Whether or not this evidence causes you to find that the defendant was conscious of his guilt of the crime charged and whether that indicates that he committed the crime charged is entirely up to you as the sole judges of the facts.

(Id. at 153 (emphasis added).)

To the extent Zareck is challenging his counsel's failure to object to the introduction into evidence that he swallowed a pill while under arrest at the Homestead Police Department, that issue is addressed in Ground Nine above. To the extent Zareck is challenging his counsel's failure to object to the jury instructions that Zareck swallowing the pill shows his consciousness of guilt for being an unlawful user of controlled substances, his counsel *did* make that objection and the court overruled it. Under those circumstances, his counsel's performance was not deficient.

Zareck also argues that his trial counsel was ineffective because he did not argue to the court that the government agreed "not to use evidence of the acts that occurred at the police station." (ECF No. 363-1 at 7.) Zareck, however, did not point to any evidence in the record to show that the government made an agreement with Zareck after the superseding indictment was filed in this case and he was charged with violating § 922(g)(1) and (g)(3). In any event, even if Zareck's trial counsel made the objection requested by Zareck, this court granted the objection, and did not provide the consciousness of guilt instruction with respect to Zareck swallowing a pill at the police station, there existed overwhelming evidence to show beyond a reasonable doubt that

Zareck was an unlawful user of controlled substances. Under those circumstances, even if

Zareck's counsel's performance was deficient, Zareck did not show that he was

prejudiced by the alleged deficiency. Zareck's § 2255 motion will, therefore, be denied

with respect to this ground for relief.

### 35. Cumulative Error Doctrine

Zareck argues in many of the foregoing thirty-six grounds for relief that he is entitled to

relief based upon the cumulative effect of his counsels' errors and the resulting prejudice to him.

One district court has explained the cumulative error doctrine as follows:

> "The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." Collins v. Sec'y of Pa. Dep't of Corr., 742 F.3d 528, 542 (3d Cir. 2014) (explaining cumulative error in context of habeas petition under 28 U.S.C. § 2254). Such claims have also been recognized in Section 2255 proceedings. See, e.g., United States v. Fields, 761 F.3d 443, 483 (5th Cir. 2014); United States v. Olsen, 704 F.3d 1172, 1196-97 (9th Cir. 2013).

United States v. Williams, No. 1:12-CR-194-17, 2018 WL 1783172, at *9 (M.D. Pa. Apr. 13,

2018).

> Another court has explained:

> Movant also seems to be making a cumulative error claim, but that doctrine is actually a cumulative prejudice doctrine that requires proof that individual errors, when considered together, had a substantial impact on the trial. United States v. Salehi, 187 Fed.Appx. 157, 169 (3d Cir. 2006). The doctrine does not allow a movant to claim that several rulings, none of which has been shown to be erroneous, nonetheless in the aggregate had an improper impact on the trial because the rulings might have gone differently.

United States v. Grados, No. 2:16-CR-57, 2021 WL 231373, at *7 (W.D. Pa. Jan. 4, 2021),

supplemented, No. 2:16-CR-57, 2021 WL 231243 (W.D. Pa. Jan. 22, 2021), and report and

recommendation adopted, No. 2:16-CR-57, 2021 WL 808859 (W.D. Pa. Mar. 3, 2021).

In this opinion, the court explained that twenty-one of Zareck's grounds for relief (grounds

two, eleven, twelve, fifteen, seventeen, eighteen, twenty-one through twenty-nine, thirty-one through thirty-five and thirty-seven) will be denied because he did not show his counsel's performance was deficient. The court denied Zareck's twentieth ground for relief, which was a claim of prosecutorial misconduct. The court, therefore, need not consider those twenty-two grounds for relief in its analysis of the cumulative error doctrine.

On the other hand, the court explained that it will deny fourteen grounds for relief (grounds one, three through ten, thirteen, fourteen, sixteen, nineteen, and thirty) because—even if Zareck's counsels' performances were deficient as alleged in those grounds for relief—he did not show that he was prejudiced by his counsels' conduct. Assuming Zareck's counsels' performances were deficient as alleged in those fourteen grounds for relief, however, Zareck did not sufficiently show that the cumulative effect of those alleged errors " 'so undermined the verdict as to constitute a denial of his constitutional right to due process.' " Williams, 2018 WL 1783172, at *9 (quoting Collins, 742 F.3d at 542). Even assuming those errors were made, the evidence against Zareck was overwhelming and the cumulative effect of his counsels' alleged errors does not challenge the fairness of his trial or otherwise undermine the jury's verdict, which was based upon the overwhelming evidence against him. Under those circumstances, his request for § 2255 relief based upon the cumulative effect of his counsel's errors will be denied.

### C.  Conclusion with respect to the § 2255 Motion

As set forth in this opinion, Zareck did not show an entitlement to relief from his conviction or sentence based upon his counsel's ineffective assistance in violation of the Sixth Amendment or prosecutorial misconduct in violation of the Fifth Amendment.

### VI.    Motion to Supplement § 2255 Motion (ECF No. 376)

Zareck in his motion to supplement argues that the court should permit him to

supplement his § 2255 motion with a claim of actual innocence based upon <u>Rehaif v. United States</u>, 139 S.Ct. 2191 (2019). The government opposes the motion to supplement arguing, among other things, that the Third Circuit Court of Appeals has held that "<u>Rehaif</u> does not apply to cases on collateral review." (ECF No. 383 at 1.)

The court need not address whether it is procedurally proper to permit Zareck to amend his § 2255 motion to include a claim of actual innocence under <u>Rehaif</u> because there exist other reasons to deny his motion to supplement. The motion to supplement will be denied because: (1) <u>Rehaif</u> is a procedural ruling that is not retroactively applied to collateral attacks under § 2255; and (2) Zareck's argument under <u>Rehaif</u> is procedurally defaulted because he did not raise the issue on appeal to the Third Circuit Court of Appeals.

### A. <u>Rehaif</u> is a procedural ruling that is not applied retroactively to collateral attacks under § 2255.

One district court has explained:

> Prior to <u>Rehaif</u> being decided, it was universally held by the federal appellate courts that in order to convict a defendant of violating Section 922(g)(1), "the government was required to prove the following elements beyond a reasonable doubt: (1) that [the defendant] had previously been convicted of a crime punishable by imprisonment for a term exceeding one year; (2) that [the defendant] knowingly possessed a firearm; and (3) that the firearm had passed in interstate commerce." <u>U.S. v. Dodd</u>, 225 F.3d 340, 344 (3d Cir. 2000), as amended (Oct. 27, 2000). In <u>Rehaif</u>, the Court determined that the Government also must prove beyond a reasonable doubt that a defendant "knew he had the relevant status when he possessed [the firearm]." <u>Rehaif</u>, 139 S. Ct. at 2194. Thus, <u>Rehaif</u> announced a "new" rule. <u>See</u> <u>U.S. v. Whit mire</u>, Crim. No. 17-34, 2020 WL 4333480, at *1 (S.D. Ohio July 28, 2020) (determining, <u>Rehaif</u> announced a "new" rule); <u>U.S. v. Montgomery</u>, 442 F.Supp.3d 875, 884 (W.D. Pa. 2020), as amended (Mar. 4, 2020) (stating, <u>Rehaif</u> set forth a "new rule for the conduct of criminal prosecutions").

> Generally, a new rule imposed by the Supreme Court is not to be applied retroactively to criminal cases on collateral review. <u>Teague v. Lane</u>, 489 U.S. 288, 311, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (holding, "new ... rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced"). There are, however, two exceptions to this general rule.

> A new rule may apply "retroactively in a collateral proceeding only if: (1) the rule is substantive, or (2) the rule is a 'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Whorton v. Bockting, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) (alteration in original) (quoting Teague, 489 U.S. at 311, 109 S.Ct. 1060). A new rule is "substantive" if "it alters the range of conduct or the class of persons that the law punishes." Schriro v. Summerlin, 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

United States v. Wood, No. CR 16-35, 2021 WL 1022693, at *5 (W.D. Pa. Mar. 17, 2021).

With respect to whether Rehaif created a "new substantive rule," another district court has explained:

> In Sampson, the Third Circuit [Court of Appeals] held that second or successive § 2255 motions were not available under Rehaif, because Rehaif did not meet § 2255(h)'s requirement of stating "a new rule of constitutional law." See In re Sampson, 954 F.3d 159, 160–61 (3d Cir. 2020). The Sampson court elaborated that even if Rehaif had announced such a rule, the Supreme Court would have to make it retroactively applicable to meet the requirements of § 2255(h)….Id. at 160 n.3. While the court was ruling on a successive § 2255 motion, the logic of the decision still suggests the Third Circuit would determine that an initial § 2255 claim under Rehaif could not overcome the retroactivity bar via the "substantive rule" exception. No other court of appeals has answered the question of whether Rehaif's holding is "substantive" such that it may be applied retroactively in a non-successive § 2255 motion.

Unites States v. Vilella, No. 16-CR-285-2, 2020 WL 6136139, at *2 (E.D. Pa. Oct. 19, 2020).

Following Sampson, courts within the Third Circuit have recognized that the rule set forth in

Rehaif is a *procedural* rule. See e.g., United States v. Davis, No. CR 4:16-138, 2021 WL

949449, at *4 (M.D. Pa. Mar. 12, 2021); Vilella, 2020 WL 6136139, at *2; Wood, 2021 WL

1022693, at *6.[27]

Courts agree that the rule set forth in Rehaif is not a "'watershed' rule of criminal

---

[27]     The court in Wood explained: "In Rehaif, the Supreme Court clarified what the Government must prove in order to convict an individual in one of the nine prohibited categories enumerated in Section 922(g). As such, the new rule announced in Rehaif is a procedural rule, and not a substantive rule." Wood, 2021 WL 1022693, at *6 (collecting decisions).

procedure, because it does not implicate 'the fundamental fairness and accuracy of the criminal proceeding." Vilella, 2020 WL 6136139, at *2 (quoting United States v. Battle, No. 16-017, 2020 WL 4925678, at *4 (W.D. Aug. 21, 2020)).

Zareck's judgment of conviction became final on March 6, 2017, when the Supreme Court of the United States denied his request for a writ of certiorari. United States v. Zareck, No. 09-168, 2018 WL 3386347, at *3 (W.D. Pa. July 12, 2018). Rehaif was decided on June 21, 2019. Thus, for Rehaif to apply to Zareck's case, it must be applied retroactively to this case. Courts have held, however, that Rehaif set forth a procedural rule—not a substantive rule or a watershed rule of criminal procedure. Under those circumstances, Rehaif does not apply to Zareck's case and he cannot rely upon the case to assert his actual innocence. To permit Zareck to supplement his § 2255 motion with an argument of actual innocence under Rehaif, therefore, would be futile. His motion to supplement his § 2255 motion will, therefore, be denied on that basis.

### B. Zareck's argument under Rehaif is procedurally defaulted because he did not raise the issue on appeal to the Third Circuit Court of Appeals.

Even if Zareck could show that Rehaif applied retroactively to his case, permitting him to supplement his § 2255 motion would be futile because his argument asserted under Rehaif is procedurally defaulted because he did not raise the issue on appeal. Bousley, 523 U.S. at 622. As explained above, a defendant can raise a procedurally defaulted claim in a habeas proceeding if the defendant can show: (1) cause and prejudice; or (2) he is actually innocent. Id. A defendant may establish "cause" for a procedural default when the claim is "so novel that its legal basis is not reasonably available to counsel." Reed v. Ross, 468 U.S. 1, 16 (1984).

### 1. Cause and Prejudice

It is a "close call" whether Zareck can show "cause" for failing to raise this issue on appeal. United States v. Whitaker, No. CR 14-393, 2020 WL 7480396, at *4 (E.D. Pa. Dec. 18, 2020) (recognizing under similar procedural facts that whether the defendant could show cause for his procedural default was a "close call"). Rehaif was not decided until after Zareck's conviction became final, but courts that have considered the issue have recognized that the issue decided in Rehaif "had been litigated in a number of circuit courts for decades." United States v. Saunders, No. CR 10-442, 2020 WL 5569785, at *4 (E.D. Pa. Sept. 17, 2020). Under those circumstances, the courts have concluded that the issue is not "so novel that its legal basis not reasonable available to counsel." Reed, 468 U.S. at 16; see United States v. Robinson, No. 2:14-CR-00455, 2021 WL 2633629, at *3 (E.D. Pa. June 25, 2021); Wood, 2021 WL 1022693, at *11; United States v. Duell, No. CR 15-87, 2021 WL 858445, at *4 (W.D. Pa. Mar. 8, 2021); Battle, 2020 WL 4925678, at *5. The court in Whitaker, however, explained:

> Although…"[t]he issue had been litigated in a number of circuit courts for decades," United States v. Saunders, No. 10-cr-442, 2020 WL 5569785, at *4 (E.D. Pa. Sept. 17, 2020), cause for procedural default exists if the argument would be contrary to "a longstanding and widespread practice to which [the] Court ha[d] not yet spoken, but which a near-unanimous body of lower court authority ha[d] expressly approved." Reed, 468 U.S. 1 at 17. Justice Alito wrote in his dissent in Rehaif that the decision "overturn[ed] the long-established" and "universal" interpretation of § 922(g) that had "been adopted by every single Court of Appeals to address the question" and "used in thousands of cases for more than 30 years." Rehaif, 139 S. Ct. at 2201-02 (Alito, J. dissenting).

Whitaker, 2020 WL 7480396, at *4 n.3. In Whitaker, the court did not ultimately decide whether the defendant established cause for his procedural default because it found that—in any event— he did not make a sufficient showing of prejudice. Id.

Similarly in this case, even if Zareck could show that he has cause for failing to raise the issue that he lacked knowledge of his status as a felon or an unlawful user of controlled

substances that prohibited him from possessing a firearm, he cannot show that he would suffer

prejudice as a result of the procedural default. One district court has explained:

> Petitioner is…barred from relief unless he can show that he was actually prejudiced
> – that the alleged Rehaif error "worked to his actual and substantial disadvantage
> infecting his entire [conviction] with error of constitutional dimensions." Frady,
> 456 U.S. at 170, 102 S.Ct. 1584. Indeed, claims of even a constitutional dimension
> raised in a § 2255 motion will be held harmless on collateral review unless the
> alleged error "had a substantial and injurious effect or influence in determining the
> jury's verdict." Fry v. Pliler, 551 U.S. 112, 116, 127 S.Ct. 2321, 168 L.Ed.2d 16
> (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631, 113 S.Ct. 1710, 123
> L.Ed.2d 353 (1993)). Petitioner must therefore show "more than a reasonable
> possibility that the error was harmful," and give the reviewing court a "grave doubt"
> as to whether the alleged error substantially and injuriously affected the outcome
> of Petitioner's case. Davis v. Ayala, 576 U.S. 257, 267-68, 135 S.Ct. 2187, 192
> L.Ed.2d 323 (2015) (internal citations and quotations omitted).

Farlow v. United States, No. CV 20-10679 (SRC), 2021 WL 838351, at *2 (D.N.J. Mar. 5, 2021).

The Third Circuit Court of Appeals on two occasions has addressed a district court's

failure to instruct the jury that the government must prove that the defendant knew about his or

her status at the time he or she possessed a firearm or ammunition. First, in United States v.

Nasir, 982 F.3d 144 (3d Cir. 2020), the defendant was convicted under § 922(g) for being a felon

in possession of a firearm. He appealed his conviction, and while the issue was pending on

appeal, the Supreme Court decided Rehaif. The defendant filed a supplemental brief before the

court of appeals "arguing that his conviction as a felon in possession of a firearm cannot stand

since the government did not provide any evidence to prove the knowledge-of-status element of

the crime." Id. The defendant did not raise the issue before the district court, and, therefore, the

court of appeals reviewed the issue under the "plain error" standard of review, which considers

whether the defendant showed there was "(1) an actual error (2) that is plain or obvious, (3) that

affected 'the outcome of the district court proceedings' and (4) that 'seriously affect[ed] the

fairness, integrity or public reputation of judicial proceedings.'" Nasir, 982 F.3d at 160. Before

beginning its analysis of the merits of the case, the court of appeals recognized that its review of the evidence was limited to the evidence *actually* presented to the jury at trial. In other words, it could not consider evidence that the government *could have* presented (but did not present) to the jury. Id. The court of appeals explained:

> As stated by the Supreme Court in In re Winship, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The government has to prove its case to the "proper factfinder," and "[d]ue process commands that no man shall lose his liberty unless the Government has borne the burden of ... convincing the factfinder of his guilt." Id. In the context of a jury trial such as Nasir's, the requirements of due process are further bolstered by the Sixth Amendment, which allocates the role of "proper factfinder" to the jury, and to the jury alone. Indeed, going back at least as far as Blackstone, it has been a given that the jury – not appellate judges after the fact – must find "the truth of every accusation" for a conviction to be sustained....4 William Blackstone, *Commentaries on the Laws of England*, *343-44. The jury has "an unquestionable right" to decide the case, "for, if the judge's opinion must rule the verdict, the trial by jury would be useless." *Id.* at *354-55. Accordingly, to secure a conviction that is consistent with its constitutional obligations, the government must present evidence to the jury to prove beyond a reasonable doubt every single element of the crime.
>
> …
>
> The question before us thus becomes whether the plain-error standard of review permits us to disregard the demands of the Due Process Clause and the Sixth Amendment and to affirm a conviction when no evidence was presented to the jury on one of the elements of the charged offense. We think the answer to that question has to be no.

Id. at 163.

Turning to the plain-error analysis, the court of appeals noted that the first two steps of the plain-error review analysis were not in dispute. The court considered the third step, i.e., whether there existed a reasonable probability that but-for the error, the outcome of the trial would have been different. The court of appeals explained that the government did not present *any* evidence to show that the defendant knew he was a felon at the time he possessed the firearm, and, therefore, it was "at least reasonably probable, if not certain, that the jury would not

134

have found there was proof beyond a reasonable doubt of the knowledge-of-status element, if it had known it was required to consider that element." Id. at 171.

With respect to the fourth step of the plain-error analysis, i.e., whether the court "should exercise…[its] discretion to notice the error because it is of a sort that would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings[,]'" the court of appeals explained:

> Nasir was deprived of the right to have a jury consider whether the government had proven him guilty beyond a reasonable doubt on every element of the § 922(g) charge. As forcefully described in the concurrence on this point, upholding that outcome would amount to an appellate court, in the jury's stead, "mak[ing] a factual determination on an unproven element of an offense by considering documents outside the evidentiary record," in derogation of the Sixth Amendment. (J. Matey Concurrence at 180.) Whether viewed as a matter of the Fifth Amendment's guarantee of due process or the Sixth Amendment's promise of trial by jury, or both, a deprivation of those essential rights "seriously impugns 'the fairness, integrity and public reputation of judicial proceedings[,]' " and thus satisfies step four of Olano. Gaydos, 108 F.3d at 509 (quoting Olano, 507 U.S. at 732, 113 S.Ct. 1770).

Nasir, 982 F.3d at 175. Based upon its plain error review, the court of appeals vacated the defendant's felon-in-possession conviction and remanded the case for a new trial.  Id. at 177.

In United States v. Boyd, 999 F.3d 171 (3d Cir. 2021), the defendant was convicted of possessing a firearm while subject to a domestic violence protective order in violation of § 922(g)(8). Before the issuance of Rehaif, the defendant's counsel argued to the district court that the jury instructions should include the requirement that the government prove beyond a reasonable doubt that the defendant knew he was subject to a domestic violence protective order when he possessed the firearm. The district court, however, did not include the defendant's requested instruction in its instructions to the jury. Id. at 179. After the defendant was convicted, the Supreme Court decided Rehaif. The defendant appealed his conviction and raised, among other issues, the district court's failure to instruct the jury that the government had the burden to prove that he knew he was subject to a domestic violence protective order when he possessed the

135

firearm. Id. The court of appeals applied the "harmless error" standard of review, which meant it could not reverse the district court " if the Government show[ed]…'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 179 (quoting Neder v. United States, 527 U.S. 1, 15 (1999)). Citing to Nasir, the court of appeals limited its review to the trial record. Id.

The court of appeals noted that it "'doubt[ed] that the obligation to prove a defendant's knowledge of his status will be as burdensome' as some may suggest, even under the most restrictive possible formulations of the knowledge requirement." Id. (quoting Rehaif, 139 S. Ct. at 2198). The court found that there existed in the trial record before the court "overwhelming record evidence" that the defendant knew he was subject to a domestic violence protective order at the time he possessed the firearm. Id. at 180-81. The court explained:

> Items of evidence included personal service of the ex parte order—a full two weeks before the state court hearing—that listed the terms required by § 922(g)(8) and set the time and place of the hearing. App. at 244–49, 544, 548. And any doubt is resolved by evidence that Boyd was actually aware of the order and its terms. A Secret Service agent testified that Boyd, during the agency's investigation, told him that Boyd's family had an order of protection against him. App. at 234. And further, Boyd's actions demonstrate knowledge of two terms in the order: (1) he apparently attempted to sidestep the "no contact" term by asking his sister to convey secret messages to Connor because he could not communicate with him directly, App. at 315, 571, 579, and (2) he acknowledged the protective order's mental health assessment term in a letter to the state court judge. App. at 491. It is illogical to believe Boyd lacked knowledge of terms #2 and #3 in the order (the § 922(g)(8) prohibitions) when he demonstrated his knowledge of terms #1 and #11 (the "no contact" and mental health provisions). Likewise, Boyd does not argue that he lacked knowledge that Jennifer, his ex-wife and the mother of his son, qualified as an "intimate partner," nor does he present any evidence that would disprove that reasonable inference.

Boyd, 999 F.3d at 180 n.6. The court of appeals found the evidence that the defendant knew about his status was "so strong it could conceivably support a finding that..[the defendant] knew he could not legally possess a firearm, a bar far higher than the Government's actual burden." Id. at 182.

The court concluded under those circumstances that even if the district court correctly instructed the jury that they were to consider whether the defendant knew he was subject to a domestic violence protective order that they would have reached the same results and convicted him. Id.

Nasir and Boyd are instructive in this case to determine whether Zareck suffered actual prejudice because this court did not instruct the jury that the government had the burden to prove beyond a reasonable doubt that Zareck knew he was a felon or an unlawful user of controlled substances to convict him. The court of appeals in both cases considered whether the defendants were prejudiced by the district court's errors. In Nasir, the jury did not hear any evidence that the defendant knew about his status, and, thus, the defendant was prejudiced because the jury would have acquitted him but-for the district court's failure to properly instruct the jury in accordance with Rehaif. On the other side of the spectrum, in Boyd, there was overwhelming evidence that the defendant knew he was subject to a domestic violence protective order when he possessed the firearm. The court of appeals held that under those circumstances, the result of the trial would have been the same,  and, therefore, the district court's error was harmless.

Here, there was sufficient evidence presented for the jury to find beyond a reasonable doubt that Zareck knew he was a felon and an unlawful user of controlled substances. With respect to Zareck's status as a felon, he informed Rodgers during a recorded telephone call from the Allegheny County Jail that the federal government placed a detainer on him because he was a convicted felon. Rodgers responded that she had told Zareck that he could not possess the shotgun because he was a convicted felon. Indeed, based upon the foregoing conversation between Rodgers and Zareck, the government argued to the jury during closing arguments: "The defendant knew with crystal clarity that he possessed this firearm and wasn't allowed to have it.

He knew that he was going to have to do some fed time." (T.T. 11/19/2012 (ECF No. 302) at 13.)

The case against Zareck to show that he knew he was an unlawful user of controlled substances is even stronger. There existed overwhelming evidence to show that Zareck was an unlawful user of controlled substances, which—by itself—was strong circumstantial evidence that Zareck knew he was an unlawful user of controlled substances, i.e., "a current user of a controlled substance in a manner other than as prescribed by a licensed physician." 27 C.F.R. § 478.11. Wintruba testified that Zareck told him he used heroin and crack cocaine the day before his arrest and was in Homestead, Pennsylvania on the day of his arrest to purchase more drugs. The jury also heard evidence that Zareck was a licensed pharmacist, which was circumstantial evidence that Zareck knew that smoking crack cocaine and using prescription medication in larger doses than what was prescribed was unlawful, and, thus, he was an unlawful user of controlled substances. Under those circumstances, there existed overwhelming evidence upon which the jury could have beyond a reasonable doubt that Zareck knew he was an unlawful user of controlled substances.

Based upon the foregoing, Zareck failed to show that—based upon the trial record—he was *actually* prejudiced because this court did not instruct the jury that the government had to prove beyond a reasonable doubt that he knew he was an unlawful user of controlled substances or a felon. In other words, he did not show more than a reasonable possibility that the error was harmful. Thus, even if Zareck could show cause for his failure to raise this issue on appeal, he did not show that he will be prejudiced if the court does not address the issue.

### 2. Actual Innocence

Zareck argues that he is actually innocent of violating § 922(g)(1) and (3) because he did

not know he was a felon or an unlawful user of a controlled substance at the time he possessed

the firearm and ammunition. The Third Circuit Court of Appeals has explained:

> To establish actual innocence, "a habeas petitioner must 'persuade[ ] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.' " Cristin v. Brennan, 281 F.3d 404, 420 (3d Cir.2002) (quoting Schlup v. Delo, 513 U.S. 298, 329, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). Actual innocence means "factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). The Supreme Court has required a petitioner "to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324, 115 S.Ct. 851 (emphasis added); see also Cristin, 281 F.3d at 420. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324, 115 S.Ct. 851; see also Werts v. Vaughn, 228 F.3d 178, 193 (3d Cir.2000) (noting that the actual innocence exception "will apply only in extraordinary cases").

Sweger v. Chesney, 294 F.3d 506, 522–23 (3d Cir. 2002).

For the same reasons Zareck cannot show that he was prejudiced by the procedural

default, i.e., sufficient evidence was presented to the jury for it to find beyond a reasonable doubt

that he knew he was a felon and an unlawful user of a controlled substance, he cannot prove that

he is actually innocent in this case. Duell, 2021 WL 858445, at *6 (explaining that the

"[d]efendant…[could not] show actual innocence for the same reasons that he…[could not]

establish actual prejudice[,]" i.e., defendant "served multiple terms of incarceration in excess of

1 year before…[he possessed the firearm in issue]").

Additionally, in 1991, a Pennsylvania jury found Zareck guilty of four drug offenses.

(Presentence Investigation Report (ECF No. 255) ¶ 51.) Zareck was sentenced at two of the four

counts to a term of imprisonment of 3 to 7 years. Zareck served approximately 3 years in prison

on those charges. (Id.) Courts have held that under those circumstances, a defendant cannot show

that he is actually innocent of violating § 922(g)(1) because "no reasonable juror" could find that

the defendant did not know that he or she was a convicted felon. See e.g., Wood, 2021 WL

1022693, at *8; Duell, 2021 WL 858445, at *6; United States v. Saunders, No. CR 10-442, 2020

WL 5569785, at *5 (E.D. Pa. Sept. 17, 2020); United States v. Roberts, No. CR 15-387, 2020

WL 6700918, at *5 (E.D. Pa. Nov. 13, 2020). Thus, even if Rehaif was retroactively appliable on

collateral review, the claim is procedurally defaulted and Zareck has not shown cause and

prejudice or actual innocence. Under those circumstances, Zareck could not raise his

procedurally defaulted Rehaif argument before this court.

**VII.    Conclusion**

For the reasons set forth in this opinion, Zareck's motion for expansion of the record and

enlargement of page limit will be granted, Zareck's § 2255 motion will be denied, and Zareck's

motion to supplement the § 2255 motion will be denied. An appropriate order will be entered.

**VIII.   <u>Certificate of Appealability</u>**

When a district court issues a final order denying a § 2255 motion, the court must also

make a determination about whether a certificate of appealability ("COA") should issue or the

clerk of the court of appeals shall remand the case to the district court for a prompt determination

about whether a certificate should issue. See 3d Cir. LAR. 22.2.

> When the district court denies a habeas petition on procedural grounds without
> reaching the prisoner's underlying constitutional claim, a COA should issue when
> the petitioner shows, at least, that jurists of reason would find it debatable whether
> the petition states a valid claim of the denial of a constitutional right and that jurists
> of reason would find it debatable whether the district court was correct in its
> procedural ruling.

Slack v McDaniel, 529 U.S. 473, 484-85 (2000).

Based upon the motion, files and records of the instant case, and for the reasons set forth

above, the court finds that petitioner did not show a denial of a constitutional right. Therefore, a

COA should not issue.

An appropriate order will be entered.

                                        BY THE COURT,

Dated: September 23, 2021               /s/ JOY FLOWERS CONTI
                                        Joy Flowers Conti
                                        Senior United States District Court Judge

cc:     RAYMOND ZARECK
        USMS 02604-068
        Unit D4
        FCI EDGEFIELD
        P.O. BOX 725
        EDGEFIELD, SC 29824